**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (*pro hac vice* forthcoming)
Jennifer E. Wuebker (D.C. Bar No. 1035039)
Nicholas S. Monico (*pro hac vice* forthcoming)
951 E. Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Proposed Counsel for Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Compass Coffee, LLC,** | |
| **Debtor.** | **Case No. 26-00005 (ELG)** |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION
FINANCING; (II) AUTHORIZING THE DEBTOR TO USE CASH
COLLATERAL; AND (III) GRANTING ADEQUATE PROTECTION**

The above-captioned debtor and debtor in possession (the "***Debtor***"), by and through its

undersigned counsel, hereby moves (the "***Motion***") for entry of interim and final orders,

substantially in the form attached hereto as <u>Exhibit A</u> (the "***Interim Order***"),[1] (i) authorizing the

Debtor to obtain post-petition financing, (ii) authorizing the Debtor to use cash collateral, and

(iii) granting adequate protection to the prepetition Secured Creditors (defined below). In support

thereof, the Debtor respectfully represents as follows:

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Interim Order.

## I.    Preliminary Statement

1.    The Debtor requires immediate access to liquidity in order to address working capital needs and complete the process of selling substantially all of its assets or otherwise effectuating a value maximizing transaction through this case.

2.    As explained in the *Declaration of Michael Haft in Support of Chapter 11 Petition and First Day Pleadings of Compass Coffee, LLC* (the "**M. Haft Declaration**"), while the Debtor projects that it will have sufficient funds, between cash on hand and the continued use of cash collateral generated by the operation of the business, to pay debt service and operational expenses incurred in the ordinary course of business post-petition (provided that it has authority to use cash collateral), the Debtor will not have sufficient funds to cover the restructuring costs of a chapter 11 sale process absent post-petition financing.    Accordingly, the Debtor has obtained a commitment from National Investment Group, Inc. (the "**DIP Lender**") for a secured, junior post-petition financing in the principal amount of $450,000 (the "**DIP Facility**") as set forth in the Junior Secured Superpriority Financing Agreement (the "**DIP Credit Agreement**") by and between the Debtor and the DIP Lender attached hereto as Exhibit B.

3.    The DIP Lender is a prepetition investor in the Debtor, holding voting equity interests in the Debtor totaling 5.04% and Series A shares totaling 8.83%.  The DIP Lender is also a holder of prepetition unsecured convertible notes owed by the Debtor.  However, the DIP Lender is neither an "affiliate" nor an "insider" of the Debtor under sections 101(a)(2) or (31) of the Bankruptcy Code, respectively, as a result of these holdings.  Nevertheless, as set forth in the M. Haft Declaration, the Debtor disclosed that shareholders in the DIP Lender include entities owned by relatives of the majority owner of the Debtor, Michael Haft.

4.    The DIP Lender agreed to provide a modest DIP Facility on terms favorable to the Debtor to permit the Debtor to have sufficient funds to cover the fees and expenses reasonable and

necessary to conduct a chapter 11 sale process and allow the Debtor to sell its business as a going concern as the best means to maximize value to creditors of the Debtor. Namely, in exchange for the DIP Facility, the Debtor only has agreed to provide junior liens and superpriority claims to the DIP Lender. The Debtor is not required to pay any upfront points for the DIP Facility and only has to pay a modest interest rate on the funds actually borrowed. There is no interest owed on funds committed but not drawn on the DIP Facility. There is no "roll-up" or other attempt to secure the prepetition unsecured notes owed by the Debtor to the DIP Lender.

5. After reasonable inquiry, the Debtor does not believe that alternative sources of financing are available on better terms. In addition, the Debtor was not able to obtain post-petition financing for the sale process with unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

6. The Debtor is seeking interim authority to immediately borrow $100,000 of the $450,000 proposed DIP Facility (the "***Interim Financing***") to reserve for fees and expenses incurred during the interim period and as a backstop for cash needs to operate the business during that same interim period in the event of unexpected expenses beyond the forecasted cash collateral interim budget (the "***Budget***"), which is attached as <u>Schedule 1</u> to the Interim Order . The Debtor's immediate access to these funds also is critical to reassure its employees, vendors, customers, and other constituencies that the Debtor will be in a position to meet its obligations during the pendency of this chapter 11 case. Nevertheless, to provide for transparency and protection during the interim period and as set forth in the Interim Order, the Debtor proposes to provide five (5) days' notice to the U.S. Trustee and counsel for any official committee of unsecured creditors appointed in this case, if any, before using any amount of the Interim Financing.

3

7.      The Debtor has four creditors (collectively, the "***Secured Creditors***") that have filed financing statements claiming liens on collateral belonging to the Debtor,[2] and the claims of those creditors total about $1.7 million:

    a.  EagleBank currently is owed $643,779.25 on a term loan, which is the subject of a forbearance agreement.

    b.  The Small Business Administration (the "***SBA***") currently is owed $464,782.07 on a disaster assistance loan made to the Debtor following the COVID-19 pandemic.

    c.  Square Financial Services, Inc. ("***Square***"), which provided receivables financing for some of the cafes, currently is owed $518,083.19.

    d.  inKind Card, Inc. ("***inKind***") operates an innovative financing and rewards platform for restaurants, bars, and coffee shops like Debtor, providing merchants with upfront working capital by purchasing large blocks of food and beverage credits—essentially electronic gift cards—at a significant discount.  In return, inKind markets and sells these credits to consumers through its mobile app, where users can buy credits often with bonuses (such as earning 20% back on purchases), redeem them seamlessly at Borrower cafes for food, drinks, or other items, and access exclusive perks, thereby driving increased foot traffic, higher spending, and customer loyalty to the merchants.  Pursuant to an April 9, 2025, agreement with the Debtor, inKind agreed to pay $120,000 for $240,000 worth of credits, allowing the Debtor to access immediate funds upon completing onboarding tasks like integrating the app and providing marketing materials.  inKind handles sales, technology, and promotions to ensure the credits are redeemed over time.  The balance of credits owed to inKind is approximately $100,000.  inKind asserts a security interest in connection with the purchase agreement, however Compass has been unable to determine the grounds on which inKind asserts such a security interest and reserves all rights with respect thereto.  Compass currently is in compliance with its obligations to inKind.

8.      As adequate protection for the use of cash collateral, the Debtor seeks authority to grant any Secured Creditors with an interest in cash collateral replacement liens in the same extent,

---

[2]  The listing of these claims shall not constitute, nor is it intended to constitute, an implication or admission as to the validity or priority of any claim or lien against the Borrower or its property, a waiver of the Borrower's, or any party in interest's, rights to subsequently dispute such claim or lien, a promise or requirement to pay any prepetition claim, an implication or admission that any particular claim is of a type specified, or any waiver of the Borrower's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.

nature and priority as of the commencement of this chapter 11 case and continued payment of debt service during the sale process.

9.      In accordance with rule 4001 Federal Rule of Bankruptcy Procedure (the "***Bankruptcy Rules***") and rules 4001-2 and 4001-3 of the Local Rules of the Bankruptcy Court for the District of Columbia (the "***Local Rules***"), the following is a concise statement and summary of the material provisions regarding the DIP Facility and the Debtor's proposed use of cash collateral:[3]

---

[3]    The summary of the Interim Order is qualified in all respects by reference to the DIP Credit Agreement and Interim Order, as applicable, and to the extent of any inconsistency between this Motion and the DIP Credit Agreement and Interim Order, the DIP Credit Agreement or Interim Order, as applicable, shall govern.

Capitalized terms used in the summary but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

| Material Terms | Summary of Material Terms |
|---|---|
| **Parties to the DIP Facility and Relationship to Debtor**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(iii)** | **DIP Borrower**:<br><br>Compass Coffee, LLC<br><br>*See* DIP Credit Agreement, Intro Paragraph, "Borrower."<br><br>**DIP Lender**:<br><br>National Investment Group, Inc.<br><br>*See* DIP Credit Agreement, Intro Paragraph, "Lender."<br><br>The DIP Lender is neither an "affiliate" nor an "insider" of the Debtor under sections 101(a)(2) or (31) of the Bankruptcy Code. |
| **Borrowing Limits**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1) and 4001-3(a)(2)** | Aggregate principal amount of up to $450,000 (the "***Borrowing Limit***") upon entry of a final order by the Bankruptcy Court approving the DIP Motion (the "***Final DIP Order***"), with up to $100,000 (the "***Interim Limit***") upon entry of an interim order by the Bankruptcy Court approving the DIP Motion on an interim basis (the "***Interim DIP Order***").<br><br>*See* DIP Credit Agreement, ¶ 2; Interim Order, ¶ 2. |
| **Budget**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-2(a)(1)(iii)** | A copy of the Budget is attached as **Schedule 1** to the Interim Order. |
| **Interest Rate**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(i)** | Interest shall accrue on the principal amount outstanding from time to time hereunder at the annual rate of ten percent (10%), and such interest shall be paid upon the Maturity Date.<br><br>*See* DIP Credit Agreement, ¶ 6. |

| Material Terms | Summary of Material Terms |
|---|---|
| **Maturity**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(i)** | All Advances borrowed by Borrower from Lender pursuant to the DIP Credit Agreement shall be due and payable in full, without notice, demand or offset upon the earliest of (a) the consummation of a sale of substantially all of the Borrower's assets pursuant to section 363 of the Bankruptcy Code in the Chapter 11 Case, (b) the effective date of a confirmed plan of reorganization or liquidation in the Chapter 11 Case, (c) dismissal or conversion of the Chapter 11 Case, (d) the date on which the Lender's obligation to make advances under the DIP Credit Agreement is terminated following an Event of Default (defined below), or (e) April 30, 2026 (unless extended by agreement of the Borrower and Lender).<br><br>*See* DIP Credit Agreement, ¶ 7. |
| **Events of Default**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(i)** | The following shall constitute an event of default ("***Event of Default***") under the DIP Credit Agreement:  the failure to obtain final Bankruptcy Court approval for all sums advanced under this DIP Credit Agreement. Following an Event of Default, all advances borrowed by Borrower from Lender pursuant to this DIP Credit Agreement shall be due and payable in full and Lender shall have no further obligations to make any advances to the Borrower under the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, ¶ 12. |
| **Priority of Claims and Liens; Collateral**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(i)** | As security for the Advances made by the Lender to the Borrower under the DIP Credit Agreement, the Borrower grants the Lender valid and perfected liens junior to any liens held by the Secured Creditors, if any, on all property of the Borrower in the principal amount outstanding hereunder. The liens granted hereunder shall be junior-priority to any valid liens, if any, held by any of the Secured Creditors.<br><br>*See* DIP Credit Agreement, ¶ 9; Interim Order, ¶ 6.<br><br>The Borrower grants the Lender superpriority senior administrative expense claims, as provided for and to the full extent allowed by sections 503(b) or 507(b) of the Bankruptcy Code, against the Borrower with priority over any and all administrative expense claims against the Borrower and its estate, now existing or hereafter arising, of any kind or nature whatsoever, subject only to the payment of the Carve-Out (as defined below).<br><br>*See* DIP Credit Agreement, ¶ 10; Interim Order, ¶ 4. |

| Material Terms | Summary of Material Terms |
|---|---|
| **Carve-Out**<br><br>**Bankr. R. 4001(c)(1)(B)**<br><br>**Local Bankr. R. 4001-3(a)(1)(i)** | The term "***Carve-Out***" shall mean the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717; (ii) Bankruptcy Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000, and (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, including transaction fees or similar fees (the "***Allowed Professional Fees***"), actually incurred by persons or firms retained by the Borrower pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and persons or firms retained by the committee of unsecured creditors appointed in the Chapter 11 Case (the "***Committee***"), if any, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***"), at any time before or on the first calendar day following delivery by the Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $150,000 incurred after the first calendar day following delivery by the Lender of the Carve-Out Trigger Notice,  to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***").  The Term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email by the Lender to counsel to the Borrower, the U.S. Trustee, and counsel to the Committee, if any, which notice may be delivered following the occurrence of and during the continuance of an Event of Default expressly stating that the Post-Carve-Out Trigger Notice Cap is triggered.<br><br>*See* DIP Credit Agreement, ¶ 11; Interim Order, ¶ 5. |
| **Parties with Interest in Cash Collateral**<br><br>**Bankr. R. 4001(b)(1)(B)(i)**<br><br>**Local Bankr. R. 4001-2(1)(i)** | The Debtor believes that one or more of the Secured Creditors may have an interest in the cash collateral.  The Debtor does not concede that any party has a perfected security interest in the cash collateral.  For purposes of this Motion, however, and the interim hearing thereon, the Debtor will presume that the Secured Creditors have a perfected security interest in the Debtor's cash collateral and are entitled to adequate protection of such interest.<br><br>*See* Interim Order, ¶ E. |

| Material Terms | Summary of Material Terms |
|---|---|
| **Purpose and Use of Cash Collateral and Material Terms**<br><br>**Bankr. R. 4001(b)(1)(B)(ii) and Bankr. R. 4001(b)(1)(B)(iii)** | The Debtor will use the cash collateral, in accordance with the Budget (subject to a 10% variance for each line item), to fund this Chapter 11 case and operate its business.<br><br>*See* Interim Order, ¶ 7. |
| **Adequate Protection Obligations**<br><br>**Bankr. R. 4001(b)(1)(B)(iv)** | The Debtor shall grant the Secured Creditors, as adequate protection, solely to the extent of the diminution in the value of the cash collateral, a valid, perfected and enforceable security interest in and upon the cash collateral (i) to the extent the cash collateral is used by the Debtor, and (ii) to the same extent, nature and priority held by the Secured Creditors as of the Petition Date.<br><br>*See* Interim Order, ¶ 8.<br><br>The Debtor also agrees to continue to pay debt service to the Secured Creditors during the sale process consistent with past practice.<br><br>*See* Interim Order, ¶ 8. |
| **Waiver or Modification of Applicable Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br><br>**Bankr. R. 4001(c)(1)(B)(vii)** | The Adequate Protection Liens granted under the Interim Order shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities set forth in the Interim Order, effective as of the date of the Interim Order, without the necessity for creating, filing, recording or serving any financing statements or other documents that might otherwise be required.<br><br>*See* Interim Order, ¶ 9. |

10.     Further, in accordance with rule 4001-2 of the Local Rules, the Debtor states as follows:

      a.     there is no insider relationship between the Debtor and the Secured Creditors;

      b.     the source of the cash collateral is cash from collection of receivables due from customers;

c.  a cash flow projection for the period which interim authorization is sought including both projected revenue and a line-item proposed budget is included in the Budget.

d.  as of the Petition Date (as defined below), the Debtor owed the Secured Creditors approximately $1.7 million, inclusive of unpaid interest, costs, and fees; and

e.  the Debtor pledged all its assets, including cash and accounts, as more fully described in the applicable loan documents, to secure the Debtor's obligations to one or more of the Secured Creditors.

## II.    Jurisdiction, Venue, and Predicates for Relief

11.    The United States Bankruptcy Court for the District of Columbia (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

12.    The predicates for the relief requested herein are sections 105, 361, 363, 364(c), 364(d), 506, and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Bankruptcy Rules 4001, 6003, and 9014, and Local Rules 4001-2 and 4001-3.

## III.    Background

### A.    Chapter 11 Case

13.    On January 6, 2026 (the "***Petition Date***"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court initiating the above-captioned case (the "***Case***").  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108(a) of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or statutory committee of creditors has been appointed in this Case.

14.    The Debtor owns and operates 25 cafés in leased premises in Washington D.C., Maryland, and Northern Virginia.

15.     As explained in the M. Haft Declaration,[4] after years of struggling financially since the COVID-19 pandemic, the Debtor has determined that selling the business as a going concern through this chapter 11 case likely represents the best means to preserve jobs and landlord and vendor relationships, and maximize the recoveries for creditors.

16.     Beginning in May 2021, the Debtor began marketing itself for sale as a going concern through outreach to numerous industry contacts.  Multiple suitors have expressed interest in exploring transactions that would result in the sale of some or substantially all of the assets of the company, recently culminating in a proposed transaction that the Debtor believes is acceptable, subject to a chapter 11 auction process.

17.     After more than two months of active negotiations with one such suitor, the Debtor has agreed, subject to this Court's approval, to sell substantially all of its assets to a strategic buyer with a substantial, global presence in the retail coffee business.  The Debtor expects to file with the Court within days of its bankruptcy filing an asset purchase agreement to document the proposed sale.  The agreement will be filed with proposed sale procedures to allow for the market-testing of the proposed sale price, subject to agreed provisions about the conduct of the sale process.  The sale procedures will also propose to designate the strategic buyer as the "stalking horse" and seek approval of certain stalking horse protections meant to protect the strategic buyer's investment of time and money in pursuing its stalking horse purchase agreement.

18.     The proposed sale is contemplated to be a sale of assets of the business as a going concern, free and clear of claims, except those expressly assumed.  The Debtor expects through the sale to pay its secured lenders in full, to pay the restructuring costs incurred to conduct the

---

[4]     Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this case is set forth in the M. Haft Declaration filed contemporaneously herewith, and incorporated herein by reference.

chapter 11 sale process, and to have additional proceeds sufficient to make a distribution to unsecured creditors through the chapter 11 case.

19.     The Debtor's access to liquidity, as sought herein, is necessary for the Debtor to fund the restructuring costs of a chapter 11 sale process and continue operations during this bankruptcy case.

## IV.     Relief Requested

20.     By this Motion, the Debtor seeks entry of interim and final orders: (i) authorizing the Debtor to obtain post-petition junior secured, superpriority financing from the DIP Lender pursuant to the DIP Credit Agreement substantially in the form attached as Exhibit 2 to the Interim Order; (ii) authorizing the Debtor to use cash collateral pursuant to the Budget (subject to a 10% variance for each line item); (iii) approving adequate protection for the Secured Creditors in the form of replacement liens in the same extent, nature and priority as of the commencement of this Case and continued payment of debt service during the sale process; (iv) waiving any applicable stay (including under Bankruptcy Rule 6004); and (v) scheduling a final hearing to consider final approval of the DIP Facility.

## V.     Basis for Relief

### A.     The Debtor Should be Authorized to Access the DIP Facility

21.     Section 364(c) of the Bankruptcy Code permits a debtor to obtain post-petition financing and, in return, to grant superpriority administrative status and liens on its property, provided that the debtor demonstrates that it could not obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. *See* 11 U.S.C. § 364(c).

22.     Here, given all the facts and circumstances present in this Case, the Debtor has amply satisfied the necessary conditions under section 364(c) of the Bankruptcy Code for authority

to enter into the DIP Facility.  Importantly, to fund the chapter 11 sale process and provide a backstop for cash needs to operate the business, the Debtor exercised proper business judgment in securing a commitment for a junior DIP Facility on terms favorable to the Debtor.  Moreover, the Debtor was not otherwise able to obtain credit on an unsecured or administrative expense basis.

### i. Entry Into the DIP Facility Reflects the Debtor's Reasonable Business Judgment and also Satisfies the Heightened Scrutiny Standard

23.     Courts grant considerable deference to a debtor's business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Estrada*, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

24.     Further, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

25.     Indeed, while the DIP Lender is neither an "affiliate" nor an "insider" of the Debtor under sections 101(a)(2) or (31) of the Bankruptcy Code, the Debtor also satisfies the "heightened scrutiny" standard, to the extent the Court applies it because shareholders in the DIP Lender include entities owned by relatives of the majority owner of the Debtor, Mr. Haft.  *See In re Latam Airlines Group S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (holding that "courts apply a 'heightened scrutiny' test in assessing the *bona fides* of a transaction among a debtor and an insider of the debtor").  "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Tr.*, 442 B.R 227, 231 (Bankr. S.D.N.Y. 2010).

26.     For the reasons set forth above, entry into the DIP Facility is a reasonable exercise of the Debtor's business judgment and also satisfies the heightened scrutiny standard.  As explained above, the terms of the DIP Facility are fair and reasonable.  Moreover, absent approval of the DIP Facility, the Debtor will not have liquidity to fund the restructuring costs of a chapter 11 sale process and maximize the value of the Debtor's estate for its stakeholders.

27.     The DIP Lender agreed to provide a modest DIP Facility on terms favorable to the Debtor as a favor to Mr. Haft and to ensure that the Debtor has sufficient funds to cover the fees and expenses reasonable and necessary to conduct a chapter 11 sale process and allow the Debtor to sell its business as a going concern.  The proposed strategic purchaser identified by the Debtor is requiring that the Debtor conduct a section 363 sale as a requirement of the sale transaction.  As set forth in the M. Haft declaration, the Debtor intends to file a sale motion in short order.  Moreover, the proposed sale will be for a price that is projected to result in sufficient funds for the Debtor to pay the Secured Creditors in full, pay the restructuring costs incurred to conduct the 363

sale, including repaying the DIP Facility in full, and have additional proceeds sufficient to make a distribution to unsecured creditors through the bankruptcy case.

**B.      The Debtor Should Be Authorized to Grant Junior Liens and Superpriority Claims to the DIP Lender**

28.      Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain post-petition financing on secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

29.      Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether:

> (a)      the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative expense claim;

> (b)      the credit transaction is necessary to preserve the assets of the estate; and

> (c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

30.      In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan* Ass'n *(In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made

reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

31. Here, the Debtor used reasonable, good faith efforts to try to obtain credit other than on a junior secured superpriority basis. Despite such efforts, the Debtor does not have any actionable financing alternatives on an unsecured or nonpriority basis that are sufficient to satisfy the Debtor's post-petition financing needs. While the DIP Lender was willing to provide favorable terms, it understandably wanted reasonable protections for its risk. The Debtor does not believe that it could obtain post-petition financing on terms more favorable than those in the DIP Facility, including the junior liens and superpriority claims. Indeed, by agreeing to provide only junior liens, the Debtor will avoid a lengthy and costly priming fight with the Secured Creditors.

**C.      Use of Cash Collateral Should be Approved**

32.      Section 363(c)(2) of the Bankruptcy Code governs the Court's approval of the use of cash collateral and provides that a debtor-in-possession may not use cash collateral without the consent of the secured party or approval of the Court.  11 U.S.C. § 363(c)(2).  By obtaining approval from the Court to use cash collateral, however, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral.  *See, e.g.*, *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

33.      To the extent the Debtor's cash on hand represents "cash collateral," it is subject to the use restriction set forth in section 363(c)(2) of the Bankruptcy Code.  The Debtor, therefore, seeks to use the cash collateral, pursuant to the Budget (subject to a 10% variance for each line item), to operate its business.  Specifically, the Debtor requires use of the cash collateral to allow it to (i) pay vendors, (ii) meet its payroll and benefit obligations to employees, (iii) preserve and protect its assets, (iv) continue payment of debt service to Secured Creditors, and (v) otherwise pay obligations necessary for the continued operation of its business.

34.      The Debtor believes its potential value as a going concern is greater than the liquidation value of its assets.  As a consequence, the Debtor's creditors are likely to receive substantially less if the Debtor ceases operations than they would if the Debtor is authorized to use the cash collateral and remain in business, thereby preserving the opportunity to potentially realize value on a going concern basis.

35.      Without authorization from the Court to immediately use the cash collateral, the Debtor submits that it will be left without a source of working capital and will be unable to operate its business and thereby preserve the value of its estate.

36.     It is well established that bankruptcy courts, where possible, resolve issues in favor of preserving the business of the debtor as a going concern.

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use cash collateral in its effort to rebuild.  Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984).

37.     Accordingly, courts authorize the use of cash collateral to enhance or preserve a debtor's going concern value.  For example, in *In re Stein*, the Court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's secured position could only be enhanced by the continued operation of the debtor's business.  19 B.R. 458, 460 (Bankr. E.D. Pa. 1982); *see also In re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993); *Federal Nat. Mort. V. Dacon Bolingbrook Assoc.*, 153 B.R. 204, 204 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Constable Plaza Assoc.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage); *In re Dynaco Corp.*, 162 B.R. 389, 395-96 (Bankr. D. N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) [Docket No. 93] (Bankr. E.D. Va. March 13, 2020) (finding the debtors had an immediate need to use cash collateral to enable the orderly continuation of their operations and to administer and preserve the value of their estates); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) [ Docket No. 84] (Bankr. E.D. Va. May 5, 2020)

(same); *In re The Gymboree Corp.*, No. 17-32986 (KLP) [Docket No. 348] (Bankr. E.D. Va. July 11, 2017) (same).

38.     Accordingly, to avoid immediate and irreparable harm, the Debtor requires immediate use of cash collateral for the payment of necessary business expenses and to continue to operate its business in accordance with the Budget (subject to a 10% variance for each line item).

**D.     The Proposed Adequate Protection Should be Approved**

39.     Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide "adequate protection" of such interest.  11 U.S.C. § 363(e).  The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including providing a "replacement lien" to the extent that use of cash collateral results in a decrease in the value of such entity's interest in the cash collateral.  *See* 11 U.S.C. 361(c).

40.     What constitutes adequate protection is evaluated on a case by case basis.  *See Resolution Trust Corp. v. Swedeland Dev. Group Inc. (In re Swedeland Deve. Group Inc.)*, 16 F.3d 552, 564 (3rd Cir. 1994) (*citing MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987)); *In re Franklin Equip. Co.*, 416 B.R. 483, 522-23 (Bankr. E.D. Va. 2009) (citing *Swedeland*, 16 F.3d at 564); *In re Martin*, 761 F.2d 472, 474, (8th Cir. 1985).  Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained.  *See  In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (*citing Swedeland*, 16 F.3d at 564) ("The purpose of 'adequate protection' for a creditor 'is to insure that the creditor receives the value for which he bargained prebankruptcy'"); *see also In re Intelsat S.A.*, No. 20-32299 (KLP), [Docket No. 140] (Bankr. E.D. Va. May 15, 2020) (authorizing debtors to use cash

collateral and granting adequate protection in the form of, among other things, replacement liens on prepetition collateral, superpriority administrative claims pursuant to section 507(b), and fees and expenses).  Courts have noted that "[t]he essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing . . . [and] confirmation."  *In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982); *In re O.P. Held, Inc.*, 74 B.R. 777,782 (Bankr. N.D.N.Y. 1987).  The focus of the requirement is to protect a secured creditor from diminution in value during the use period.  *See Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Beker Indus. Corp.*, 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

41.    Here, to the extent any of the Secured Creditors has a perfected pre-petition security interest in the cash collateral, the Debtor proposes to provide the Secured Creditors a valid, perfected and enforceable security interest (the "***Replacement Lien***") in and upon cash collateral generated post-petition (i) to the extent the cash collateral is used by the Debtor, and (ii) to the same extent, validity, and priority held by such Secured Creditors as of the Petition Date.  The Debtor proposes that the Replacement Lien will be limited only to secure an amount equal to the actual amount of cash collateral used by the Debtor.  The Debtor further proposes that such Replacement Lien will be perfected, enforceable and effective without the necessity of the Secured Creditors taking any further actions with respect thereto.

42.    Further, the Debtor proposes to continue paying debt service obligations to the Secured Creditors during the sale process.

43.    The Debtor respectfully submits that the proposed Replacement Lien and the continued payment of debt service are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection."  Such protections will serve to maintain the value of the cash

collateral during the pendency of this Case and allow the Debtor to maximize the value of its assets

for the benefit of all stake holders.  Thus, the Debtor respectfully requests that the Court approve

the protections proposed in the Interim Order as adequately protecting any interest the Secured

Creditors may have in the cash collateral.

### E.        The DIP Lender Should Be Deemed a Good-Faith Lender

44.        Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

45.        As explained herein, the DIP Facility is the result of: (a) the Debtor's reasonable

business judgment that the DIP Lender provided the best post-petition financing option available

under the circumstances; and (b) arm's-length, good-faith negotiations between the Debtor and the

DIP Lender.  The DIP Facility also easily satisfies the heightened scrutiny standard.  The Debtor

submits that the terms and conditions of the DIP Facility are fair and reasonable.  The DIP Lender

is providing the DIP Facility in "good faith" within the meaning of section 364(e) of the

Bankruptcy Code in express reliance on the protections offered thereby, and the proceeds of the

DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  The

protections afforded by section 364(e) of the Bankruptcy Code are integral, critical, and essential

components of the DIP Facility provided by the DIP Lender.  Accordingly, the Court should find

that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and entitled to all of the protections afforded by that section.

### F.   Approval of Interim Relief

46.   Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2); (c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).  Furthermore, Local Rules 4001-2 and 4001-3 provide that the Court may provide interim relief to use cash collateral or obtain financing as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

47.   As described above, the Debtor's immediate access to the Interim Financing is critical to reassure its employees, vendors, customers, and other constituencies that the Debtor will be in a position to meet its obligations during the pendency of this Case, and establish a reserve for fees and expenses incurred during the interim period and as a backstop for cash needs to operate the business.  As set forth above and in the Interim Order, the Debtor proposes to provide five (5) days' notice to the U.S. Trustee and counsel for any official committee of unsecured creditors appointed in this case, if any, before using the Interim Financing.

### G.      Request for a Final Hearing

48.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is at least fourteen (14) days following service of this Motion, and fix the time and date before the Final Hearing for parties to file objections.

### H.      Request for Waiver of Stay

49.      To implement the forgoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## VI.      <u>Notice</u>

50.      The Debtor will serve notice of this Motion on: (i) the Office of the United States Trustee; (ii) those creditors holding the 20 largest unsecured claims against the Debtor; (iii) the Secured Creditors; and (iv) those parties who receive NextGen CM/ECF notifications.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtor respectfully request the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: January 6, 2026
Richmond, Virginia

Respectfully submitted,

/s/ *Jennifer E. Wuebker*

Tyler P. Brown (*pro hac vice* forthcoming)
Jennifer E. Wuebker (D.C. Bar No. 1035039)
Nicholas S. Monico (*pro hac vice* forthcoming)
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, Virginia 23219
Telephone:    (804) 788-8200
Facsimile:    (804) 788-8218
Email:    tpbrown@hunton.com
    jwuebker@hunton.com
    nmonico@hunton.com

*Proposed Counsel for the Debtor and Debtor in Possession*

## Exhibit A

**Interim Order**

## **Exhibit 1**

**Budget**

## **Exhibit 2**

**DIP Credit Agreement**