# JUNIOR SECURED SUPERPRIORITY FINANCING AGREEMENT

## Dated as of January 6, 2026

THIS JUNIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "**DIP Credit Agreement**") is entered into by and between COMPASS COFFEE, LLC, a Delaware limited liability company (the "**Borrower**"), and NATIONAL INVESTMENT GROUP, a Delaware corporation (the "**Lender**"; together with the Borrower, the "**Parties**").

## RECITALS

**WHEREAS**, the Borrower owns and operates 25 cafés in leased premises in Washington D.C., Maryland, and Northern Virginia.

**WHEREAS**, the Borrower intends to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Columbia (the "**Bankruptcy Court**"), commencing a bankruptcy case (the "**Chapter 11 Case**"), to sell substantially all of its assets pursuant section 363 of the Bankruptcy Code or otherwise effectuate a value maximizing transaction.

**WHEREAS**, the Borrower believes that its potential value as a going concern is greater than the liquidation value of its assets.

**WHEREAS,** while the Borrower projects that it will have sufficient cash on hand and through the continued use of funds generated by the operation of the business to pay debt service and operational expenses incurred in the ordinary course of business post-petition, the Borrower will not have liquidity to fund the restructuring costs of a Chapter 11 sale process absent post-petition financing.

**WHEREAS**, the Borrower has four creditors (collectively, the "**Secured Creditors**") that have filed financing statements claiming liens on collateral belonging to the Debtor[1], and the claims of those creditors total approximately $1.7 million, as follows:

(a)  EagleBank ("**Eagle**") currently is owed $643,779.25 in connection with a term loan, which is the subject of a forbearance agreement.

---

[1] The listing of these claims shall not constitute, nor is it intended to constitute, an implication or admission as to the validity or priority of any claim or lien against the Borrower or its property, a waiver of the Borrower's, or any party in interest's, rights to subsequently dispute such claim or lien, a promise or requirement to pay any prepetition claim, an implication or admission that any particular claim is of a type specified, or any waiver of the Borrower's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.

(b) The Small Business Administration (the "**SBA**") currently is owed $464,782.07 in connection with an Economic Injury Disaster Loan made to Borrower following the COVID-19 pandemic.

(c) Square Financial Services, Inc. ("**Square**"), which provided receivables financing for some of the cafes, currently is owed $518,083.19.

(d) inKind Card, Inc. ("**inKind**") operates an innovative financing and rewards platform for restaurants, bars, and coffee shops like Borrower, providing merchants with upfront working capital by purchasing large blocks of food and beverage credits—essentially electronic gift cards—at a significant discount. In return, inKind markets and sells these credits to consumers through its mobile app, where users can buy credits often with bonuses (such as earning 20% back on purchases), redeem them seamlessly at Borrower cafes for food, drinks, or other items, and access exclusive perks, thereby driving increased foot traffic, higher spending, and customer loyalty to the merchants. Pursuant to an April 9, 2025, agreement with Borrower, inKind agreed to pay $120,000 for $240,000 worth of credits, allowing Borrower to access immediate funds upon completing onboarding tasks like integrating the app and providing marketing materials. inKind handles sales, technology, and promotions to ensure the credits are redeemed over time. The balance of credits owed to inKind is approximately $100,000.

**WHEREAS**, subject to approval of the Bankruptcy Court, the Lender has agreed to provide post-petition financing to the Borrower pursuant to the terms and conditions herein.

**WHERAS**, to secure Borrower's obligations hereunder, the Borrower will grant to Lender valid, perfected and enforceable junior liens in all property of the Borrower and superpriority administrative claims, which junior liens and superpriority administrative claims are a material and necessary condition of Lender's willingness to provide the credit contemplated herein.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrowers and Lender hereby agree as follows:

1. **Bankruptcy Court Approval.** As soon as practical after execution of this Agreement by both Parties and following commencement of the Chapter 11 Case by the Borrower, the Borrower shall file a motion with the Bankruptcy Court (the "**DIP Motion**") seeking, among other things, interim and final orders authorizing the Borrower to obtain post-petition financing from the Lender substantially in the form of this DIP Credit Agreement. The obligations of the Borrower and Lender to consummate the transactions contemplated by this DIP Credit Agreement are conditioned upon Bankruptcy Court approval.

2. **Borrowing Limits**. Aggregate principal amount of up to $450,000 (the "**Borrowing Limit**") upon entry of a final order by the Bankruptcy Court approving the DIP Motion (the "**Final DIP Order**"), with up to $100,000 (the "**Interim Limit**") upon entry of an

interim order by the Bankruptcy Court approving the DIP Motion on an interim basis (the "**_Interim DIP Order_**").

3. **Advances**. "*Advances*" shall mean any amount borrowed by the Borrower from the DIP Lender under this DIP Credit Agreement. Each Advance shall increase the principal amount outstanding hereunder.

4. **Interim Advances.** Prior to entry of a Final DIP Order, and subject to entry of an Interim DIP Order and upon request by the Borrower, Lender shall make interim Advances to the Borrower in amounts requested by the Borrower; provided, however, the aggregate amount of such interim Advances shall not exceed the Interim Limit.

5. **Final Advances.** Subject to entry of a Final DIP Order and upon request by the Borrower, Lender shall make Advances to the Borrower in amounts requested by the Borrower; provided, however, the aggregate amount of such advances shall not exceed the Borrowing Limit. The aggregate amount of all Advances made by Lender to the Borrower under this DIP Credit Agreement, including both interim and final Advances, shall not exceed the Borrowing Limit.

6. **Interest**. Interest shall accrue on the principal amount outstanding from time to time hereunder at the annual rate of ten percent (10%), and such interest shall be paid upon the Maturity Date (defined below).

7. **Maturity**. All Advances borrowed by Borrower from Lender pursuant to this DIP Credit Agreement shall be due and payable in full, without notice, demand or offset upon the earliest of (a) the consummation of a sale of substantially all of the Borrower's assets pursuant to section 363 of the Bankruptcy Code in the Chapter 11 Case, (b) the effective date of a confirmed plan of reorganization or liquidation in the Chapter 11 Case, (c) dismissal or conversion of the Chapter 11 Case, (d) the date on which the Lender's obligation to make advances under this DIP Credit Agreement is terminated following an Event of Default (defined below), or (e) April 30, 2026 (unless extended by agreement of the Borrower and Lender).

8. **Prepayment.** Borrower shall be able to prepay all amounts borrowed by Borrower from Lender pursuant to this DIP Credit Agreement at any time and from time to time without penalty.

9. **Junior Priority Liens.** As security for the Advances made by the Lender to the Borrower under this DIP Credit Agreement, the Borrower grants the Lender valid and perfected liens junior to any liens held by the Secured Creditors, if any, on all property of the Borrower in the principal amount outstanding hereunder. The liens granted hereunder shall be juniorin priority to any valid liens, if any, held by any of the Secured Creditors.

10. **Superpriority Claims.** The Borrower grants the Lender superpriority senior administrative expense claims, as provided for and to the fullest extent allowed by sections 503(b) or 507(b) of the Bankruptcy Code, against the Borrower with priority over any and all

3

administrative expense claims against the Borrower and its estate, now existing or hereafter arising, of any kind or nature whatsoever, subject only to the payment of the Carve-Out (as defined below).

11. **Carve-Out**. For purposes hereof, the "***Carve-Out***" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717; (ii) Bankruptcy Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000, and (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, including transaction fees or similar fees (the "***Allowed Professional Fees***"), actually incurred by persons or firms retained by the Borrower pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and persons or firms retained by the committee of unsecured creditors appointed in the Chapter 11 Case (the "***Committee***"), if any, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***"), at any time before or on the first calendar day following delivery by the Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $150,000 incurred after the first calendar day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***"). The Term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email by the Lender to counsel to the Borrower, the U.S. Trustee, and counsel to the Committee, if any, which notice may be delivered following the occurrence of and during the continuance of an Event of Default expressly stating that the Post-Carve-Out Trigger Notice Cap is triggered.

12. **Event of Default.** The following shall constitute an event of default ("***Event of Default***") under this DIP Credit Agreement: the failure to obtain final Bankruptcy Court approval for all sums advanced under this DIP Credit Agreement. Following an Event of Default, all advances borrowed by Borrower from Lender pursuant to this DIP Credit Agreement shall be due and payable in full and Lender shall have no further obligations to make any advances to the Borrower under this DIP Credit Agreement.

13. **Governing Law**. This DIP Credit Agreement and the rights and obligations of the Parties hereunder shall be construed in accordance with and governed by the law of the District of Columbia without giving effect to the conflict of law principles thereof.

14. **Entire Agreement**. This DIP Credit Agreement embodies the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this DIP Credit Agreement shall affect, or be used to interpret, change or restrict the express terms and provisions of this DIP Credit Agreement.

15. **Binding Effect**. This DIP Credit Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, heirs, personal representatives, legal representatives, and permitted assigns.

16. **Modifications and Amendments.** The terms and provisions of this DIP Credit Agreement may be modified or amended only by written agreement executed by all Parties hereto.

17. **Counterparts.** This DIP Credit Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

18. **Headings**. The descriptive headings in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this DIP Credit Agreement.

19. **Severability**. If any clause or provision hereof shall be deemed unlawful in whole or in part, then such clause or provision shall have no force or effect, as though not herein contained, and the remainder of this DIP Credit Agreement shall remain operative and in full force and effect.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

IN WITNESS WHEREOF, each of the Parties has duly executed this DIP Credit Agreement as of the date first written above.

BORROWER:

COMPASS COFFEE, LLC
a Delaware limited liability company


By: *Michael Haft*
Name: Michael Haft
Title:  Chief Executive Officer




LENDER:

NATIONAL INVESTMENT GROUP, INC.
a Delaware corporation,


By: *Robert Haft*
Name:   Robert Haft
Title:   Manager