**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>**Compass Coffee, LLC,**<br><br>Debtor. | Chapter 11<br><br>Case No. 26-00005 (ELG) |

**DECLARATION OF MICHAEL HAFT IN SUPPORT OF CHAPTER 11**
**PETITION AND FIRST DAY PLEADINGS OF COMPASS COFFEE, LLC**

I, Michael Haft, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of Compass Coffee, LLC ("*Compass*" or the "*Debtor*") and have served in that capacity since the company's founding in 2014. I am authorized to submit this declaration (this "*Declaration*") on behalf of Compass.

2. Except as otherwise indicated, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by Compass's outside professional advisors, or my lay opinion based upon my experience, knowledge, and information concerning the Debtor's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3. On the date hereof (the "*Petition Date*"), the Debtor commenced with this bankruptcy court (the "*Court*") a voluntary case under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").

4. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of this chapter 11 case and in support of the motions the Debtor has filed with the Court contemporaneously herewith (the "*First Day Motions*").

1

A.   **Corporate History and Business Operations**

5.   I co-founded Compass in 2014.  The founders organized the company as a Delaware Limited Liability Company with its first cafe opened in the District of Columbia that same year.  I hold a majority of the equity interests in the company, and there are 22 other persons or entities with minority equity interests in Compass.

6.   Compass currently has 25 retail café locations in DC, southern Maryland, and northern Virginia.  All cafes are operated in locations leased from unrelated parties.

7.   Compass currently employs 166 individuals on a full or part-time basis.  Those employees are based either in its cafe locations or in its headquarters.

8.   Until December 2025, Compass maintained its headquarters in the Ivy City section of DC, at 1401 Okie St. N.E.  The company still owns substantial coffee roasting equipment in that leased location but has moved its other personal property and headquarters personnel from those premises.  Headquarters personnel are now working adjacent to the café located in leased premises at 1535 7th Street NW, Washington DC, 20001.

9.   Compass previously had a coffee distribution business.  Prior to the bankruptcy filing, Compass closed its distribution line of business, sold certain of its equipment and inventory, and used the proceeds to fund the remaining operations.

10.  Compass also has personnel on staff who have performed construction duties in café locations, and when those employees were not being utilized for café work, Compass has on occasion taken on non-café construction projects for third parties. One such project, involving the construction of a bar for an unaffiliated restaurant, is nearing completion.  Upon completion, Compass will need to pay for the plumbing work of several subcontractors and then will be able to collect payment from the owner for the job.  Because Compass does not have other construction

projects currently in the queue and is not expecting to undertake any new café construction work, Compass intends to end the construction line of business previously performed in-house. Compass has concluded there is no value to maintaining or attempting to market that line of business for sale in the present circumstances.

### B. Significant Financial Impacts on the Business

11. The onset of the Covid-19 pandemic in early 2020 had a massive impact on the company. Compass had to modify its customer-facing retail business, which resulted in the loss of considerable revenue and a resulting need to downsize its workforce. During the pandemic, the company developed a coffee roastery and distribution business in an attempt to offset the loss of income from the substantial reduction in cafe traffic.

12. Despite the end of the pandemic, customer traffic remains depressed from pre-pandemic levels due to forces beyond the company's control, including the reduction in government employees and the remote nature of the work of some of the company's customer base in urban areas. While some café locations remain profitable, others are only minimally profitable or unprofitable. In an attempt to overcome the loss of customer traffic, the company has instituted significant overhead reductions to maintain its operating cashflow while attempting to cultivate opportunities for a value-maximizing transaction. In particular, Compass has exited the coffee distribution business and returned its focus to the core business of operating cafes.

### C. Capital Structure

13. Compass has four creditors that have filed financing statements claiming liens on collateral belonging to the Debtor,[1] and the claims of those creditors total about $1.7 million:

---

[1] The listing of these claims shall not constitute, nor is it intended to constitute, an implication or admission as to the validity or priority of any claim or lien against the Debtor or its property, a waiver of the Debtor's, or any party in interest's, rights to subsequently dispute such claim or lien, a promise or requirement to pay any prepetition claim, an implication or admission that any particular claim is of

3

    (a)    EagleBank currently is owed $643,779.25 on a term loan, which is the subject of a forbearance agreement. Compass is current on its payment obligations pursuant to the forbearance agreement.

    (b)    The Small Business Administration (the "**SBA**") currently is owed $464,782.07 on a disaster assistance loan made to Compass following the pandemic. Compass is current on its payment obligations to the SBA.

    (c)    Square, which provided receivables financing for some of the cafes, currently is owed $518,083.19. Compass is current on its payment obligations to Square.

    (d)    inKind operates an innovative financing and rewards platform for restaurants, bars, and coffee shops like Compass, providing merchants with upfront working capital by purchasing large blocks of food and beverage credits—essentially electronic gift cards—at a significant discount. In return, inKind markets and sells these credits to consumers through its mobile app, where users can buy credits often with bonuses (such as earning 20% back on purchases), redeem them seamlessly at Compass cafes for food, drinks, or other items, and access exclusive perks, thereby driving increased foot traffic, higher spending, and customer loyalty to the merchants. Pursuant to an April 9, 2025, agreement with Compass, inKind agreed to pay $120,000 for $240,000 worth of credits, allowing Compass to access immediate funds upon completing onboarding tasks like integrating the app and providing marketing materials. inKind handles sales, technology, and promotions to ensure the credits are redeemed over time. The balance of credits owed to inKind is approximately $100,000. inKind asserts a security interest in connection with the purchase agreement, however Compass has been unable to determine the grounds on which inKind asserts such a security interest and reserves all rights with respect thereto. Compass currently is in compliance with its obligations to inKind.

14. Compass owes approximately $5.2 million to insider and outside investors on unsecured convertible notes.

15. Additionally, Compass has slightly more than 100 additional unsecured creditors with claims against Compass totaling approximately $4.8 million, comprised mostly of past due rent, unpaid purchase amounts for store acquisitions, and accounts payable to suppliers and other vendors.

---

a type specified, or any waiver of the Debtor's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.

16. Compass has been named as a defendant in lawsuits filed by certain landlords and vendors seeking payment of past due rent or other payments.

17. Compass is current on its obligations to employees and in the payment of trust and other taxes to governmental entities.

### D. Pre-Petition Marketing of Company and its Assets

18. After years of struggling financially since the pandemic, Compass has determined that selling the business as a going concern through this chapter 11 case likely represents the best means to preserve jobs and landlord and vendor relationships, and maximize the recoveries for creditors.

19. Beginning in May 2021, Compass began marketing itself for sale as a going concern through outreach by me to numerous industry contacts. Multiple suitors have expressed interest in exploring transactions that would result in the sale of some or substantially all of the assets of the company, recently culminating in a proposed transaction that Compass believes is acceptable, subject to a chapter 11 auction process.

20. After more than two months of active negotiations with one such suitor, the company has agreed, subject to this Court's approval, to sell substantially all of its assets to a strategic buyer with a substantial, global presence in the retail coffee business. Compass expects to file with the Court within days of its bankruptcy filing an asset purchase agreement to document the proposed sale. The agreement will be filed with proposed sale procedures to allow for the market-testing of the proposed sale price, subject to agreed provisions about the conduct of the sale process. The sale procedures will also propose to designate the strategic buyer as the "stalking horse" and seek approval of certain stalking horse protections meant to protect the strategic buyer's investment of time and money in pursuing its stalking horse purchase agreement.

21.     The proposed sale is contemplated to be a sale of assets of the business as a going concern, free and clear of claims, except those expressly assumed.  Compass expects through the sale to pay its secured lenders in full, to pay the restructuring costs incurred to conduct the chapter 11 sale process, and to have additional proceeds sufficient to make a distribution to unsecured creditors through the chapter 11 case.

### E.    DIP Financing and Use of Cash Collateral

22.     Compass projects that it will have sufficient cash on hand and through the continued use of funds generated by the operation of the business to pay debt service and operational expenses incurred in the ordinary course of business post-petition.  Parties with interest in the cash collateral that Compass will need to use during the chapter 11 case will be adequately protected through replacement liens and the continued payment of debt service during the sale process.

23.     Compass does not believe it will have sufficient liquidity to fund the restructuring costs of a chapter 11 sale process without post-petition DIP financing.  National Investment Group, Inc., a Delaware corporation ("***National Investment***"), has committed to provide Compass with up to $450,000 through a postpetition line of credit, subject to approval by the Court, to fund the fees and expenses for the runway needed to conduct a sale process and allow the company to sell the business as a going concern.  National Investment is an investor in Compass.  Specifically, it holds voting equity interests in Compass totaling 5.04%, Series A shares totaling 8.83%, and $1,050,000 in principal amount of unsecured convertible notes issued by Compass.  Shareholders in National Investments include entities owned by relatives of mine.  That proposed financing is described in more detail in a motion filed contemporaneously with this Declaration.

### F.     Summary of First-Day Motions

24.     Contemporaneously with the filing of its chapter 11 petition and this Declaration, the Debtor filed the First Day Motions described below. I am familiar with the contents of each First Day Motion, and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in the First Day Motions will permit the Debtor to, among other things, establish certain administrative procedures to promote a seamless transition into its chapter 11 case, which will enable the Debtors to efficiently administer its estate and affairs.

25.     As detailed more fully in the First Day Motions, entry of the orders granting the relief requested in the First Day Motions will provide critical assistance in the Debtor's chapter 11 case by aiding in preserving the value of the Debtor's assets and assisting in its reorganization efforts. The Debtor will suffer immediate and irreparable harm absent the interim relief sought in the First Day Motions. Listed below are the First Day Motions and a short summary of the relief the Debtor seeks through each such motion:

- *Debtor's Motion to Expedite Hearing On, and to Shorten Time to Respond to, First Day Motions* [Docket No. 15] (the "**Shorten and Expedite Motion**")

26.     By the Shorten and Expedite Motion, the Debtor seeks a shortened notice period with respect to, and expedited hearing on, the First Day Motions. There is a cognizable exigency which requires a prompt ruling on each of the First Day Motions to enable the Debtor to operate as a debtor-in-possession and preserve the value of its estate. Where appropriate, the Debtor is seeking interim relief, providing parties in interest a further opportunity to contest the relief sought at a final hearing. As such, the Debtor believes that the relief requested in the Shorten and Expedite Motion is necessary and appropriate.

- *Debtor's Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 4] (the "**Extend Time to File Schedules and SOFA Motion**").

27. By the Extend Time to File Schedules and SOFA Motion, the Debtor seeks entry of an order extending the fourteen (14) day period to file its schedules of assets and liabilities and statement of financial affairs by an additional fourteen (14) days, through and including February 3, 2026, without prejudice to the Debtor's right to request additional time should it become necessary. Due to critical matters that the Debtor's management and professionals were required to address prior to the commencement of this Case, the Debtor was not in a position to complete the schedules and statement of financial affairs by the Petition Date, even with the assistance of professionals. As such, the Debtor believes that the relief requested in the Extend Time to File Schedules and SOFA Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing; (II) Authorizing the Debtor to Use Cash Collateral; and (III) Granting Adequate Protection* [Docket No. 5] (the "**DIP Motion**").

28. By the DIP Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to obtain a $450,000 junior debtor-in-possession financing facility (the "**DIP Facility**") and use cash collateral pursuant to the budget attached to the DIP Motion. As described above, the Debtor has agreed to sell substantially all of its assets, subject to this Court's approval, to a strategic buyer following a section 363 sale process. To fund the section 363 sale process and administrative cost of this Case, the Debtor requires access to the DIP Facility.

29. The terms of the DIP Facility are fair and reasonable. On behalf of the Debtor, I contacted alternative third-party financing providers. The Debtor did not receive any other offer for DIP financing on a junior basis, and I am not aware of any party who would agree to lend on more favorable terms. Further, without the ability to use existing cash collateral and the DIP

Facility, the Debtor's operations will effectively be brought to a standstill. Without the ability to pay employees, suppliers, professionals, and others, the Debtor will be unable to preserve its business as a going concern to the detriment of creditors and other parties in interest.

30. Further, if the requested relief is not granted the Debtor will not have sufficient liquidity to fund this Case and ultimately consummate a value maximizing transaction for the benefit of creditors and other parties in interest. As such, the Debtor believes the relief requested in the DIP Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Salaries, Employee Benefits, Expenses, and Other Compensation, and (B) Pay or Otherwise Honor such Postpetition Obligations in the Ordinary Course of Business; and (II) Directing Financial Institutions to Honor Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**").

31. By the Wages Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to pay prepetition wages, salaries, benefits, and related expenses to its employees and continue honoring such obligations on a postpetition basis in the ordinary course. The Wages Motion does not seek authority to pay any amounts in excess of the statutory cap provided in section 507(a)(4)-(5) of the Bankruptcy Code. The Debtor reserves the right to seek payment of any such amounts at a later time, if necessary and appropriate.

32. As of the Petition Date, the Debtor employs 166 people, including 23 salaried employees and 143 hourly employees. The Debtor's workforce is critical to maintaining its business operations and the success of this Case. If the relief requested in the Wages Motion is not granted, the Debtor's relationship with its workforce would be adversely impacted and likely suffer irreparable harm. The Debtor's business hinges on its relationship with its workforce, and the ability to provide superior service is vital. At this early stage, the Debtor simply cannot risk the substantial damage to its business that would inevitably attend any decline in its workforce's

morale attributable to the Debtor's failure to pay wages, salaries, benefits, and other similar forms of compensation. As such, the Debtor believes that the relief requested in the Wages Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Maintain its Existing Cash Management System, Bank Accounts, and Business Forms; (II) Waiving Certain Requirements of the U.S. Trustee Operating Guidelines; and (III) Granting Related Relief* [Docket No. 8] (the "**Cash Management Motion**").

33. By the Cash Management Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to maintain existing bank accounts and business forms and to continue using its existing cash management system in the ordinary course of business. As of the Petition Date, the Debtor maintained nine (9) bank accounts across (4) banks. The accounts are used for various purposes, including but not limited to collecting revenue from the Debtor's various business lines (in-store, mobile app, third party app, business to business, and website purposes), managing sales taxes, making payroll, paying vendors and utilities, and other miscellaneous expenses, as more fully described in the Cash Management Motion.

34. Requiring the Debtor to obtain new business forms, close its accounts, and adopt a new cash management system would be time-consuming, administratively burdensome, and unnecessarily disruptive to the Debtor's operations. The Debtor collects revenue through a multitude of platforms and third party processors. Any disruption to its payment channels could result in the interruption of the Debtor's cash flow at this critical time and cause irreparable harm to the Debtor's estate. As such, the Debtor believes that the relief requested in the Cash Management Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders: (I) Deeming Utility Companies Adequately Assured of Payment; (II) Approving Procedures for Resolving Requests by Utility Companies for Additional Assurances; and (III)*

*Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services* [Docket No. 9] (the "**Utility Motion**").

35. By this Motion, the Debtor seeks an order deeming its utility providers adequately assured of payment, approving procedures for resolving requests for additional assurances, and prohibiting such utility providers from altering, refusing, or disconnecting services. The Debtor's utility companies provide internet, electricity, gas, water, sewer, and waste management. The Debtor has a long, established history of making timely payments and remaining current with its utility companies, and such payments are adequately accounted for in the budget submitted in connection with the DIP Motion. The Debtor requires uninterrupted utility services in order to operate is business as a going concern and therefore preserve the value of the estate. As such, the Debtor believes that the relief requested in the Utility Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Maintain its Existing Insurance Policies and Honor all Obligations in Respect Thereof, and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 10] (the "**Insurance Motion**").

36. By the Insurance Motion, the Debtor seeks authority to maintain, continue, and renew its insurance policies and pay related insurance obligations, whether they arose before or after the Petition Date. The Debtor maintains four insurance policies through three carriers, providing commercial umbrella, property, general liability, auto, workers compensation, and employee liability coverage.

37. The Bankruptcy Code, U.S. Trustee Guidelines, and other applicable laws and regulations require the Debtor to maintain certain of the coverages provided by its insurance policies. Moreover, many of the Debtor's leases and financing agreements obligate the Debtor to remain current with certain of its insurance policies. Thus, in order for the Debtor to maintain its ongoing business operations in compliance with various legal and contractual obligations, the

Debtor must continue its insurance program without disruption. As such, the Debtor believes that the relief requested in the Insurance Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Tax and Fee Obligations, and (II) Granting Related Relief* [Docket No. 11] (the "**Tax Motion**").

38. By the Tax Motion, the Debtor seeks authority to pay certain prepetition taxes that will become payable during the pendency of this Case. In the ordinary course of business, the Debtor incurs certain sales, use, trust fund, payroll, property and other taxes and is charged amounts for fees and other similar charges and assessments by various governmental entities. Certain of the taxes are "trust fund" taxes which the Debtor does not believe are property of its estate. Moreover, certain of the taxes and fees may or could become statutory liens or entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. The Debtor's ability to pay its taxes and fees is critical to its continued and uninterrupted operations. If certain of the taxes and fees remain unpaid, the Debtor's taxing authorities may, in certain instances, seek to recover certain amounts directly from the Debtor's directors, officers, or employees, thereby distracting such key personnel from the administration of this Case. Payment of the taxes and fees is necessary to avoid other potential administrative and operational difficulties, including audits, imposition of liens, and motions seeking relief from the automatic stay, to the detriment of its estate. As such, the Debtor believes that the relief requested in the Tax Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* [Docket No. 12] (the "**Critical Vendors Motion**").

39. By the Critical Vendor Motion, the Debtor seeks authority to pay certain prepetition claims of its vendors. The critical vendors fall into two categories: (1) critical suppliers, and (2) subcontractors.

40. As for the critical suppliers, the Debtor has identified three suppliers of green coffee beans and one supplier of branded coffee cups and other related supplies as indispensable to its continued operations. The critical suppliers are longstanding partners familiar with the Debtor's specific quality requirements, volume needs, and provide net-30 payment terms; replacing them on short notice would be extraordinarily difficult, if not impossible, without severe disruption, including potential inability to roast and produce coffee products, leading to immediate loss of sales and customer goodwill. The harm that would be incurred from having to replace the critical suppliers would likely far outweigh the cost of payment of their prepetition claims.

41. Additionally, with respect to the subcontractors, the Debtor contracted with a third party for the Debtor to build a bar in the customer's premises and provide related construction services therein. To perform its work, the Debtor subcontracted with certain subcontractors to provide materials and perform certain of the construction work. Absent payment of those subcontractor expenses, the subcontractors may assert, and may be entitled to, a mechanic's lien on the improvements constructed and/or the premises where the work was performed. Paying the subcontractors will allow the Debtor to be paid for its work on the project in an amount in excess of the payment to the subcontractors. As such, the Debtor believes that the relief requested in the Critical Vendor Motion is necessary and appropriate.

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue Its Customer Programs and Honor All Obligations Related Thereto, and (II) Granting Related Relief* [Docket No. 13] (the "**Customer Program Motion**").

42. By the Customer Programs Motion, the Debtor seeks authority to continue its customer programs and honor all obligations related thereto. The Debtor offers a variety of promotional programs to its customers, including "Compass Rewards," gift cards, and miscellaneous discounts.

13

43. "Compass Rewards," is a tiered loyalty system for in-café purchases at Washington D.C. locations. Customers sign up in-store or through the Debtor's mobile device app and earn points on every dollar spent. Points earned are redeemable for free drinks, food, and other items. Customers earn points at different rates depending on their purchase history. Compass Rewards fosters repeat customer visits and loyalty through escalating benefits for frequent buyers.

44. As described above, the Debtor also participates in a gift card program with inKind. Access to inKind's marketing channels and customer network increases the Debtor's market reach with little to no administrative burden on the Debtor. Additionally, the Debtor offers discounts and various other miscellaneous perks to its customers. For example, the Debtor offers limited discounts for online ordering and free drinks for Compass Rewards members on their birthdays. From time to time, the Debtor also runs short-term promotions in connection with holidays, significant events, and the like. The Debtor designed its customer programs, individually and as a whole, to increase customer engagement and loyalty, and therefore revenue.

45. If the Debtor is prohibited from honoring and maintaining its customer programs consistent with past business practices, customers will likely lose confidence in and loyalty to the Debtor. The damage from refusing to honor these commitments far exceeds the costs associated with honoring prepetition commitments and continuing these practices. The relief requested herein will protect the Debtor's goodwill during this critical time and enhance the Debtor's ability to generate revenue, to the benefit of all parties in interest. As such, the Debtor believes that the relief requested in the Customer Program Motion is necessary and appropriate.

- *Debtor's Motion to Reject Certain Unexpired Non-Residential Leases* [Docket No. 14] (the "**Reject Leases Motion**").

46. By the Reject Leases Motion, the Debtor seeks to reject certain unexpired non-residential leases that it has determined are burdensome to its estate effective as of January 30,

2026. Although the Debtor filed the Reject Leases Motion contemporaneous with the filing of its petition, the Debtor is not seeking relief on that motion at the "first-day hearing" in this case. Between now and the "second-day hearing" the Debtor will attempt to determine whether there is a potential suitor for any of those leased locations on existing or potentially modified terms.

[*Signature Page Follows*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 6, 2026
Washington, D.C.

/s/ *Michael Haft*
Chief Executive Officer
Compass Coffee, LLC