# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| COMPASS COFFEE, LLC, | ) |
| | ) Case No. 26-00005-ELG |
| Debtor. | ) |
| | ) |
| | ) |

**OBJECTION OF HARRISON SUAREZ TO DEBTOR'S MOTION FOR (A) ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES; (II) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) APPROVING STALKING HORSE PROTECTIONS; (IV) SCHEDULING BID DEADLINE, AUCTION DATE AND SALE HEARING DATE; (V) APPROVING FORM OF NOTICE THEREOF; (B) ENTRY OF AN ORDER AFTER THE SALE HEARING; (I) AUTHORIZING THE DEBTOR TO SELL ITS ASSETS AND (II) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Harrison Suarez ("Mr. Suarez"), equity interest holder and creditor, by counsel, hereby files this Objection (the "Objection") to Debtor Compass Coffee, LLC's Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (V) Approving Form of Notice Thereof; (B) Entry of an Order After the Sale Hearing; (I) Authorizing the Debtor to Sell its Assets; and (II) Authorizing the Debtor to Assume and Assign Certain Executory

Katie Lane Chaverri (DC Bar No. 502976)
Jeffrey Rhodes (DC Bar No. 456371)
Tayman Lane Chaverri LLP
2001 L Street NW, Suite 500
Washington, DC 20036
kchaverri@tlclawfirm.com (202-695-8146)
jrhodes@tlclawfirm.com (202-921-4080)

Contracts and Unexpired Leases; and (C) Granting Related Relief (the "Sale Motion")[1] [Docket No. 76] and in support thereof states as follows:

## INTRODUCTION

The Debtor's Sale Motion contemplates a rushed and disorganized auction and sale process that fails to permit fulsome marketing of the Debtor's enterprise as a going concern—which the Debtor estimated was worth $75 million as of 2021 (when gross revenues were less than those reported by the Debtor for 2025). The Debtor fails to articulate any business justification for the need to fast-track the sale of substantially all of its assets free and clear of liens and interests, and doing so absent the Chapter 11 plan and disclosure process directly contradicts the purposes of Chapter 11. The Debtor's rush to sell substantially all of its assets free and clear of liens and interests with no exit plan in sight improperly utilizes the restructuring process to insulate the Debtor's insiders from risk at the expense of the rest of the estate's creditors.

Mr. Suarez cannot support the proposed sale because the Debtor failed to provide enough information to (a) determine whether there are alternatives to the proposed sale such as a stand-alone plan of reorganization, a going concern sale or any other alternative transaction or transactions which could yield a meaningful recovery to the estate's creditors and other parties in interest; (b) assess whether the assets have been properly marketed; (c) assess the terms of the proposed sale to the Successful Bidder or Back-up Bidder, including what is really in it for the Debtor's insiders; (d) assess the true value of the assets where the Debtor ascribes no value to the intellectual property, goodwill and other intangibles; (e) assess the fairness and good faith nature

---

[1] Capitalized terms otherwise undefined in this Objection shall have the meanings ascribed to them in the Sale Motion and Court's Order(I) Approving Bidding Procedures; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (V) Approving Form of Notice Thereof [Docket No. 90] (the "Bidding Procedures Order").

2

of the transaction; (f) assess the financial wherewithal of the Successful Bidder or Back-up Bidder to perform its obligations under the Asset Purchase Agreement (which to date does not include a complete set of schedules); and (g) determine any relationship between the Debtor's insiders and either the Successful Bidder or the Back-up Bidder, to properly assess any insider dominion, control and involvement in this process. In fact, a recent *Washington Post* article contains more information about the proposed sale than any documents filed with the Court.[2]

At least nine landlords have objected to the Sale pointing out, *inter alia*, that the Debtor's proposed cure amounts are insufficient to assume and assign the leases the Debtor considers such a valuable part of the Debtor's enterprise value. Furthermore, with the Sale Hearing only three business days away, the Debtor has not allowed any time for sale-related discovery, nor details of the proposed transactions. The cash purchase price contemplated by the initial Asset Purchase Agreement was woefully inadequate considering the Debtor's expressions of prepetition value in excess of *twenty times* that number.

The Debtor's rushed auction—which ultimately spanned over three days—actually underscores the additional potential value available to the estate if the Debtor had allowed adequate time to conduct a well-marketed, fulsome sales process. However, the Debtor has not yet disclosed any details as to the winning bid, what makes it the highest and best offer, or even how much of the "total value" of $4,764,988 offered by Caffè Nero will generate cash for the estate. The Debtor's proposal to sell substantially all of its assets at a fraction of the value represented by Debtor's management prepetition (and for that matter, less than what the Debtor values those assets at in its Schedules) strongly suggests that the Debtor seeks to utilize Section 363(b) as an end run

---

[2] https://www.washingtonpost.com/food/2026/02/19/compass-coffee-caffe-nero-bankruptcy (last visited Feb. 23, 2026).

around the plan and disclosure process contemplated by Chapter 11 to the detriment of the estate and its stakeholders. Accordingly, the Court should deny the Debtor's Sale Motion.

## FACTUAL BACKGROUND

1. On January 6, 2026 (the "Petition Date") the Debtor filed a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia (the "Court"). The Debtor is managing its assets and operating its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As of the date of this Objection, no Trustee or examiner has been appointed. On January 23, 2026, the Office of the United States Trustee appointed a committee (the "Committee") in this case.

2. As of the Petition Date, the Debtor owned and operated twenty-five cafes in premises it leases from various landlords in Washington, D.C., Maryland and Northern Virginia (the "Business"). The Debtor's Schedules and Statements [Docket No. 170] reflect that the Debtor had gross revenues of almost $23 million in 2025, prior to the January 2026 filing of the Petition.

3. In his Declaration in Support of Chapter 11 Petition and First Day Motions [Docket No. 16], the Debtor's Chief Executive Officer, Michael Haft, cited the pandemic and loss of customer traffic as the reason for the Chapter 11 filing. At the 341 Meeting of Creditors, Mr. Haft further cited the Debtor's inability to renegotiate its leases as a basis for the filing.

4. On January 23, 2026, the Court entered the Bidding Procedures Order [Docket No. 90] which established, among other things, bidding procedures for the auction of substantially all of the Debtor's assets and the assumption and assignment of the Debtor's executory and unexpired Leases to the Stalking Horse, which was eventually identified as Caffè Nero North America, Inc. (the "Stalking Horse"), or to such other Successful Bidder at auction.

5. Also on January 23, 2026, the Debtor filed the Stalking Horse Selection Notice (the "Stalking Horse Notice") [Docket No. 93] notifying interested parties that Caffè Nero North

America was selected as the Stalking Horse Purchaser pursuant to the terms of the asset purchase agreement attached to the Stalking Horse Notice as Exhibit 1 (the "Asset Purchase Agreement").

6.  Late in the evening of February 18, 2026, the Debtor filed its Notice of Adjournment of Auction and Extension of Related Deadlines [Docket No. 186] (the "Adjournment Notice"), citing "numerous rounds of bidding" that required adjournment of the auction beyond the initial date of February 17, 2026 through February 19, 2026. On February 19, 2026, the Debtor filed the Notice of Successful Bidder and Backup Bidder [Docket No. 190].

7.  Although the Debtor has not yet formally disclosed any details of the Auction of the Successful Bid, *The Washington Post* reported that Michael Haft told it "[Caffè Nero] has indicated that it would like to keep the current Compass management team in place, including Haft, . . . but job offers have not yet been extended."[3]

8.  Mr. Suarez co-founded Compass Coffee LLC in 2013 and worked hard building the company—for the most part completely uncompensated—until he was abruptly terminated in 2021. While leading Compass, Mr. Suarez shouldered risk alongside his co-founder Michael Haft by guaranteeing the Debtor's debts and leases, based on misrepresentations that Mr. Suarez was an equal partner in the business. He later learned that this had never been true, and that Michael Haft had concealed his outsized ownership interest behind a web of LLCs. Through these misrepresentations, the Debtor (through Michael Haft and his father, Robert Haft) induced Mr. Suarez to sign over his 50% interest in the Compass Coffee brand, valued at $34 million in 2020, to the Debtor for no consideration at all.[4] When Mr. Suarez attempted to effectuate a buyout of his shares after he was terminated, the Debtor (through Michael Haft and his father, Robert Haft),

---

[3] https://www.washingtonpost.com/food/2026/02/19/compass-coffee-caffe-nero-bankruptcy (last visited Feb. 23, 2026).

[4] The Debtor lists the value of its intellectual property, intangibles and goodwill as "unknown" on its Schedules and Statement of Financial Affairs [Docket No. 170].

5

obstructed the process mandated by the Debtor's Operating Agreement and refused to repurchase Mr. Suarez's shares.

9. In January 2025, Mr. Suarez filed a lawsuit (the "Lawsuit") against the Debtor, Michael Haft and Robert Haft (Case No. 1:25-cv-89-SLS (D.D.C.)). Mr. Suarez alleges claims of at least $75 million against the Debtor and the Hafts for: violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) & (d), fraud, breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing.

10. On November 3, 2025—two months prior to the Petition Date—Judge Sparkle Sooknanan issued a Memorandum Opinion and Order denying the Debtor's, Michael Haft's and Robert Haft's motion to dismiss the Lawsuit, finding instead that all of Mr. Suarez's claims (other than a breach of contract claim against Robert Haft) survived dismissal. Curiously, Michael Haft makes no mention of the pending litigation in the Declaration in Support of Chapter 11 Petition. However, the timing of Judge Sooknanan's Memorandum Opinion coincides perfectly with the time frame when Mr. Haft told the Washington Post that he "realized [he] had to [file for bankruptcy]."[5]

11. Accordingly, Mr. Suarez is a creditor and an equity interest holder of the Debtor.[6]

---

[5] *See* https://www.washingtonpost.com/food/2026/02/19/compass-coffee-caffe-nero-bankruptcy (last visited Feb. 23, 2026). Notably, the Washington Post reported that Mr. Haft stated, days after the Petition Date: "It was about two months ago when I realized I had to do this . . .That was a really terrible feeling. I mean, a lot of shame, embarrassment. … It's going to be hard for employees. It's going to be hard for customers. It's hard for my family. It sucks for everyone. But filing in many ways is a huge relief because then you sort of hit the bottom and now you're working on a plan for the future." *See id*.

[6] Although the Debtor failed to list Mr. Suarez on its Schedule F, in its Statement of Financial Affairs, the Debtor references the Lawsuit pending in the United States District Court for the District of Columbia in which Mr. Suarez asserts claims against the Debtor and two individual defendants (Michael Haft and Robert Haft).

6

## **OBJECTION**

12. The Sale Motion advocates a sale which is improper and non-approvable as a matter of law. First and foremost, the amount of time that has elapsed since the Petition Date has been extremely short and the sale process has been compressed to the point that the Debtor has only disclosed minimal information to the Court and parties in interest. The Sale Motion, filed on January 14, 2026, failed to identify a Stalking Horse Bidder, and the Court and the estate's creditors only learned its identity on January 23, 2026 when the Debtor filed its Stalking Horse Selection Notice, which itself was incomplete as several of the schedules attached to the Asset Purchase Agreement were missing (and remain missing).

13. At that point, the Debtor had not even filed its Schedules and Statement of Financial Affairs. The Debtor ultimately filed its Schedules and Statements on the Court-ordered deadline of January 30, 2026—twenty-four days from the Petition Date, and only a week before its Meeting of Creditors. The entire timeline in this case has been unnecessarily compressed in such a way that it has been virtually impossible for parties in interest to meaningfully participate in the proceeding. The accelerated timing for expedited consideration of the Sale Motion smacks of an attempt to push a sale through before creditors, the Office of the U.S. Trustee, the Committee and parties-in-interest can appropriately assess and respond to the Debtor's actions.

14. As further evidence of the impropriety of the sale process in this case, the Debtor conducted an auction that apparently resulted in several rounds of bidding and spanned over the course of three days, versus the one day allocated by the Sale Motion. The Debtor only notified parties in interest that the Auction had not concluded and deadlines appurtenant to the sale were extended the evening before the original Sale Objection deadline of February 19, 2026.

15. The Sale Objection deadline was extended to February 23, 2026, the same date by which the Debtor represents it will file a proposed Sale Order, which, based on the Debtor's prior

conduct of filing only hours before a deadline, renders it virtually impossible for parties in interest to object meaningfully to the content of the Sale Order. Without meaningful disclosure to parties in interest of any detail as to the terms of the Qualified Bids or what made the Successful Bidder the highest or otherwise best offer, it is impossible for Mr. Suarez and other parties in interest to timely file objections or to participate substantively in the Sale Hearing that the Debtor insists will proceed on the morning of February 26, 2026.

16. Although not titled as a motion to sell substantially all of the Debtor's assets free and clear, the Sale Motion actually contemplates a sale of *substantially all* of the Debtor's assets for a cash purchase price woefully inadequate when compared to recent valuations performed by Debtor's own management prepetition. In fact, the only benefit the proposed sale has is to divert estate assets to pay down indebtedness on which the insiders in control of the Debtor are personally liable. Rather than using the Chapter 11 process to reorganize for the benefit of Debtor's creditors and other parties in interest, the Debtor's insiders stand to benefit from the use of Chapter 11 for their own benefit and to the detriment of the estate's creditors.

17. Not only does the Debtor fail (in its Schedules and Statements and elsewhere) to provide any detail or estimated value of the goodwill, brand and intellectual property, but the Sale Motion itself fails to even summarize the asset purchase agreement, let alone properly explain the justification of why the assets are being sold (let alone on an expedited basis), describe the marketing efforts for the assets, and describe any relationship between the buyer, the debtor, insiders, creditors or professionals in the case. Many of these standard items have not been done.

18. The Debtor provides no detail as to the marketing efforts it has undertaken and the estate's stakeholders have no knowledge as to the breadth of the Debtor's efforts to market the Assets by any party with any expertise in selling assets such as these, nor has any broker or investment banker been retained (or even proposed to be retained) to market the Assets. Without

8

any marketing of the Assets, the Debtor cannot demonstrate to the Court, creditors, and parties-in-interest that the sale is for fair value or that Caffè Nero or the Back-up Bidder's offers are the best and highest offers as required by Section 363 of the Bankruptcy Code.

19. As a result, creditors and parties-in-interest, including Mr. Suarez, have not had the opportunity to obtain, review and fully analyze the information and documents that would be relevant to the sale process, proposed sale transaction and all related transactions. Given the nature of the proposed sale transaction, where the Debtor proposes to sell substantially all of its assets and no going concern reorganization is contemplated, coupled with the lack of detail regarding the terms of such sale, a higher degree of scrutiny is required as the proposed sale appears to be a calculated effort by the Debtor and its insiders to circumvent the Chapter 11 plan process to further their self-interest.

20. In fact, if the Sale Motion is approved, it is clear that upon the closing of the sale there will be no cash or significant assets remaining in the estate. Nonetheless, there will be obligations and expenses continuing after the closing, both from an operating perspective and in order to administer the Chapter 11 case. If the Debtor wants the many benefits of an asset sale under the bankruptcy process, it must comply with the obligations imposed by the Bankruptcy Code. The Debtor simply has not done this in this instance. The Debtor should not be permitted to use the Court, Chapter 11 and this bankruptcy case as a tool to insulate its insiders against personal liability while thrusting the entire cost of liquidation upon the creditors, leaving the estate with no ability to satisfy such claims

21. Nor is there justification for the fast-tracked timeline the Debtor has imposed upon itself to sell the Assets. The Debtor urges that the bankruptcy and related sale is necessary due to a COVID-related slowdown in the DC Metro market. However, the Debtor made several public representations that it had a "record-breaking year" in 2022 *after* the COVID pandemic subsided.

In a Q4 2022 investor update, Compass reported "[w]e are thrilled to announce that 2022 was a record-breaking year for Compass Coffee. Our revenue increased by an impressive 57%, exceeding our expectations and solidifying our position as the leading specialty coffee company in Washington D.C." According to Debtor's management as published in a later investor update, 2023 was an even better year.

22. Mr. Suarez, himself an equity owner and cofounder of the Debtor, believes the Purchase Price of the proposed sale transaction is woefully inadequate in light of the true value of the assets being sold. A properly conducted and transparent sale process—conducted with the assistance of financial advisors with experience in the retail marketplace and enough notice to allow proper marketing is far more likely to result in additional potential purchasers and the highest and best price for the Debtor's assets. If the opaque, improper, and legally deficient sale transaction proposed by the Debtor is allowed to continue, any such opportunity to maximize the value of the assets for the benefit of the creditors will be lost. The Debtor's Sale Motion should be denied.

23. Moreover, The Debtor's fiduciary obligations to maximize value for the benefit of the bankruptcy estate demand that they pursue an appropriate sale process. Without the Debtor following an appropriate marketing and sales process, the Court cannot make the factual findings of good faith and compliance with the Bankruptcy Code.

24. Other than the barest information, the Sale Motion contains nothing that allows Mr. Suarez and the other creditors and parties-in-interest to understand the proposed sale transaction and to evaluate whether Caffè Nero or the Back-up Bidder have the financial wherewithal to complete the transaction. At least nine landlords have filed objections to the Sale citing inaccurate cure amounts and a lack of information necessary to provide adequate assurance of future performance. There has been no disclosure whether Caffè Nero or the Back-up Bidder are in fact

disinterested third parties or the level of continued involvement of the Debtor's insiders, although *The Washington Post* has reported that Mr. Haft said he would remain post-sale.

25.   The Debtor seeks to sell substantially all of its assets free and clear of liens and claims pursuant to Section 363(f).  However, the Debtor fails to satisfy the requirements of Section 363(f) of the Bankruptcy Code to obtain a sale free and clear.  In light of the nature of the proposed sale, where the Debtor seeks to sell substantially all of its assets, have claims attach to the proceeds and offers no going concern reorganization, a higher degree of scrutiny is required.  As the holder of an interest in the Debtor's property that is (presumably) in bona fide dispute, the Debtor must obtain Mr. Suarez's consent to sell such property free and clear of Mr. Suarez's interest.  Mr. Suarez does not consent to such sale free and clear of such interest.

26.   The Debtor has not yet articulated its basis for utilizing Chapter 11 in furtherance of a sale of substantially all of its assets—which could have been achieved far more efficiently in a Chapter 7 proceeding—or even how it plans to exit Chapter 11.  It is a well-established principle that where there is a proposed sale in the context of a Chapter 11 proceeding of substantially all of a debtor's property without the creditor protections of the disclosure statement and plan process, as here, the transaction must be closely scrutinized and the proponent bears a heightened burden of proving the elements necessary for authorization.  *Committee of Equity Security Holders v. The Lionel Corporation (In re The Lionel Corp.*), 722 F.2d 1063 (2d Cir.1983).

27.   In *Lionel,* the Second Circuit Court of Appeals rejected the Debtor and Committee's argument that § 363(b) grants the bankruptcy court wide latitude to approve a sale outside a plan of reorganization. *Id.* at 1069. Rather, the court concluded that the Debtor must demonstrate some business justification before the bankruptcy judge may order such disposition under § 363(b). *Id.* at 1070.  A Debtor seeking to sell substantially all of its assets under § 363(b) must demonstrate that a sale will aid the Debtor's reorganization.  *See In re Encore Heathcare Associates*, 312 B.R.

11

52, 55 (E.D. Pa. 2004) (denying Debtor's request for approval of a sale absent a business justification in furtherance of reorganization); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) ("[t]he closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter").

28. Courts have expressed great concern that asset sales—particularly sales of a substantial portion of the estate's assets, as here—not be used to bypass the protections afforded by Chapter 11 and the Bankruptcy Code. For example, in *Abbots Dairies*, the Third Circuit expressed concern that Section 363 sales should not be used to circumvent the protections afforded to creditors under the plan confirmation process and Section 1129 of the Bankruptcy Code. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986). In *Abbots Dairies*, the court held that the "good faith" requirement of a Section 363 sale should be used as assurance that a debtor does not, by means of an asset sale, abrogate the protections afforded to creditors and shareholders by Section 1129 of the Bankruptcy Code and the plan confirmation process. *Id*. at 150.

29. Moreover, well-settled law dictates that when a debtor proposes to sell substantially all of its assets outside of the creditor protections of the disclosure statement and plan process, as the Sale Motion proposes to do, that debtor must demonstrate a "sound business purpose" for such a proposal. *See In re Lionel*, 722 F.2d at 1070 (a debtor cannot liquidate substantially all of its assets on an expedited basis and outside the ordinary course of their businesses under Section 363(b) of the Bankruptcy Code absent "some articulated business justification"); *Stephens Industries, Inc., v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (following *Lionel* and stating that a "debtor must show

12

that a sound business purpose justifies such actions"); *In re Delaware & Hudson R. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (same). Even those cases that require only a "good business justification" to approve a sale of substantially all of the estate's assets expressed concern that courts not adopt a "construction of §363(b) [that] swallows up Chapter 11's safeguards." *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel*), 722 F.2d 1063, 1069 (2d Cir. 1983). The transaction proposed in the Sale Motion clearly circumvents the protections afforded to creditors under the plan confirmation process and Section 1129 of the Bankruptcy Code.

30.    Here, the Debtor has not enunciated any business purpose for the sale of all of the estate's assets at a price well below several prepetition valuations and other indications of value. For example, Mr. Suarez is aware of several representations as to value, including an offer by Juggernaut in February 2020 that translated to an enterprise value of $75.2 million. Compass's management rejected that proposal.

31.    Accordingly, the Debtor cannot meet the legal standard established for the approval of Section 363 Sales. Furthermore, the Debtor seeks the protection of Section 363(m) of the Bankruptcy Code, which requires that the Court make a good faith finding, which is impossible without further disclosure of detailed information to ensure the Successful Bidder acted in good faith and is actually entitled to the protections of § 363(m) of the Bankruptcy Code.

32.    As set forth above, the Sale Motion provides no evidence describing the sale process, showing that it is or was fair, and that the parties achieved a fair and reasonable price without fraud, collusion, or bad faith. Without this evidence and in the absence of a sound business purpose justifying the proposed sale, the Debtor cannot meet the requirements for a finding of good faith under Section 363(m) of the Bankruptcy Code.

33.    Furthermore, the Debtor seeks a waiver of the fourteen-day stay imposed by Federal Rule of Bankruptcy Procedure 6004(h). However, the Debtor fails to articulate any business or

good faith reason for such waiver. Without such a showing, the Court should deny the Debtor's request for such waiver.

34. Mr. Suarez believes it is important to recognize that, at this point, the case has been pending only six weeks, at the time of the filing of the Sale Motion, the Debtor had not even identified the Stalking Horse Bidder, and since then, the Debtor has disclosed very little information in further support of the Sale.[7] The Asset Purchase Agreement is missing many critical schedules. No broker or marketing professional has been retained and no fulsome marketing of the Assets has been done. Given these failures, the creditors and parties-in-interest simply cannot make a determination as to the proposed sale and attempting to force them to do so under short notice is highly inappropriate.

35. Mr. Suarez expressly reserves and does not waive any Seventh Amendment jury trial rights, and the right to adjudication of non-core claims in an Article III court. Mr. Suarez does not consent to final adjudication of non-core matters.

36. Based on the foregoing, the Court should not countenance such blatant disregard by the Debtor for the basic principles by which assets are to be sold Chapter 11 and should deny the Sale Motion.

Dated: February 23, 2026            **TAYMAN LANE CHAVERRI LLP**

*/s/ Katie Lane Chaverri*
Katie Lane Chaverri (DC Bar No. 502976)
Jeffrey Rhodes (DC Bar No. 456371)
Tayman Lane Chaverri LLP
2001 L Street NW, Suite 500
Washington, DC 20036
kchaverri@tlclawfirm.com (202) 695-8146
jrhodes@tlclawfirm.com (202) 921-4080
*Counsel to Harrison Suarez*

---

[7] The Debtor and the Hafts appear determined to thwart any effort by creditors and parties in interest to discovery of the Debtor's true financial condition, as further evidenced by the Debtor's refusal to consent to a Rule 2004 examination in this case.

14

**CERTIFICATE OF SERVICE**

I, Katie Lane Chaverri, hereby certify that on February 23, 2026, a true and correct copy of the above *Objection* was served to all parties of record via CM/ECF and further served in accordance with the process delineated in the Bidding Procedures Order.

/s/ *Katie Lane Chaverri*
Katie Lane Chaverri (DC Bar No. 502976)