**HUNTON ANDREWS KURTH LLP**
Tyler P. Brown (admitted *pro hac vice*)
Jennifer E. Wuebker (D.C. Bar No. 1035039)
Nicholas S. Monico (admitted *pro hac vice*)
951 E. Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel for Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Compass Coffee, LLC,** | |
| **Debtor.** | **Case No. 26-00005 (ELG)** |

## NOTICE OF FILING ASSET PURCHASE AGREEMENT AND REDLINE OF ASSET PURCHASE AGREEMENT AGAINST THE STALKING HORSE PURCHASE AGREEMENT

**PLEASE TAKE NOTICE** that on January 23, 2026, the above-captioned debtor and debtor-in-possession (the "***Debtor***") filed the *Stalking Horse Selection Notice* (the "***Selection Notice***") [Docket No. 93] with the United States Bankruptcy Court for the District of Columbia (the "***Court***"). The asset purchase agreement which served as the Stalking Horse Bid[1] is attached to the Selection Notice as Exhibit 1 (the "***Stalking Horse Purchase Agreement***").

**PLEASE TAKE FURTHER NOTICE** that on February 19, 2026, the Debtor filed its *Notice of Successful Bidder and Back-Up Bidder* [Docket No. 190], identifying Caffe Nero North America, Inc. as the Successful Bidder for the Purchased Assets at the close of the Auction.

**PLEASE TAKE FURTHER NOTICE** attached hereto as Exhibit A is a revised version of the Stalking Horse Purchase Agreement (the "***Revised Asset Purchase Agreement***").

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order [Docket No. 90] or Bidding Procedures attached thereto.

**PLEASE TAKE FURTHER NOTICE** that a redline of the Revised Asset Purchase Agreement to the Stalking Horse Purchase Agreement is attached hereto as <u>Exhibit B</u>.

**PLEASE TAKE FURTHER NOTICE** that the Debtor intends to seek approval of the Revised Asset Purchase Agreement at the Sale Hearing before the Court scheduled for February 26, 2026, at 11:00 a.m. (ET).

*[Remainder of page intentionally left blank]*

Dated: February 24, 2026
Richmond, Virginia

Respectfully submitted,

/s/ *Jennifer E. Wuebker*

Tyler P. Brown (admitted *pro hac vice*)
Jennifer E. Wuebker (D.C. Bar No. 1035039)
Nicholas S. Monico (admitted *pro hac vice*)
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, Virginia 23219
Telephone:     (804) 788-8200
Facsimile:     (804) 788-8218
Email:          tpbrown@hunton.com
                jwuebker@hunton.com
                nmonico@hunton.com

*Counsel for the Debtor and Debtor in Possession*

## <u>Exhibit A</u>

**Revised Asset Purchase Agreement**

*EXECUTIVE VERSION*

---

**ASSET PURCHASE AGREEMENT**

**by and between**

**COMPASS COFFEE, LLC,**

**as Seller,**

**and**

**CAFFE NERO NORTH AMERICA, INC.,**

**as Buyer,**

**and solely for purposes of Section 9.19,**

**CAFFE NERO AMERICAS, INC.,**

**as Buyer Guarantor**

**January 23, 2026**

---

## <u>Table of Contents</u>

<u>Page(s)</u>

ARTICLE I DEFINITIONS ...................................................................................................... 2

ARTICLE II PURCHASE AND SALE........................................................................................ 11

 Section 2.1. Purchase and Sale of Acquired Assets ................................... 11
 Section 2.2. Excluded Assets .................................................................... 14
 Section 2.3. Assumption of Assumed Liabilities ...................................... 15
 Section 2.4. Excluded Liabilities ............................................................. 15
 Section 2.5. Purchase Price ..................................................................... 18
 Section 2.6. Assumption and Assignment of Contracts ........................... 19
 Section 2.7. Closing ................................................................................ 19
 Section 2.8. Deliveries at Closing........................................................... 20
 Section 2.9. Allocation ........................................................................... 20

ARTICLE III SELLER'S REPRESENTATIONS AND WARRANTIES....................................21

 Section 3.1. Organization of Seller; Good Standing................................. 21
 Section 3.2. Authorization of Transaction ............................................... 21
 Section 3.3. Noncontravention................................................................ 22
 Section 3.4. Title to Acquired Assets ...................................................... 22
 Section 3.5. Contracts ............................................................................ 22
 Section 3.6. Real Property ...................................................................... 22
 Section 3.7. Intellectual Property ............................................................ 22
 Section 3.8. Information Technology ....................................................... 23
 Section 3.9. Permits ............................................................................... 23
 Section 3.10. Employee Benefit Plans....................................................... 23
 Section 3.11. Labor Relations................................................................... 23
 Section 3.12. Environmental Matters ........................................................ 23
 Section 3.13. Insurance ............................................................................ 24
 Section 3.14. Related Party Transactions................................................... 24
 Section 3.15. No Brokers or Finders.......................................................... 24
 Section 3.16. Litigation; Proceeding.......................................................... 24
 Section 3.17. Compliance with Laws ........................................................ 24
 Section 3.18. Taxes.................................................................................. 24
 Section 3.19. Discontinuance of Seller Operations .................................... 26

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES.................................26

 Section 4.1. Organization of Buyer ......................................................... 26
 Section 4.2. Authorization of Transaction. .............................................. 26
 Section 4.3. Adequate Assurances Regarding Executory Contracts .......... 26
 Section 4.4. Good Faith Purchaser........................................................... 26
 Section 4.5. Brokers' Fees ...................................................................... 26
 Section 4.6. Financial Capacity ............................................................... 27
 Section 4.7. Condition of Assets.............................................................. 27

i

ARTICLE V PRE-CLOSING COVENANTS ................................................................ 27

    Section 5.1.    Certain Efforts; Cooperation. .................................................. 27
    Section 5.2.    Notices and Consents. ........................................................... 28
    Section 5.3.    Bankruptcy Actions. .............................................................. 28
    Section 5.4.    Preservation of Acquired Assets ........................................... 28
    Section 5.5.    Notice of Developments And Disclosure Schedule Supplements. ...................... 30
    Section 5.6.    Access .................................................................................... 30
    Section 5.7.    Press Releases and Public Announcements ......................... 30
    Section 5.8.    Bulk Transfer Laws ............................................................... 31

ARTICLE VI OTHER COVENANTS. ....................................................................... 31

    Section 6.1.    Cooperation. .......................................................................... 31
    Section 6.2.    Removal of Assets from Leased Premises ........................... 31
    Section 6.3.    Further Assurances ................................................................ 31
    Section 6.4.    Availability of Business Records .......................................... 31
    Section 6.5.    Employee Matters. ................................................................ 32
    Section 6.6.    Taxes. .................................................................................... 32
    Section 6.7.    Casualty ................................................................................ 33
    Section 6.8.    Collection on Acquired Assets .............................................. 33
    Section 6.9.    No Successor Liability .......................................................... 33

ARTICLE VII CONDITIONS TO CLOSING .............................................................. 35

    Section 7.1.    Conditions to Buyer's Obligations ........................................ 35
    Section 7.2.    Conditions to Seller's Obligations ........................................ 36
    Section 7.3.    Investigation ......................................................................... 36
    Section 7.4.    No Frustration of Closing Conditions .................................. 37

ARTICLE VIII TERMINATION ................................................................................. 37

    Section 8.1.    Termination of Agreement .................................................... 37
    Section 8.2.    Procedure Upon Termination ................................................ 38
    Section 8.3.    Effect of Termination. .......................................................... 38

ARTICLE IX MISCELLANEOUS .............................................................................. 39

    Section 9.1.    Expenses ............................................................................... 39
    Section 9.2.    Entire Agreement .................................................................. 39
    Section 9.3.    Incorporation of Schedules, Exhibits and Disclosure Schedule ................ 39
    Section 9.4.    Amendments and Waivers .................................................... 39
    Section 9.5.    Succession and Assignment .................................................. 40
    Section 9.6.    Notices .................................................................................. 40
    Section 9.7.    Governing Law; Jurisdiction ................................................ 41
    Section 9.8.    Equipment Storage Through Closing ................................... 41
    Section 9.9.    Consent to Service of Process ............................................... 41
    Section 9.10.    WAIVER OF JURY TRIAL ................................................. 41
    Section 9.11.    Severability ........................................................................... 41
    Section 9.12.    No Third Party Beneficiaries ................................................ 41
    Section 9.13.    No Survival of Representations, Warranties and Agreements .............. 41

Section 9.14.    Construction..................................................................................................... 42
Section 9.15.    Mutual Drafting ............................................................................................... 42
Section 9.16.    Disclosure Schedule......................................................................................... 42
Section 9.17.    Headings; Table of Contents ........................................................................... 42
Section 9.18.    Counterparts; Facsimile and Email Signatures .................................................. 42
Section 9.19.    Buyer Guarantor .............................................................................................. 42
Section 9.20.    Solicitation of Competitive Bids........................................................................ 43

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of January 23, 2026 (the "Execution Date"), by and between Compass Coffee, LLC, a Delaware limited liability company ("Seller"), Caffe Nero North America, Inc., a Delaware corporation (together with its permitted successors, designees and assigns, "Buyer"), and, solely for purposes of Section 9.19, Caffe Nero Americas, Inc., a Delaware corporation (the "Buyer Guarantor"). Seller, Buyer, and Buyer Guarantor are referred to collectively herein as the "Parties." The Key Member is a party to this Agreement for the limited purposes set forth herein. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Seller is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended (the "Bankruptcy Code"), in a voluntary administered bankruptcy case under Chapter 11 of the Bankruptcy Code captioned *In re: Compass Coffee, LLC bearing Case No. 26-00005 (ELG)* (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy Court");

WHEREAS, Seller has been engaged in the coffee retail and wholesale businesses, through both physical locations and online, including but not limited to the operation of cafes, a roastery and the online E-Commerce Platform (the "Business");

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Seller, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as of the Closing;[1]

WHEREAS, the Parties intend that the Acquired Assets include, but are not limited to, substantially all of Seller's inventory, equipment, intellectual property, and certain other real property Leases and Contracts;

WHEREAS, as a material inducement to Buyer to enter into this Agreement, the Key Member has agreed to provide certain representations warranties and covenants to Buyer as set forth in Section 6.10 hereto;

WHEREAS, Buyer Guarantor has agreed to absolutely, unconditionally, and irrevocably guarantee, as a surety, the full and timely performance and payment of all obligations of Buyer under this Agreement and any other document or instrument contemplated hereby (collectively, the "Transaction Documents"); and

WHEREAS, Seller shall seek Bankruptcy Court approval to implement the transactions contemplated hereby, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

---

[1] The transaction set forth in this Agreement is solely for a purchase of assets and the assumption of certain leases and executory contracts and is not for the purchase of equity interests or as a going concern entity.

# ARTICLE I
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Seller, and (b) any security interest, claim, remedy or other right related to any of the foregoing; *provided that* Accounts Receivable only includes accounts receivable and rights to payment for any product orders that have been delivered and fulfilled as of the Closing.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, such Person's parent and Subsidiary entities, and any other Person directly or indirectly controlling, controlled by, or under common control with, said Person. For purposes of this definition, control of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Seller (a) accepts a Qualified Bid, as defined in the Sale Procedures, other than that of Buyer, as the highest or best offer, or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets in a transaction or series of transactions to a party or parties other than Buyer.

"Assigned Causes of Action" means: any Claims of Seller arising out of or related the Acquired Assets including, but not limited to, Claims related to Contracts, Leases and other agreements related to the Acquired Assets; and any claim of Seller against Buyer other as specifically set for this Agreement, but shall specifically exclude any Claims and causes of action against the officers, directors, shareholders, members, managers, Affiliates and Insiders of Seller other than for a breach of this Agreement or as specifically set forth in this Agreement.

"Assigned Contract" has the meaning set forth in Section 2.6(a)(ii).

"Assumed Leases" means all Leases set forth on Schedule 2.1(d), but excluding all Leases to the extent solely related to any Excluded Asset.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"Avoidance Actions" mean, collectively and individually, preference actions, fraudulent conveyance actions and any other claims or causes of action, including but not limited to under sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553, and other applicable provisions of the Bankruptcy Code and other similar state law claims and causes of action.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Incentives" means the Break-Up Fee.

"Bidding Procedures" means the bidding and sale procedures approved by the Bankruptcy Court and attached to the Bidding Procedures Order.

"Bidding Procedures Motion" shall mean the Debtor's Motion For (A) Entry Of An Order (I) Approving Bidding Procedures and related relief Doc. 76.

"Bidding Procedures Order" shall mean the Order entered by the Bankruptcy Court approving of the Bidding Procedures Motion.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Break-Up Fee" means $87,000.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday and any day that is a legal holiday or a day on which banks located in New York, New York shall be authorized or required by Law or other government action to close.

"Buyer" has the meaning set forth in the preamble.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Closing Date Cure Amount" has the meaning set forth in Section 2.5(c)(i).

"Confidentiality Agreement" means any applicable agreement governing confidentiality of Seller's information which has been executed by and between Buyer (or its Affiliates) and Seller.

"Contemplated Transactions" means the sale by Seller to Buyer, and the purchase by Buyer from Seller, of the Acquired Assets, including the assumption, assignment and sale by Seller to Buyer, and the acceptance by Buyer, of the Assigned Contracts and Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Related Agreements.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding, and any amendments, modifications or supplements thereto that is an executory contract pursuant to Section 365 of the Bankruptcy Code.

"Cure Amounts" means all amounts, costs and expenses (including real estate taxes) required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Current Employees" means all employees of Seller employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Decree" means any legally binding judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" means the sum of $290,000.00.

"Disclosure Schedule" has the meaning set forth in Article III.

"E-Commerce Platform" means the series of Software and hardware applications (and related services) integrated into and used in the operation of, and through which Seller or any of its respective Subsidiaries sells Inventory to consumers who place orders for such Inventory through websites (including www.compasscoffee.com (and similar permutations thereof) and any other websites used by Seller or any of its respective Subsidiaries and related internet or "app" based sales, marketing, advertising, and social media channels, including the Assigned Contracts and any Intellectual Property Licenses included in the Acquired Assets pursuant to which such Software and hardware applications (and related services) are owned or licensed by Seller or any of its respective Subsidiaries.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by Seller or for which Seller may have liability as being an ERISA Affiliate, or in which Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"Environmental Claim" means any action, order from a Governmental Entity, Lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification, and injunctive relief) arising out of, based on, or resulting from: (a) the presence, release of, or exposure to an Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means all federal, state, and local statutes, regulations, orders, rules, permits, licenses and ordinances (including common laws) concerning employee health and safety, pollution, and protection of human health or the environment, including, without limitation, the Clean Air Act; the Clean Water Act; the Resource Conservation Recovery Act; the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to Know Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Endangered Species Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the National Environmental Policy Act; and the Occupational Safety and Health Act, and the Hazardous Materials Transportation Act, and all similar state statutes and local ordinances, and all regulations promulgated under any of those statutes, and all administrative and judicial actions respecting such legislation, all as amended from time to time.

4

"Environmental Liabilities and Costs" means any Liabilities determined as a result of an order from a Governmental Entity and pursuant to an Environmental Law, in each case: (a) arising from or relating to any claim pursuant to an Environmental Law for death or personal injury, property damage, damage to the environment, or a release of Hazardous Material (whether based on negligent acts or omissions, statutory liability without fault or otherwise), in connection with the Business or the Acquired Assets or the activities or operations conducted on the Acquired Assets; (b) arising from or related to any remediation occurring pursuant to applicable Environmental Law; or (c) incurred by reason of the failure of the Business or Seller or the activities or operations conducted on the Acquired Assets pursuant to Environmental Law, including (i) any fines and penalties assessed, levied or asserted against the Business or Seller, or (ii) any Liabilities or other losses related to the installation of or repairs to equipment or facilities used by the Business or Seller.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equity Securities" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests or partnership interests.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with Seller within the meaning of Section 414(b) or (c) of the IRC (and Sections 414(m) and (o) of the IRC for purposes of provisions relating to Section 412 of the IRC).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means the Claims described in Section 2.2(l), Section 2.2(m) and Section 2.2(n), but expressly excluding the Assigned Causes of Action.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Taxes" means any and all: (i) Taxes of Seller or its Affiliates; (ii) Taxes imposed on or arising in connection with the Business, the Acquired Assets, the employees of Seller or its Affiliates, and any withholding Taxes, in each case for any Pre-Closing Tax Period or allocable or apportioned to the portion of a Straddle Period ending on the Closing Date as provided herein; (iii) Taxes arising from a breach of covenant of, agreement, representation or warranty of Seller in this Agreement; (iv) all deferred payroll Taxes and credits associated with wages paid or incurred of employees of Seller and Affiliates for any Pre-Closing Tax Period; (v) Taxes of another Person as a result of Treasury Regulation Section 1.1502-6 (or any similar state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise; (vi) Taxes described in Section 6.5(d), and Seller's share of Transfer Taxes determined in accordance with Section 6.5(a); and (vii) all Taxes arising from any bulk sale provisions, or failure of Seller to obtain, comply with, and deliver to Buyer any tax clearance or certificate of no tax due or similar document.

"Final Order" means an Order, judgment or other Decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, enjoined, set aside, annulled, suspended or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Former Employees" means all individuals who have been employed by Seller who are not Current Employees.

"GAAP" means United States generally accepted accounting principles.

"Gift Cards" means (a) prepaid balance cards (including single use set amount cards, if any) or prepaid wallet accounts or applications issued by Seller or by any entity that Seller contracted with that can be used or redeemed to purchase products of the Business, including but not limited to any card program Seller contracted with any entity, including but not limited to In-Kind or Ansa, and (b) cards to customers of the Business entitling such customers to discounts on purchases of products of the Business.

"Governmental Entity" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi- governmental power or authority.

"Hazardous Material" means: (i) those substances included within the statutory and/or regulatory definitions of "hazardous substance," "hazardous waste," "extremely hazardous substance," "regulated substance," "contaminant," "hazardous materials" or "toxic substances," under any Environmental Law; (ii) those substances listed in 49 C.F.R. 172.101 and in 40 C.F.R. Part 302; (iii) any material, waste or substance which is designated as a "hazardous substance" pursuant to 33 U.S.C. § 1321 or listed pursuant to 33 U.S.C. § 1317; (iv) any material, waste or substance designated, classified or regulated as a "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "pollution" under any Environmental Laws; and (v) such other substances, materials, or wastes that are or become classified or regulated under Environmental Laws including, but not limited to, petroleum (including crude oil, gasoline, and diesel oil), asbestos, asbestos containing material, toxic mold, radon, urea formaldehyde, polychlorinated biphenyls, and per- and polyfluoroalkyl substances (PFAS).

"Indebtedness" of any Person means, without duplication, (a) the principal of, interest on, and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Information Technology" means any computer hardware, Software, microprocessors, networks, handheld devices, electronic devices, hardware, middleware, servers, workstations, routers, hubs, switches, data communications lines, outsourced information technology arrangements and resources and all other information technology and communications assets and equipment used by the Business, and all associated documentation.

"Insider" shall have the meaning set forth in the Bankruptcy Code.

6

"<u>Intellectual Property</u>" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing, (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property, and (j) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"<u>Intellectual Property Assignment Agreement</u>" has the meaning set forth in <u>Section 2.8(a)(ii)</u>.

"<u>Intellectual Property Licenses</u>" means (i) any grant in writing to a third Person of any right to use any Intellectual Property owned by Seller and (ii) any grant in writing to Seller of a right to use a third Person's Intellectual Property rights, and in the case of each of the foregoing clauses (i) and (ii), the right to use any Intellectual Property shall include any co-existence agreements, covenants not to sue and any agreements of a similar nature relating to Intellectual Property.

"<u>Inventory</u>" means all of Seller's now owned and hereafter acquired raw materials, commodities and work-in-process therefor, and all of Seller's tangible property used in the operation of the Business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"<u>IRC</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Key Member</u>" means Michael Haft.

"<u>Knowledge</u>," with respect to Seller, means the actual or constructive knowledge of the Key Member.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation, order or Decree of any Governmental Entity.

"<u>Leased Real Property</u>" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Seller which is used in the Business or related to the Acquired Assets.

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which Seller holds any Leased Real Property.

"<u>Liabilities</u>" means any Indebtedness, liabilities, demands, deferred revenue, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto.

"<u>Lien</u>" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien (including but not limited to any mechanics liens, attorneys liens and construction liens), encumbrance, interest, reclamation demand or claim, charge, security interest (including but not limited to any purchase money security interest), put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, reclamation claim, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type, and the meaning ascribed to the term "lien" in the Bankruptcy Code.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Losses</u>" means losses, damages, Liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"<u>Material Adverse Effect</u>" means any state of facts, change, event, effect, development, condition, circumstance or occurrence (individually or when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the condition (financial or otherwise) or results of operations of the Acquired Assets (taken as a whole) or the Business or prospects of the Business; <u>provided</u>, <u>however</u>, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, which do not disproportionately affect Seller relative to other industry participants; (ii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; and (iii) resulting from any act of God, any pandemic or other force majeure event (including natural disasters).

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and that is subject to Title IV of ERISA, to which Seller or ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"<u>Ordinary Course of Business</u>" means the conduct by Seller in the Business consistent with past custom and practice.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Patents</u>" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"<u>Pension Plan</u>" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Seller or ERISA Affiliate or to which Seller or ERISA Affiliate contributes or has an obligation to contribute, or has made contributions at any time during the preceding six plan years.

"<u>Permit</u>" means any franchise, approval, permit, license, order, registration, certificate, variance, concession, authorization, grant, easement, consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"<u>Permitted Liens</u>" means: (a) Liens for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (b) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business; and (c) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Petition Date</u>" means January 6, 2026.

"<u>Pre-Closing Tax Period</u>" means a taxable period of Seller or an Acquired Asset that begins before and ends on or before the Closing Date.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Records</u>" means the books, records (including electronically stored files), information, ledgers, files, invoices, documents, work papers, correspondence (including emails), lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"<u>Rejected Contract</u>" has the meaning set forth in <u>Section 2.6(a)(ii)</u>.

"<u>Related Agreements</u>" means the Bill of Sale, the Intellectual Property Assignment Agreement and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Acquired Assets to Buyer.

"<u>Representative</u>" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" has the meaning set forth in Section 5.3(a).

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Case approving this Agreement pursuant to 11 U.S.C. 363 and conveying all Acquired Assets free and clear of all liens, claims and encumbrances to Buyer along with an assumption and assignment of the Assigned Contracts.

"Sale Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Sales Order, as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"Seller" has the meaning set forth in the preamble.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Stalking Horse Purchaser" has the meaning set forth in the Bidding Procedures.

"Straddle Period" means a taxable period that commences on or before the Closing Date and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means (a) any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, escheat, unclaimed property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed; and (b) any Liability for the payment of any amount of a type

10

described in clause (a) arising as a result of Treasury Regulation Section 1.1502-6 (or similar provision of state, local, or foreign Law), or as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto; and (c) any Liability of another Person for the payment of any amount of a type described in clause (a) or clause (b) as a result of being a transferee, successor, by Contract, or otherwise.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Technology</u>" shall mean any or all of the following (A) works of authorship including computer programs (whether source code or executable code, and whether embodied in software, firmware or otherwise), compilers, middleware, development tools, firmware, operating systems and specifications, platforms, interfaces, APIs, test specifications and scripts, architecture, documentation, designs, files and records, (B) inventions (whether or not patentable or reduced to practice), discoveries, and improvements, (C) proprietary and confidential information, trade secrets and know how, (D) database rights, databases, data compilations and collections, and technical data, whether or not machine readable, (E) internet domain names, applications and reservations therefor, and uniform resource locators and the corresponding internet websites (including any content and other materials accessible and/or displayed thereon), (F) tools, methods and processes, (G) all versions, updates, releases, patches, corrections, enhancements and modifications thereto and all documentation, developer notes, instructions, comments and annotations relating to any of the foregoing and (H) any and all embodiments of the foregoing in any form and embodied in any media.

"<u>Trademarks</u>" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"<u>Transfer Tax</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Treasury Regulation</u>" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.1.**    **Purchase and Sale of Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's direct or indirect, right, title and interest in, to and under all of Seller's tangible and intangible assets, properties and rights as of the Closing Date of whatever kind or nature and wherever situated or located, free and clear of all Liens (other than Permitted Liens), for the consideration specified in <u>Section 2.5</u>, in each case, expressly excluding all Excluded Assets (as defined below). All of such assets, properties and rights (other than the Excluded Assets) of Seller are collectively referred to in this Agreement as the "<u>Acquired Assets</u>." For the avoidance of doubt, the Acquired Assets shall include all of Seller's assets located at the Leased Real property, whether such Leases will be assumed or rejected by Buyer herein. Without limitation of the foregoing, the Acquired Assets shall include all of Seller's right, title and interest in, to and under the following assets as of the Closing Date:

11

(a)    all items of equipment ("Equipment"), machinery, supplies, furniture and furnishings owned by Seller as of the Closing, including, but not limited to, those items set forth on Schedule 2.1(a), to the extent owned by Seller as of the Closing (it being understood that Schedule 2.1(a) has been prepared in good faith based on Seller's books and records, is not based on a current physical inventory count, does not purport to be complete or accurate in all respects, and may be over-inclusive or under-inclusive with respect to such items) *provided, that* all Equipment marked in red on Schedule 2.1(a) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets;

(b)    all Inventory of Seller as of the Closing, and all rights of Seller to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)    all security deposits for rent, electricity, telephone, utilities for Assumed Leases, or otherwise related to the Acquired Assets and other prepaid charges and expenses of Seller relating to the Acquired Assets, including but not limited to all such deposits set forth on Schedule 2.1(c);

(d)    all Assigned Contracts (including but not limited to any Assumed Leases) set forth on Schedule 2.1(d)[2];

(e)    to the extent that such Lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a Lease (and any agreement related thereto) for a Leased Real Property, in each case together with all interests in and to all leasehold improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(f)    [Reserved];

(g)    all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by Seller or any Subsidiary thereof and all owned Software and Technology;

(h)    all customer data and information derived from any purchases at physical locations of the Business, through the E-Commerce Platform or through any other platform or branded loyalty promotion programs, provided such information is owned by Seller and solely to the extent permitted by the Bankruptcy Code and applicable Law, and subject to Buyer's commitment to use such customer and data consistent with Seller's contractual obligations and respective privacy policies or notices in effect at the time of collection of such information;

(i)    servers, offsite and backup storage, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of Seller in whatever media retained or stored, including computer programs and disks, in each case used in, held for use in, or relating to the Acquired Assets or the Assumed Liabilities, including files in the possession of or under the control of Seller;

(j)    all Intellectual Property owned by Seller and all of Seller's rights to use other Intellectual Property, including but not limited to the Intellectual Property set forth on Schedule 2.1(j); *provided that*, all Intellectual Property under the header "Sell at Auction" on Schedule 2.1(j) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets;

---

[2] Schedule 2.1(d) sets forth a listing of all leases and executory contracts which Buyer may assume at the Closing. Pursuant to the Bidding Procedures Order and as described in the Bidding Procedures Motion, the Buyer has the right to supplement or delete any lease or executory contract set forth on Schedule 2.1(d) up to two (2) Business Days prior to the Closing.

(k)      all Information Technology systems;

(l)      all Records related to the Acquired Assets and Assumed Liabilities, other than Records related to income Taxes of Seller, copies of which, however, shall be provided to Buyer upon request;

(m)      all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Seller and all rights under any Confidentiality Agreements to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(n)      all royalty payments and licensing receivables generated in connection with the Intellectual Property Licenses attributable to the period from and after the Closing;

(o)      any Intellectual Property Licenses granted by Seller or its respective Subsidiaries to third parties;

(p)      all of the Assumed Permits or all of the rights and benefits accruing under any Permits, as set forth on Schedule 2.1(p);

(q)      the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets or (ii) any Assumed Liabilities;

(r)      except for the Excluded Claims, all causes of action, lawsuits, settlements, awards, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related to the Acquired Assets, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law, including, without limitation, all Assigned Causes of Action;

(s)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by, or provided to, Seller or to the extent related to the Acquired Assets;

(t)      all prepaid assets;

(u)      all accounts receivable and rights to payment for any product orders that have not been delivered and fulfilled as of the Closing;

(v)      all of Seller's rights of publicity and all similar rights, including all commercial merchandising rights;

(w)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts, profiles, pages, feeds, registrations and other online presences owned or purported to be owned by Seller (and usernames and passwords associated with the foregoing); and

(x)      all internet domain names owned by Seller, including but not limited to those set forth on Schedule 2.1(x); *provided that*, all internet domain names under the header "Sell at Auction" on Schedule 2.1(x) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets.

13

Notwithstanding anything herein to the contrary, Buyer may, from time to time remove any Acquired Asset from this <u>Section 2.1</u> in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.2.** **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer; Buyer hereby disclaims all liability or responsibility with respect to any of the Excluded Assets; and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of the following items and assets:

(a)      all Accounts Receivable as of the Closing;

(b)      Seller's certificate of formation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of Seller as a limited liability company;

(c)      all Equity Securities of Seller and any of its Subsidiaries;

(d)      all executory contracts and unexpired leases that are not Assigned Contracts;

(e)      all Rejected Contracts;

(f)      any personnel and medical Records pertaining to any Current Employees or Former Employees, (2) other Records that Seller is required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Case that are protected by the attorney-client privilege;

(g)      all Permits other than the Assumed Permits;

(h)      all directors' and officers' liability insurance policies;

(i)      the rights of Seller under this Agreement and all cash and non-cash consideration payable or deliverable to Seller under this Agreement;

(j)      all cash and cash equivalents of Seller;

(k)      any credit card numbers or related customer payment source, social security numbers or other personal identifiers;

(l)      any Seller employee benefit plan, including but not limited to any equity incentive and other long-term incentive plans and grants thereunder and, if applicable, any funding arrangements related thereto;

(m)      all Tax records related to income Taxes of Seller, subject to Buyer's rights under <u>Section 2.1(k)</u> and <u>Section 6.5(b)</u>;

(n)      any unused retainers paid by Seller to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same other than deposits for the Assigned Contracts or Acquired Assets;

(o)      any Avoidance Action of Seller;

(p)      any Claims and causes of action of Seller against any of its directors, shareholders, officers, members, managers, Insiders, or Affiliates other than as set forth in this Agreement;

(q)      all Equipment, Intellectual Property, and internet domain names expressly designated as Excluded Assets as provided in Section 2.1 above; and

(r)      any Claims of Seller solely to the extent arising in respect of any of the Excluded Assets listed in (a)-(q) listed above, and excluding the Assigned Causes of Action or any Acquired Assets.

**Section 2.3.**    **Assumption of Assumed Liabilities**. Other than all Liabilities in respect of the Acquired Assets arising from the period commencing on or after the Closing (the "<u>Assumed Liabilities</u>"), Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created (including such Liabilities relate to or arise from any breach of contract, tort or violation of Law occurring prior to the Closing).

**Section 2.4.**    **Excluded Liabilities.** Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>"). For the avoidance of doubt and without limiting the generality of the foregoing, all of the following shall be Excluded Liabilities:

(a)      all Cure Amounts;

(b)      the Lien Payoff Amount;

(c)      the DIP Payoff Amount;

(d)      all Liabilities related to the Business as of the Closing (other than the Assumed Liabilities);

(e)      Excluded Taxes;

(f)      all Liabilities of Seller relating to the negotiation, execution and consummation of the Contemplated Transactions, including legal services, accounting services, financial advisory services, investment banking services or any other professional services ("<u>Professional Services</u>") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

(g)      all Liabilities of Seller relating to or arising from any breaches or defaults under the Assigned Contracts that are required to be cured pursuant to Sections 363 and 365(b) of the Bankruptcy Code so that the Assigned Contracts may be assigned to Buyer;

(h)     all Liabilities of Seller relating to or arising from any collective bargaining agreement, Multiemployer Plan or Pension Plan, if any;

(i)     any Liability arising out of any employee benefits or employee benefit plan (as defined in ERISA) maintained at any time by Seller or any Seller Affiliate, or to which any of the foregoing has ever made any contributions, if any;

(j)     all Liabilities related to the WARN Act, to the extent applicable, with respect to Seller's termination of employment of Sellers' or any of their respective Affiliates' employees on or prior to Closing;

(k)     any claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, right of set-off, rights of subrogation and all other rights of any kind, in each to the extent arising from the Excluded Assets or the Excluded Liabilities;

(l)     all Liabilities of Seller or any of its predecessors to their respective equity holders, partners, founders or members respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise and any Liability of Seller in any non-assigned contract;

(m)     all Liabilities of Seller relating to escheat or unclaimed property obligations arising from the ownership or operation of the Business or the Acquired Assets prior to Closing, including any such Liabilities;

(n)     all Liabilities of Seller or any of its Affiliates associated with any and all Indebtedness, including guarantees of third party obligations and reimbursement obligations to guarantors of Seller's obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred with Seller's affiliates;

(o)     all Liabilities arising out of or relating to any business or property currently or formerly owned or operated by Seller, any Affiliate or predecessor thereof, whether or not presently owned and operated by Seller (other than the Assumed Liabilities);

(p)     all Liabilities relating to any construction project(s) including for any reclamation, construction, mechanics or other Liens (except for Permitted Liens);

(q)     all Liabilities relating to any employee, independent contractor or agent of Seller;

(r)     all Liabilities relating to: (i) any payments or entitlements to any current or former employees, officers, directors, members, partners or consultants of the Business, including wages, other remuneration, holiday or vacation pay, bonus, change of control, retention, key employee incentive plan payments, key employee retention plan, ownership rights, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions, insurance premiums and taxes; (ii) ERISA Affiliate Liability; (iii) any Liability of any Current Employee or other Former Employee or independent contractor of Seller; (iv) any obligation, Liability or expense relating to any collective bargaining agreement or union agreement, including without limitation any withdrawal liability with respect to any Multiemployer Plan (whether or not yet asserted), if any; (v) any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of Sellers accrued or deferred as permitted under Section 2303 of the Coronavirus Aid, Relief and Economic Security Act of 2020 that otherwise would have been required to be deposited and paid in connection with amounts paid to such Person at any time on or prior to the Closing; (vi) any Liability with respect to Seller's defined benefit Pension Plans or retiree medical or retiree life insurance

16

plans or arrangements, if any; and (vii) any obligation, Liability or expense relating to or arising out of the employment practices of Seller or any of its Affiliates in connection with or related to the Business occurring prior to the Closing, including any violations of Seller or its Affiliates of any labor or employment agreement in connection with or related to the Business;

(s)     other than the payments to be made at the Closing pursuant to this Agreement, any Liability relating to any loan or obligation owed or related to the SBA, Paycheck Protection Program, Economic Impact Dister Loan, Restaurant Revitalization Fund or other loan, grant or other funding received from any local, state or federal agency or authority by Seller;

(t)     all accounts payable of Seller or any of its predecessors, Affiliates or assigns;

(u)     all Liabilities for any rent or costs related to any Acquired Assets that arose after the Petition Date through the Closing, including but not limited to any rent or other affiliated costs related to any Assumed Leases set forth on Schedule 2.1(d) that are designated to be assumed and assigned to Buyer;

(v)     all Liabilities of Seller or any of its Affiliates or predecessors arising out of any contract, permit or claim that is not transferred to Buyer hereunder;

(w)     all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing by a Seller;

(x)     all Liabilities of Seller under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities);

(y)     all Liabilities of Seller incurred in connection with, or related to, the administration of the Chapter 11 Case, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Chapter 11 Case;

(z)     all Liabilities relating to or arising out of honoring any Gift Cards issued by Seller before the Closing and presented to Buyer or its Affiliates for redemption after Closing, which shall be disclosed in full by Seller to Buyer on Schedule 2.4(z), other than any Liabilities related to any Assigned Contract;

(aa)     all Liabilities of Seller with regard to any branded loyalty promotional programs, contracts or accounts which do not become Assigned Contracts;

(bb)     all Liabilities of Seller to any supplier, vendor, former or current employee, founder, member or customer of Seller;

(cc)     all Liabilities to or relating to any property, store, owner, contractor, subcontractor supplier, vendor or other party related to any construction, sub-contracting or other work performed or administered by the Seller;

(dd)     any Environmental Liabilities and Costs or any Liability arising from or related to any Environmental Claim which relates to operations conducted under prior ownership, or the period prior to the Closing;

(ee)     any Liability for the Stored Equipment as defined in Section 9.8 herein; and

17

(ff)    without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Seller or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by Buyer pursuant to the provisions of Section 2.3.

**Section 2.5.    Purchase Price**.

(a)    Consideration. In consideration of the sale of the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets shall be composed of the following: (i) a cash payment of $4,550,000.00 (the "Cash Purchase Price"), subject to Section 2.5(c) below; (ii) the negotiated waiver by landlord of the payment of any rent for the post-petition period of January 6, 2026, through February 28, 2026 for the property located at 1401 Okie St NE Washington, DC 20002; and (iii) the assumption by Buyer of the Assumed Liabilities (together, the "Purchase Price"). For the avoidance of doubt, the Cash Purchase Price shall never exceed a cash payment of $4,550,000.00; provided, however, that Buyer may (i) be subject to additional and separate pro-rated rental costs and expenses as set forth in Section 2.6(a)(iii) and/or (ii) increase the Purchase Price through the Bidding Procedures approved by the Bankruptcy Court.

(b)    Purchase Price Deposit. Within three (3) Business Days after the execution of this Agreement, Buyer shall transfer cash in an amount equal to the Deposit to Seller, in the form of a wire transfer, certified check, or cash, pursuant to instructions to be provided by Seller, and which will be deposited into a segregated Seller-owned bank account designated as a "debtor-in-possession" account to be held by Seller, in escrow, and not utilized for any other purpose, in accordance with the Bidding Procedures, and reserved for distribution as follows:

(i)    In connection with the Closing, the Deposit shall be paid to Seller; or

(ii)    If this Agreement is terminated pursuant to Section 8.1 (except by Seller pursuant to (A) Section 8.1(b) (due to Buyer's failure to perform or comply with the terms of under this Agreement), (B) Section 8.1(d), or (C) Section 8.1(h)), the Deposit shall be returned to Buyer within three (3) Business Days of such termination.

(c)    Cash Purchase Price Payment.

(i)    At the Closing, Buyer shall use that portion of the Cash Purchase Price sufficient to pay off:

(a)    first, (X) all Cure Amounts, by wire transfer of immediately available funds to the applicable counterparties to the Assigned Contracts that Buyer has designated as Assigned Contracts as of the Closing (such total Cure Amounts, the "Closing Date Cure Amount"), and (Y) any and all liens secured by the Acquired Assets, as set forth on Schedule 2.5(c)(i)(a), but explicitly *not* to include any obligations under any court approved Debtor-in-Possession financing issued as part of the Chapter 11 Case (collectively, the "Lien Payoff Amount"); and

(b)    second, to the extent the Cash Purchase Price has not been fully exhausted by the obligations in Section 2.5(c)(i)(a) above, any and all liens secured by any court approved Debtor-in-Possession financing issued as part of the Chapter 11 Case (the "DIP Payoff Amount").

(ii)    At the Closing but only after all of the obligations in Section 2.5(c) have been satisfied to Buyer's satisfaction and to the extent any portion of the Cash Purchase Price remains payable, Buyer shall deliver cash in an amount equal to the Cash Purchase Price *less* the Deposit *less* the

18

Closing Date Cure Amount *less* the Lien Payoff Amount *less* the DIP Payoff Amount by wire transfer of immediately available funds to Seller (the "Net Closing Date Cash Amount").

**Section 2.6.     Assumption and Assignment of Contracts**.

(a)     Assignment and Assumption at Closing.

(i)     Schedule 2.6(a)(i) sets forth a list of all Contracts that Buyer has selected which may become Assigned Contracts if so designated by Buyer, together with estimated Cure Amounts for each such Contract. Buyer may delete any Contract set forth on Schedule 2.6(a)(i) up to two (2) Business Days prior to the Closing.

(ii)     At Closing, (x) Seller shall, pursuant to the Sale Order, the Bill of Sale and any other transfer and assignment documents requested by Buyer, assume (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assign to Buyer (the consideration for which is included in the Purchase Price) each of the Assigned Contracts so designated by Buyer as of the Closing, and (y) Buyer shall pay the Closing Date Cure Amount in connection with such assumption and assignment out of the Purchase Price, and such Assigned Contracts shall be "Assigned Contracts" for all purposes under this Agreement.

(iii)     Seller shall be solely responsible for and pay all rent and costs of the Assigned Contracts (including but not limited to any Assumed Leases) through the Closing Date, *provided that*, to the extent applicable, Buyer will reimburse Seller for the prorated portion of the March 2026 monthly-rent payments of the Assumed Leases.

(b)     Assigned Contracts.

(i)     At the Closing, Seller shall promptly cause all of its Contracts which have not been assumed and assigned to Buyer and which have not previously been rejected, to be rejected pursuant to Section 365 of the Bankruptcy Code at or as soon after Closing as practicable.

(ii)     Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assigned Contracts to Buyer at Closing without the need for obtaining consents to such assignments unless required under the terms of such Assigned Contracts, in which case Seller shall use commercially reasonable efforts to obtain such required consents in writing. In the event Seller is unable to assign any such Assigned Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from any Governmental Entities and third parties necessary to assume and assign such Assigned Contracts to Buyer. Notwithstanding anything to the contrary in this Agreement, nothing herein shall require the Seller to pay more than the Cure Amount in exchange for such consents.

(iii)     All Assigned Contracts must be assigned to Buyer no later than March 6, 2026, unless extended or waived in writing by Buyer and Seller.

**Section 2.7.     Closing**. The closing of the Contemplated Transactions (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing on the date (the "Closing Date") that is the first Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Seller and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto. The Closing shall be deemed to have

occurred at 11:59 p.m. (prevailing Eastern time) on the Business Day prior to the Closing Date. Unless waived in writing by Buyer and Seller, the Closing must take place on or prior to March 6, 2026.

Section 2.8.    **Deliveries at Closing**.

(a)    At the Closing, Seller shall deliver or cause to be delivered to Buyer the following documents and other items, duly executed by Seller, as applicable:

(i)    a Bill of Sale, Assignment and Assumption Agreement substantially in the form of Exhibit A attached hereto (the "Bill of Sale");

(ii)    an Intellectual Property Assignment Agreement substantially in the form of Exhibit B attached hereto for each registered Patent, Trademark, registered copyright, license, and domain name, respectively, transferred or assigned hereby and for each pending application therefor (the "Intellectual Property Assignment Agreement"); *provided that*, to the extent certain Trademarks of Seller cannot be assumed and assigned under Law, Seller shall then retire and surrender any such Trademarks related to the Business to the satisfaction of Buyer;

(iii)    a duly executed non-foreign affidavit from Seller, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that Seller is not a "foreign person" as defined in Section 1445 of the IRC;

(iv)    the officer's certificate required by Section 7.1(m);

(v)    a copy of the Sale Order entered on the docket of the Chapter 11 Case;

(vi)    evidence reasonably satisfactory to Buyer that all consents, approvals or novations, as applicable, listed on Schedule 2.8(a)(vi), have been received, including that executed counterparts of any such consents, approvals or novations have been delivered to Buyer; and

(vii)    any other customary business documents requested by Buyer to enable the Closing.

(b)    At the Closing, Buyer shall deliver to Seller, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)    the Bill of Sale;

(ii)    evidence satisfactory to Seller of the waiver by landlord of the payment of any rent for the post-petition period of January 6, 2026, through February 28, 2026 for the property located at 1401 Okie St NE Washington, DC 20002;

(iii)    the Net Closing Date Cash Amount by wire transfer of immediately available funds to one or more bank accounts designated by Seller in writing to Buyer; and

(iv)    the officer's certificate required by Section 7.2(e).

Section 2.9.    **Allocation.** The Parties agree and intend that the transactions contemplated herein are intended to constitute a taxable asset acquisition for federal and state income Tax purposes and not as any "reorganization" within the meaning of Section 368 of the IRC. Within thirty (30) calendar days after

the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all Assumed Liabilities, capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) and the methodology set forth on <u>Schedule 2.9</u>, substantially in the form set forth therein (the "<u>Allocation</u>"). Seller shall have thirty (30) days following receipt of Buyer's proposed Allocation to review and comment on such proposed Allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Seller with Buyer's final Allocation. Buyer and Seller shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation and this <u>Section 2.9</u>. Neither Buyer nor Seller shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with this <u>Section 2.9</u> unless required to do so by a "determination" within the meaning of Section 1313 of the IRC to the contrary.

**ARTICLE III**
**SELLER'S REPRESENTATIONS AND WARRANTIES.**

Seller represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"):

**Section 3.1.    <u>Organization of Seller; Good Standing.</u>**

(a)    Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Seller has all requisite limited liability power or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted. Compass Coffee Corporation, an Indiana corporation, is not an Affiliate of Seller.

(b)    Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2.    <u>Authorization of Transaction.</u>** Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    Seller has all requisite limited liability power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by Seller and no other corporate action on the part of Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement has been duly and validly executed and delivered by Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Seller is a party will have been duly and validly executed and delivered by Seller. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related

21

Agreement to which Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Seller, enforceable against Seller in accordance with such Related Agreement's terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3.    **Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Assignments and Assumptions Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents of Seller, or (ii) violate any Law to which Seller is, or its assets or properties are, subject, in the case of clause (ii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4.    **Title to Acquired Assets.** Seller, as of the Closing, shall have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (other than Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6, Seller will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, to the fullest extent permissible under section 363(b) of the Bankruptcy Code and applicable non-bankruptcy law, free and clear of all Liens (other than Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

Section 3.5.    **Contracts.**   To the knowledge of Seller, no Contract (i) deviates in any material respect from the samples provided to Buyer, (ii) includes a "most favored customer" or similar restriction or (iii) includes a liquidated damages provision. Seller has delivered or made available to Buyer any and all material amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement in connection with such exemplary contracts. Seller has identified to Buyer the Cure Amounts (listing separately both pre-petition and post-petition amounts) with respect to such Contracts. Seller has provided timely and proper written notice of the Sale Motion, which includes the procedures for the assumption and assignment of Contracts, to all parties to Assigned Contracts and all other parties in interest and all individuals and entities that Buyer requested be served with the Sale Motion and proposed Sale Order.

Section 3.6.    **Real Property.** Seller does not own any real property. Seller has provided to Buyer true and complete copies of all default notices and any other correspondence of a material nature to or from any party to any lease, ground lease, sublease or license relating to the Leased Real Property.

Section 3.7.    **Intellectual Property.**

(a)    Except as set forth on Section 3.7(a)(i) of the Disclosure Schedule, (i) with respect to any Intellectual Property owned by Seller (as opposed to any Intellectual Property Licenses of which such Seller is a licensee), to the Knowledge of Seller, Seller has all right, title and interest to all such Intellectual Property, (ii) to the Knowledge of Seller, no Person other than Seller has the right to use the Intellectual Property owned by Seller and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in the Business that is owned by a party other than Seller. Section 3.7(a)(ii) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all registered and applied for Intellectual Property owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

22

(b)      Section 3.7(b) of the Disclosure Schedule sets forth all Intellectual Property Licenses denoting if Seller is the licensor or licensee.

Section 3.8.    **Information Technology.** Except as set forth on Section 3.8 of the Disclosure Schedule: (a) no notice of any material defect has been sent or received by Seller in respect of any Permits or lease under which Seller receives Information Technology; (b) all of the Information Technology owned by Seller is held by Seller as sole, legal and beneficial owner and is held free of all Liens or any other similar third party rights or interests, other than Permitted Liens; (c) the records, systems, controls and/or data used by Seller are recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by third parties with whom Seller has contracted for such services (including holding through electronic, mechanical or photographic process whether computerized or not); and (d) to the Knowledge of Seller, Seller has taken commercially reasonable precautions to protect the integrity and security (both logical and physical), as applicable, of the Information Technology and Technology from any unauthorized use, access, interruption or modification by any other Person. To the Knowledge of Seller, the Information Technology, including the Technology, shall (i) operate and run in a commercially reasonable business manner, and (ii) conform in all material respects to the Business or customer specifications thereof. None of the Information Technology has materially malfunctioned or failed in any manner that materially and adversely impacted customer-facing capabilities within the past three (3) years.

Section 3.9.    **Permits.** Section 3.9(i) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits issued to Seller for the operation of the Business. Section 3.9(ii) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits applied for by Seller or the issuance of which to Seller is pending. Seller represents and warrants that such approvals are in full force and effect and have not been limited, revoked or modified in any manner. Section 3.9(iii) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits required for the operation of the Business and the Acquired Assets which have not been issued to Seller or applied for by Seller or the issuance of which to Seller is not pending.

Section 3.10.    **Employee Benefit Plans.** Except as set forth on Section 3.10 of the Disclosure Schedule, Seller is not a participant in any  Employee Benefit Plans.

Section 3.11.    **Labor Relations.** Except as set forth on Section 3.11 of the Disclosure Schedule, (a) Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization, and (b) Seller has not received written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any state labor board, and, to the Knowledge of Seller, no such petition has been threatened, and, to the Knowledge of Seller, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing. Seller is not subject to any material unfair labor practice charge.

Section 3.12.    **Environmental Matters.** Except as set forth on Section 3.12 of the Disclosure Schedule, to the Knowledge of Seller, the Acquired Assets are in material compliance with all applicable Environmental Laws. Except as set forth on Section 3.12 of the Disclosure Schedule, since January 1, 2022 Seller has conducted the Business and its operations in accordance with all Environmental Laws applicable to Seller and the Business. Since January 1, 2021, Seller has not received written notice of any violation, investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to the Knowledge of Seller, are any of the same being threatened in writing against Seller. Seller holds, and to the Knowledge of Seller, is in compliance in all material respects with, all Permits required under applicable Environmental Laws (each of which is listed in Section 3.12 of the Disclosure Schedule) to operate at the Acquired Assets and to carry on its respective businesses as now conducted and, to the Knowledge of Seller, there are no material capital expenditures

23

required to maintain or achieve such compliance in all material respects. Seller has not received any written notice of, or entered into, any obligation, Order, settlement, judgment, injunction, indemnity, or Decree involving outstanding requirements relating to or arising under Environmental Laws, nor are Seller a party to any settlement agreement pertaining to matters arising under Environmental Laws. Seller has provided to Buyer any and all material environmental reports, surveys, studies, audits and other similar documents in Seller possession with respect to the Business and the Acquired Assets.

Section 3.13. **Insurance.** Seller maintains the insurance policies set forth on Section 3.13 of the Disclosure Schedule, which sets forth all insurance policies covering the Acquired Assets. Such policies are in full force and effect. Seller has paid all premiums on such policies due and payable prior to the date hereof. To the Knowledge of Seller, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

Section 3.14. **Related Party Transactions.** Except as set forth on Section 3.14 of the Disclosure Schedule, no current or former equity holder, officer, director, employee, member, manager, managing member or Affiliate of Seller, or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns or has any interest in, has any ownership or right, title or other interest in any of the Acquired Assets, tangible (real or personal) or intangible property or assets of or used by, is a party to any Contract with, or performs any services for, or on behalf of, or provides any group purchasing benefits to or with respect to, Seller.

Section 3.15. **No Brokers or Finders.** No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of Seller in connection with the negotiation, execution or performance of this Agreement or the Contemplated Transactions is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which Buyer could become liable or obligated to pay.

Section 3.16. **Litigation; Proceeding.** Except as set forth in Section 3.16 of the Disclosure Schedule, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Knowledge of Seller, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Entity, nor are there any investigations relating to Seller or the Business, pending or, to Knowledge of Seller, threatened by or before any arbitrator or any Governmental Entity. None of the Acquired Assets is subject to any judgment, injunction, Order, consent, or Decree of any Governmental Entity or any arbitration award or settlement agreement with any Person.

Section 3.17. **Compliance with Laws.** Except as set forth on Section 3.17(i) of the Disclosure Schedule, since January 1, 2021, to the Knowledge of Seller, Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits (exclusive of Tax law compliance to the extent disclosed in Section 3.17(i) of the Disclosure Schedule) in all material respects, and (ii) holds all Permits necessary for the lawful conduct of the Business by Seller. Except as set forth on Section 3.17(ii) of the Disclosure Schedule, Seller has not received any written notice or other written communication from any Governmental Entity or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (y) notifying Seller of the non-renewal, revocation or withdrawal of any Permit. Seller is in material compliance with the terms of the Permits.

Section 3.18. **Taxes.**

(a)    Except as set forth on Section 3.18(a) of the Disclosure Schedule, all Tax Returns with respect to the Business or the Acquired Assets required to be filed for any Tax period ending on or before the Closing Date have been timely filed. Such Tax Returns are true, complete, and correct in all

24

material respects. All Taxes due and owing by Seller or with respect to the Acquired Assets or the Business (whether or not shown on any Tax Return) have been timely paid;

(b)      Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, member, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law;

(c)      No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller or relating to the Acquired Assets or the Business;

(d)      Except as set forth on Section 3.18(d) of the Disclosure Schedule, all deficiencies asserted, or assessments made, against Seller or relating to the Acquired Assets or the Business as a result of any examinations by any Taxing authority have been fully paid;

(e)      Seller is not a party to any Litigation by any Taxing authority. There is no pending or, to the Knowledge of Seller, threatened Litigation by any Taxing authority;

(f)      Except as set forth on Section 3.18(f) of the Disclosure Schedule, no claim has been made by any Taxing authority in a jurisdiction in which Seller do not file Tax Returns that a Seller is or may be subject to taxation by that jurisdiction;

(g)      Seller is not a party to any Tax allocation or sharing agreement applicable to the Business or the Acquired Assets other than such agreements entered into by Seller in the Ordinary Course of Business, the primary purpose of which does not relate to Taxes;

(h)      Seller has not been a member of an affiliated, combined, consolidated or unitary Tax group filing a consolidated, unitary or combined Tax Return. Seller has no Liability for Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign Law), as transferee or successor, by Contract or otherwise;

(i)      Seller is not subject to any private ruling of the Internal Revenue Service or comparable ruling of other Taxing authorities with respect to the Acquired Assets or the Business;

(j)      To the Knowledge of Seller, Seller does not have any Liability for Taxes pursuant to any Assigned Contract;

(k)      The Acquired Assets do not include any stock or other equity interests in any Person, including for these purposes any interest in a "disregarded entity" described in Treasury Regulation Section 301.7701-3;

(l)      None of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the IRC;

(m)      Except as set forth on Section 3.18(m) of the Disclosure Schedule, there are no Liens for any Tax on the Acquired Assets, except for Taxes not yet due and payable nor, to the Knowledge of Seller, is any Taxing authority in the process of imposing any Liens for Taxes on any of the Acquired Assets (other than for current Taxes not yet due and payable);

(n)      Seller is not a foreign person as defined in Section 897 of the IRC; and

(o)     None of the Acquired Assets is a "United States real property interest" within the meaning of Section 897 of the IRC.

**Section 3.19.**    <u>**Discontinuance of Seller Operations**</u>. The Seller will sell, liquidate or abandon all of its assets in the Bankruptcy proceeding and permanently discontinue its business operations (subject to the Fiduciary Out (as defined below)).

# ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as follows:

**Section 4.1.**    <u>**Organization of Buyer.**</u> Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its assets and to carry on the Business as now being conducted.

**Section 4.2.**    <u>**Authorization of Transaction.**</u>

(a)     Buyer has full corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)     The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other corporate action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)     This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Seller, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Seller, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3.**    <u>**Adequate Assurances Regarding Executory Contracts.**</u> As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and, subject to section 365(c), 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**Section 4.4.**    <u>**Good Faith Purchaser.**</u> Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 4.5.**    <u>**Brokers' Fees.**</u> Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Seller could become liable or obligated to pay**.**

Section 4.6.    **Financial Capacity.** Buyer (a) has, and at all time through the Closing will have, the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

Section 4.7.    **Condition of Assets.** Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Seller (including its directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other Representatives) makes no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition, value or otherwise of any of the Acquired Assets. Except for the representations and warranties contained in Article III (as qualified, amended, supplemented and modified by the Disclosure Schedule), Buyer will accept the Acquired Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1.    **Certain Efforts; Cooperation.**

(a)    Each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2. Without limiting the generality of the foregoing, each of the Parties shall use commercially reasonable efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

(b)    On and after the date hereof, Seller and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Seller and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Seller's right, title and interest to the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order). For the avoidance of doubt, prior to the Closing, at no material cost to Seller, Seller shall use commercially reasonable efforts to support Buyer's efforts to facilitate the transition of the Acquired Assets to the Buyer. Such support shall include, but is not limited to, Seller providing information and data reasonably requested by Buyer and participating in teleconference calls with third party providers that may be required to transition the Acquired Assets.

Section 5.2.    **Notices and Consents.**

(a)    To the extent required by the Bankruptcy Code, Bankruptcy Rules (Federal and Local) or the Bankruptcy Court, Seller shall give any notices to third parties, including notices of Buyer's Sale Motion and assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code consistent with this Agreement.

(b)    Seller and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

Section 5.3.    **Bankruptcy Actions.**

(a)    Upon the execution of this Agreement, Seller shall select Buyer as the Stalking Horse Purchaser in accordance with, and subject to the requirements of, the Bidding Procedures and Bidding Procedures Order.

(b)    The final Sale Order shall be provided to Buyer prior to filing in the Bankruptcy Court and shall include reasonable provisions requested by Buyer prior to the filing. Consent of Buyer to the proposed Sale Order is required prior to filing.

(c)    Seller shall provide timely and proper written notice of the Sale Motion, "Stalking Horse Selection Notice" and any cure notice upon all known lien holders, creditors, landlords, suppliers, vendors, applicable governmental and regulatory agencies, the U.S. Small Business Administration, state, local and federal taxing authorities and all interested parties required to be served under the Bankruptcy Code and the Federal and Local Bankruptcy Rules. In addition, Seller shall serve the Sale Motion, "Stalking Horse Selection Notice," Sale Order and any cure notice on any other individual or party as may be requested by Buyer.

(d)    Seller shall provide timely and proper written notice to all parties to Assigned Contracts and all other parties in interest and will take all other actions necessary to cause all Assigned Contracts to be assumed by Seller (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assigned to Buyer, provided that the only Contracts to be actually assumed and assigned to Buyer at or after Closing will be the Assigned Contracts pursuant to this Agreement.

(e)    If the Break-Up Fee becomes payable, then Seller shall make the Break-Up Fee payment at the closing of the Alternate Transaction.

(f)    If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights otherwise arising from this Agreement, Seller shall use commercially reasonable efforts to prosecute such appeal, petition or motion and seek to obtain an expedited resolution of any such appeal, petition or motion.

Section 5.4.    **Preservation of Acquired Assets**. Except as may have been authorized or approved by the Bankruptcy Court, as set forth on Schedule 5.4 attached hereto or as agreed to in writing

by Buyer (which agreement shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing:

(a)     Seller shall: (i) operate the Business in all material respects substantially the same manner as conducted as of the date of this Agreement and only in the Ordinary Course of Business; and (ii) preserve in all material respects the Acquired Assets;

(b)     Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than the sale of Inventory in the Ordinary Course of Business; provided, however, that Seller may dispose of obsolete, worn-out or immaterial assets in the Ordinary Course of Business with Buyer's consent;

(c)     Seller shall not, directly or indirectly, knowingly permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or Encumbrance (other than Permitted Liens);

(d)     Seller shall not, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in or constitute a material breach of any representation or warranty (as if then made) or covenant made by Seller in this Agreement;

(e)     Seller shall notify Buyer promptly in writing of the occurrence of any Material Adverse Effect;

(f)     Seller shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(g)     Seller shall not purchase any other assets, including Inventory, other than in the Ordinary Course of Business unless the price of any single transaction or series of transactions shall exceed 130% of such transaction(s)' historical cost, in which case Buyer's written consent is required;

(h)     Seller shall not, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Acquired Asset;

(i)     Seller shall not, directly or indirectly, reject, terminate, amend or modify in any manner any Contract for Leased Real Property that has been identified to be assumed and assigned to Seller;

(j)     Seller shall use commercially reasonable efforts to assist Buyer in obtaining all consents or approvals prior to the Closing that are required, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Buyer any Assigned Contract or Permit;

(k)     Seller shall use commercially reasonable efforts to assist Buyer in obtaining all Permits required to own or operate the Acquired Assets under applicable Laws, including making filings with the Governmental Entity;

(l)     Seller shall maintain in full force and effect each Permit held by Seller as of the date of this Agreement or otherwise obtained by Seller prior to the Closing, Seller shall comply with, in all material respects, the terms of each such Permit and Seller shall not permit any such Permit to terminate, expire or lapse; provided, however, that any failure to maintain a Permit that is promptly cured or that does not have a Material Adverse Effect shall not constitute a breach of this Section;

(m)    Seller shall maintain in full force and effect without modification any insurance policy with respect to Acquired Assets in all material respects, Seller shall comply with, in all material respects, the terms of such insurance policy and Seller shall not permit any such policy to terminate, expire or lapse; and

(n)    Commencing at 5:00 pm Eastern Time on January 30, 2026, Seller shall not issue any Gift Cards, allow any value to be loaded or re-loaded onto any Gift Cards, or replace lost or stolen Gift Cards, and shall terminate the continuation of any branded liability programs, unless otherwise agreed in writing by Buyer and Seller.

**Section 5.5.    Notice of Developments And Disclosure Schedule Supplements.**

(a)    From the date hereof until the Closing Date, Seller shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Seller, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Seller and Buyer) of any material failure of Seller or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

(b)    From time to time prior to the Closing Date, Seller, on the one hand, with respect to the Disclosure Schedule and representations and warranties relating to Seller, shall notify Buyer of, and Buyer on the other hand, with respect to representations and warranties relating to Buyer, shall notify Seller of, and shall supplement or amend the Disclosure Schedule, if applicable, with respect to, any matter that arises after the date hereof and that, (i) if existing or occurring at or prior to such delivery of the Disclosure Schedule, would have been required to be set forth or described in the Disclosure Schedule to this Agreement or (ii) makes it necessary to correct any information in the Disclosure Schedule or in any representation or warranty of Seller or Buyer, as applicable, that has been rendered inaccurate thereby. Each such notification and supplement, to the extent known, shall be made by Seller to the Disclosure Schedule prepared by Seller no later than two (2) Business Days after discovery thereof by Seller or Buyer, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties hereto, then promptly after discovery thereof by Seller or Buyer, as applicable, and in any event prior to the Closing. Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Buyer under Section 7.1(a) and Section 8.1(b)(i) as if the Schedules were not supplemented or amended pursuant to this Section 5.5(b) and (ii) no such supplement or amendment to the Disclosure Schedule shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

**Section 5.6.    Access**. Upon reasonable advance written request by Buyer prior to Closing, Seller shall permit Buyer and its Representatives, at Buyer's sole cost and expense, to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Seller, to all facilities, offices, premises, and documents related to the Acquired Assets.

**Section 5.7.    Press Releases and Public Announcements.** Promptly following the Closing, the Buyer may issue a press release concerning this Agreement and the Contemplated Transactions. The Seller shall not issue any press release or make any statements relating to this Agreement, except that the Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court and that Seller may make statements in furtherance of the Bidding Procedures Motion, the sale process, any auction held in accordance with the Bidding Procedures and the Bidding Procedures Order, and any hearing in connection with, and to obtain, the Sale Order.

**Section 5.8.**    __Bulk Transfer Laws.__  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

## ARTICLE VI
## OTHER COVENANTS.

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1.**    __Cooperation.__  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Seller to Buyer.

**Section 6.2.**    __Removal of Assets from Leased Premises__.  Seller shall ensure that Buyer has access to all and the ability to remove all Acquired Assets at any location wherever located. Except to the extent expressly required by the Sale Order, Seller shall have no obligation to remove or relocate any Excluded Assets.

**Section 6.3.**    __Further Assurances.__  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Seller's retention of the Excluded Assets and Excluded Liabilities.

**Section 6.4.**    __Availability of Business Records.__  For a period of two (2) years after the Closing Date, or such longer period as the parties may agree or may be required by any order from a court with jurisdiction, Buyer shall promptly provide to Seller and its Representatives (after reasonable notice and during normal business hours and without charge to Seller) access to all Records included in the Acquired Assets for periods prior to the Closing to the extent such access is necessary in order for Seller to: (a) comply with applicable Law or any contract to which it is a party, (b) for liquidation, winding up, Tax reporting, or other financial reporting, and (c) the investigation or defense of claims, litigation, or disputes arising from periods prior to the Closing, and so long as such access is subject to an obligation of confidentiality.  Buyer shall preserve such Records until the latest of (i) two (2) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents (solely for such information which such requirement applies), (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Case, or (iv) the final disposition of any pending litigation with respect to any disputes arising from periods prior to the Closing. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing during the two (2) year period described herein, Buyer shall notify Seller and any statutory committee of unsecured creditors (or any successor or continuation of Seller or such committee, including any liquidation trustee, plan administrator, or chapter 7 trustee) thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Seller to retain such Records at Seller's cost and expense. For the avoidance of doubt, and notwithstanding anything to the contrary herein, during the two (2) year period described herein, Buyer shall maintain and grant Seller continuous access to the email addresses and associated Google accounts, including calendar, drive, and related Google suite services, for the email accounts michael@compasscoffe.com and harrison@compasscoffee.com; *provided, that*, upon request, Seller shall reimburse Buyer for the cost to maintain such email addresses and associated Google accounts.  Further, notwithstanding anything to the

31

contrary herein, any access of Seller to Records maintained by Oracle America, Inc. ("Oracle") via its NetSuite platform, or otherwise, shall be limited to access through Buyer's account with Oracle, if any, and Oracle shall have no obligation to provide Seller direct access to any Records after the Closing.

**Section 6.5.**    **Employee Matters.**

(a)    Buyer is only purchasing assets in the Contemplated Transactions. While Buyer intends to review and consider for potential employment some or all of the Current Employees, Buyer shall have no obligation to retain or offer (or cause a designee of Buyer to offer) employment to any Current Employees after the Closing Date. Buyer shall have no liability to any of Seller's employees and Seller shall be solely responsible for terminating its employees prior to the Closing and any costs associated therewith.

(b)    Nothing contained herein shall be construed as requiring, and neither Seller nor any of its Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Seller's Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any of Seller's employees or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.6.**    **Taxes.**

(a)    To the extent not exempt under any section of the Bankruptcy Code, any and all stamp, documentary, registration, transfer or similar Tax (each, a "Transfer Tax") imposed under any applicable Law on the transfer of the Acquired Assets contemplated by this Agreement shall be borne by Seller; *provided that* Buyer shall reasonably cooperate with Seller to timely prepare and timely file any Tax Returns required to be filed with respect such Transfer Taxes, and shall provide such other assistance including exemption or resale certificates as allowable to reduce any such Transfer Taxes, unless otherwise required by Law; *provided further that* if Buyer is required by Law to pay any such Transfer Taxes, Seller shall promptly reimburse Buyer for the amount of such Transfer Taxes actually paid by Buyer (including the cost associated with preparing and filing any such Tax Returns).

(b)    Seller and Buyer shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any Tax proceeding relating to: (a) the Acquired Assets; or (b) the Contemplated Transactions. Such cooperation shall include the retention and (upon the other party's written request) the provision of records and information which are reasonably relevant to any Tax audit, Litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Parties agree that all books and records with respect to Tax matters pertinent to the Acquired Assets relating to any taxable period beginning before the Closing Date shall be retained by Seller and that each of Seller and Buyer shall have reasonable access to same upon request so long as Seller has not previously dissolved. In the event Seller intends on destroying any such books and records, Seller shall provide Buyer with written notice of same and Buyer shall have thirty (30) days thereafter to remove the books and records that are the subject of destruction from the premises. This Section 6.6(b) is intended to, and shall, supplement and not limit the generality of the provisions contained in Section 6.4.

(c)    Notwithstanding anything to the contrary in this Agreement, Seller shall not file any Tax Return or amended Tax Return relating to any property, ad valorem, or similar Tax with respect to

the Acquired Assets or the Business ("Asset Taxes") (or otherwise change such Tax Returns) or make or change an election relating to Asset Taxes, in each case, with respect to a Pre-Closing Tax Period, without a written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), unless required to do so by applicable Law.

(d)     For the avoidance of doubt, Seller shall remain responsible for, and Buyer shall have no liability for, all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets or the Business or attributable to Tax periods (or portions thereof) commencing on or after the Petition Date and ending on or before the Closing Date. Seller shall remain responsible for all sales Taxes, use Taxes, payroll Taxes, real property taxes (including such amounts included in the Cure Amounts), personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or are attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date.

Section 6.7.     **Casualty**. If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Buyer shall have the option to: (a) acquire such Acquired Assets on an "AS IS" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the applicable Casualty; or (b) in the event that the applicable Casualty would have a Material Adverse Effect, Buyer may terminate this Agreement and the transactions contemplated hereby.

Section 6.8.     **Collection on Acquired Assets**. If, after the Closing Date, Seller receives any cash, checks, payments or other property with respect to any Acquired Assets (including misdirected customer payments under the Assigned Contracts), Seller shall promptly (and within three (3) Business Days) remit or deliver such cash, checks, payments or other property to Buyer and use commercially reasonable efforts to take such actions to vest title to such cash, checks, payments or other property in Buyer. After the Closing Date, Seller hereby designates Buyer and its officers as the true and lawful attorney in-fact of Seller, with full power of substitution, solely for the limited purpose to execute and endorse for the benefit of Buyer all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Acquired Assets. Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agrees to execute and deliver to Buyer from time to time any documents or other instruments requested by Buyer to evidence such power of attorney; provided further that nothing herein shall require Seller to take any action that would be inconsistent with applicable law or any order of the Bankruptcy Court. If, following the Closing, any right, property or asset forming part of the Acquired Assets is found not have been transferred to Buyer, Seller shall, upon written notice from Buyer, use commercially reasonable efforts to transfer such rights, property or asset forming part of the Acquired Assets as soon as practicable to Buyer.

Section 6.9.     **No Successor Liability**. Buyer is only purchasing the Acquired Assets, including by taking an assignment of, and assuming liabilities under, certain Leases and executory contracts as specifically set forth herein in connection with the Contemplated Transactions. The parties hereto intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under COBRA and the applicable regulations thereunder) to Seller, including with respect to any collective bargaining agreement and any Employee Benefit Plans; (b) have *de facto* or otherwise, merged with or into Seller; (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller; or (d) be liable for any acts or omissions of Seller in the conduct of the Business, other than with respect to the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement, the parties hereto intend that Buyer shall not be liable for any Liens against Seller or any of its Affiliates, and that Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising on

33

or prior to the Closing Date. The parties hereto agree that a provision substantially in the form of, and with comparable effect (to the extent permitted by law), to this <u>Section 6.9</u> shall be reflected in the Sale Order.

Section 6.10.      <u>Non-Competition; Non-Solicitation.</u>

(a)      For a period of two (2) years commencing on the Closing Date (the "<u>Restricted Period</u>"), Seller and the Key Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly: (i) engage in or assist others in engaging in the Business within the Mid-Atlantic region of the United States (the "<u>Territory</u>"); (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, (A) the Key Member may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person; and (B) neither Seller nor the Key Member shall be deemed to violate this <u>Section 6.10</u> solely by reason of the ownership, directly or indirectly, by any of their respective Affiliates, of equity interests or other securities in any Person that engages in the Business in the Territory during the Restricted Period, to the extent such interests are owned as of the Execution Date.

(b)      During the Restricted Period, Seller and the Key Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any Person who is offered employment by Buyer at or after the Closing or is or was employed in the Business during the Restricted Period, or encourage any such Person to leave such employment or hire any such Person who has left such employment; <em>provided</em>, <em>however</em>, that this restriction shall not apply to (i) general solicitations which are not directed specifically to any such Persons, (ii) any Former Employee who is terminated by Buyer without cause after the Closing Date, or (iii) to any Former Employee after the expiration of the one (1)-year period commencing on the date of the termination of such Person's employment relationship with Buyer.

(c)      Seller and the Key Member acknowledge that a breach or threatened breach of this <u>Section 6.11</u> would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by Seller or the Key Member of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond or prove likelihood of success).

(d)      Seller and the Key Member acknowledge that the restrictions contained in this <u>Section 6.10</u> are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the Contemplated Transactions. In the event that any covenant contained in this <u>Section 6.10</u> should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this <u>Section 6.10</u> and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any

such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1.** **Conditions to Buyer's Obligations**. Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or express written waiver by Buyer of each of the following conditions:

(a)     each of the representations or warranties set forth in Article III that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) when made and shall be true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in Article III that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date); provided, however, that any failure of any such representation or warranty to be so true and correct shall not constitute a failure of this condition unless such failure, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(b)     Seller shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and at the Closing, Seller shall have caused the documents and instruments required by Section 2.8(a) (Deliveries at Closing) to be delivered to Buyer (or tendered subject only to Closing);

(c)     all of the Assigned Contracts shall have been cured and assumed and assigned to Buyer;

(d)     the full satisfaction of the DIP Payoff Amount (either payable from the Purchase Price or by Seller);

(e)     the full satisfaction of any Administrative Claims;

(f)     Seller shall have paid and satisfied all fees, obligations, costs and rent related to all of the Acquired Assets, including but not limited to all obligations under the Assumed Leases set forth on Schedule 2.1(d), which accrued after the Petition Date through the Closing;

(g)     all of the Acquired Assets located at any location other than at the Assumed Lease location sites shall have been delivered to Buyer at a location reasonably acceptable to Buyer;

(h)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(i)     the Sale Order, in a manner acceptable to Buyer, shall have become a Final Order (unless this condition has been waived in writing by Buyer);

35

(j)      the Cash Purchase Price shall not exceed $4,550,000.00, unless otherwise agreed to by Buyer;

(k)      all Intellectual Property of Seller shall have been assigned and delivered, pursuant to the Intellectual Property Assignment Agreement, and/or retired and surrendered to Buyer in a form and format reasonably satisfactory to Buyer;

(l)      Seller shall certify, represent and warrant in writing that all Lien holders, creditors, landlords, required Governmental Entities, parties to any ongoing Litigation involving Seller (both plaintiffs and defendants), counterparties to the Assigned Contracts, relevant Taxing authorities and any other parties-in-interest, including any individual or entity that Buyer requests be served, has been notified and served under the Chapter 11 Case; and

(m)      Seller shall have delivered a certificate from an authorized officer of Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) has been satisfied.

**Section 7.2.**      **Conditions to Seller's Obligations**. Subject to Section 7.3, Seller's obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver by Seller of the following conditions:

(a)      each of the representations or warranties set forth in Article III that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) when made and shall be true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in Article III that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date); provided, however, that any failure of any such representation or warranty to be so true and correct shall not constitute a failure of this condition unless such failure, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Seller (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order shall have become a Final Order (unless waived by Buyer);

(e)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3.**      **Investigation**. Buyer shall not be entitled to rely on the failure of any representation or warranty to be true and correct as of the Closing as a basis to refuse to consummate the

Closing or to claim the failure of any closing condition to the extent such failure was disclosed to Buyer or otherwise known to Buyer prior to the Closing.

      **Section 7.4.**    **No Frustration of Closing Conditions.** Neither Buyer nor Seller may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.  In the event all of the Acquired Assets are not present at the Closing then, only with the consent of the Buyer, the Parties may seek approval to modify the Purchase Price.

<b>ARTICLE VIII<br>TERMINATION</b>

      **Section 8.1.**    **Termination of Agreement.** This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

      (a)    by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

      (b)    by Buyer or Seller if the Closing has not occurred by March 6, 2026;

      (c)    by Buyer by giving written notice to Seller at any time prior to Closing (i) in the event Seller has breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in <u>Section 7.1(a))</u>, contained in this Agreement in each case in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of five (5) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in <u>Section 7.1</u> shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

      (d)    by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in <u>Section 7.2(a))</u>, contained in this Agreement in each case in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of five (5) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Seller;

      (e)    by Buyer, if, prior to the Closing, (x) Seller seeks to have the Bankruptcy Court enter an order dismissing, or converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason, or (y) the Chapter 11 Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

37

(f) automatically and without any action or notice by Seller to Buyer, or Buyer to Seller, immediately upon the issuance of a final and non-appealable order, Decree, or ruling by a Governmental Entity to permanently restrain, enjoins or otherwise prohibits the Closing;

(g) by Buyer if Buyer reasonably determines that Seller has frustrated the satisfaction of any of the conditions to Closing in Section 7.1;

(h) by Seller if Seller reasonably determines that Buyer has frustrated the satisfaction of any of the conditions to Closing in Section 7.2;

(i) by Buyer or Seller, in either case, upon the approval by the Bankruptcy Court of an Alternate Transaction;

(j) by Seller, notwithstanding anything to the contrary in this Agreement, if Seller reasonably determines in good faith, after consultation with counsel, that continuing to pursue or consummate the Contemplated Transactions would be inconsistent with applicable Law or Seller's fiduciary duties thereunder; provided, however, that Seller shall promptly provide Buyer with written notice of any such determination (collectively, the "Fiduciary Out");

(k) by Buyer if, commencing at 5:00 pm Eastern Time on January 30, 2026 until the Closing Date, Seller issues any Gift Cards, allows any value to be loaded or re-loaded onto any Gift Cards (including but not limited to those issued under the Ansa Platform Services Agreement) or replaces any lost or stolen Gift Cards, unless otherwise agreed to in writing by Buyer and Seller;  or

(l) by Buyer if the Cash Purchase Price exceeds $4,550,000.00.

**Section 8.2.**     **Procedure Upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Seller, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Seller.

**Section 8.3.**     **Effect of Termination.**

(a) If any Party terminates this Agreement pursuant to Section 8.1, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I (Definitions), Article IX (Miscellaneous), and this Article VIII (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party with respect to the Contemplated Transactions, as applicable, except as otherwise expressly set forth in this Agreement including as set forth in Section 2.5(b) with respect to the Deposit. In the event Buyer terminates this Agreement pursuant to Section 8.1, Seller shall return the Deposit within three (3) Business Days of the termination. Notwithstanding anything to the contrary in this Agreement, in the event of a termination of this Agreement, Seller's exclusive remedies shall be to seek compensatory damages and/or, if Seller terminates this Agreement pursuant to (i) Section 8.1(b) (due to Buyer's failure to perform or comply with the terms of under this Agreement), (ii) Section 8.1(d), or (iii) Section 8.1(i), to seek an order permitting Seller to retain the Deposit. The parties acknowledge and agree that in no event shall Seller or Buyer be entitled to punitive or liquidated damages.

(b) Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)      Any Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 8.3(c) shall relieve Buyer or Seller of their respective obligations under a Confidentiality Agreement.

(d)      The Break-Up Fee shall be payable to Buyer (consistent with Section 5.3(e)) from the sale proceeds received in connection with an Alternate Transaction if this Agreement is terminated for any reason, other than by Seller in the circumstances set forth in Section 8.1(b), (d) or (h).

Any obligation to pay the Break-Up Fee hereunder shall be absolute and unconditional; and such payment shall constitute an administrative expense of Seller's estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. Seller and Buyer agree that the Bidding Incentives were a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(e)      Except as set forth above in this Section 8.3, all fees and expenses incurred in connection with this Agreement and the other documents contemplated thereby shall be paid by the party incurring such expenses, whether or not the Sale is consummated.

(f)      This Section 8.3 and the rights and obligations created hereunder, shall survive termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1.    Expenses**. Except as otherwise provided in this Agreement, Seller and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.2.    Entire Agreement**. This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements.

**Section 9.3.    Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4.    Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by either Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein. Except where a specific period for

39

action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

        **Section 9.5.**    <u>**Succession and Assignment**</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither of the Parties may assign either this Agreement nor any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Seller; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

        **Section 9.6.**    <u>**Notices**</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller, then to: | Compass Coffee, LLC<br>1535 7th Street NW<br>Washington, D.C. 20001<br>Attention: Michael Haft & Robert Haft<br>Email: <u>michael@compasscoffee.com</u> |
| with a copy to: | Hunton Andrews Kurth LLP<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219<br>Attention: Tyler P. Brown<br>Email: <u>tpbrown@hunton.com</u> |
| If to Buyer, then to: | Caffe Nero North America, Inc.<br>320 Congress Street, 4th Floor<br>Boston, MA 02210<br>Attention: Michael Ford-Deegan, President<br>Email: <u>michaeld@caffenero.com</u> |
| with a copy to: | McCarter & English, LLP<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, NJ 07102<br>Attention: Jeffrey T. Testa<br>      Theodore M. Grannatt<br>Email: <u>jtesta@mccarter.com</u><br>     tgrannatt@mccarter.com |

        Either Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.6</u>.

**Section 9.7.**   **Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; *provided that* if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the state and federal courts located in the State of Delaware shall have exclusive jurisdiction over such Litigation.

**Section 9.8.**   **Equipment Storage Through Closing**. Seller intends to close certain cafés at locations other than those locations subject to the Assumed Leases,  between the date hereof and the Closing, and the Parties acknowledge and agree that any Equipment to be sold by Seller to Buyer under this Agreement may be moved or relocated by Seller to the property located at 1401 Okie St NE Washington, DC 20002, commonly referred to the Roastery, or to such other location as the Parties may agree (the "Stored Equipment"). Seller shall retain title to all such Stored Equipment until Closing and shall have continuous twenty-four (24) hour access to any Stored Equipment wherever stored. Buyer shall have no Liability related to or arising from the Stored Equipment until the Closing.

**Section 9.9.**   **Consent to Service of Process.** Both Parties hereby consent to process being served by either Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.6.

**Section 9.10.**   **WAIVER OF JURY TRIAL.** BOTH PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11.**   **Severability.** The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12.**   **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13.**   **No Survival of Representations, Warranties and Agreements.** None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, and (ii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

**Section 9.14.     Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.15.     Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.16.     Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the applicable disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is readily apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly referenced.

**Section 9.17.     Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18.     Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.19.     Buyer Guarantor**.

(a)     Buyer Guarantor hereby absolutely, unconditionally and irrevocably guarantees, as surety, the full and timely performance and payment of all of Buyer's obligations under this Agreement and the other Transaction Documents (the "Buyer Guarantee"). The Buyer Guarantee is valid, in full force

42

and effect, and constitutes the valid and binding obligation of Buyer Guarantor, enforceable in accordance with its terms. Buyer Guarantee is an irrevocable guarantee of payment (and not just of collection) and shall continue in effect notwithstanding any extension or modification of the terms of this Agreement (except to the extent such extension or modification affects Buyer's 's obligations hereunder) or any assumption without the consent of Buyer of any such guaranteed obligation by any other Party. The obligations of Buyer Guarantor hereunder shall not be affected by or contingent upon (i) the liquidation or dissolution of, or the merger or consolidation of Buyer with or into any Person or any sale or transfer by Buyer of all or any part of its property or assets, (ii) the bankruptcy, receivership, insolvency, reorganization or similar actions involving or affecting Buyer, (iii) any modification, alteration, amendment or addition of or to this Agreement (except to the extent such modification, alteration, amendment or addition affects Buyer's obligations hereunder and then only to such extent) or (iv) any disability or any other defense of Buyer or any other Person (with or without notice) which might otherwise constitute a legal or equitable discharge of a surety or a guarantor or otherwise. In connection with the foregoing, Buyer Guarantor waives all defenses and discharges it may have or otherwise be entitled to as a guarantor or surety and further waives presentment for payment or performance, notice of nonpayment or nonperformance, demand, diligence or protest. Seller entered into this Agreement in reliance upon this <u>Section 9.19</u>. Buyer Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated hereby and that the waivers and agreements by Buyer Guarantor set forth in this <u>Section 9.19</u> are knowingly made in connection with such benefits.

(b)     Upon default by Buyer with respect to, or failure by Buyer to perform any of, its obligations under this Agreement or any other document or instrument contemplated hereby, as the case may be, Buyer Guarantor shall be liable for the obligations of Buyer arising under this Agreement and the other Transaction Documents, as applicable.

(c)     Buyer Guarantor hereby represents and warrants as follows: (i) Buyer Guarantor is a Delaware corporation and has all power and authority to execute, deliver and perform its obligations created by this <u>Section 9.19</u>; (ii) the execution, delivery and performance of this Agreement by Buyer Guarantor has been duly and validly authorized and approved by all necessary corporate action; (iii) this Agreement has been duly and validly executed and delivered by Buyer Guarantor and constitutes a valid and legally binding obligation of Buyer Guarantor, enforceable against Buyer Guarantor in accordance with its terms; (iv) all consents, approvals, authorizations of, or filings with, any Governmental Entity necessary for the due execution, delivery and performance of this Agreement by Buyer Guarantor have been obtained or made; (v) the execution, delivery and performance by Buyer Guarantor of this Agreement does not and will not violate its organizational and charter documents, any applicable law or any material contractual restriction binding on Buyer Guarantor or its assets; and (vi) Buyer Guarantor has, and, for so long as this <u>Section 9.19</u> shall remain in effect in accordance with its terms, Buyer Guarantor shall have, funds sufficient to satisfy all of its obligations hereunder.

**Section 9.20.    <u>Solicitation of Competitive Bids</u>**. Upon selection of Buyer as the Stalking Horse Purchaser pursuant to <u>Section 5.3(a)</u> of this Agreement, Seller is authorized to solicit competing bids in accordance with the Bidding Procedures and Bidding Procedures Order, subject to Buyer's right to terminate pursuant to <u>Section 8.1(i)</u> of this Agreement.   Buyer acknowledges that the transactions contemplated herein are subject to potential higher and better offers in connection with the Bidding Procedures.

**[SIGNATURE PAGES FOLLOW]**

**SIGNATURE PAGE TO
ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

<u>SELLER</u>:

COMPASS COFFEE, LLC

By _____

     Name:  Michael Haft
     Title:  CEO / President

BUYER:

CAFFE NERO NORTH AMERICA, INC.

By _____
         Name: Michael Ford-Deegan
         Title: President

Acknowledged and accepted by the Key Member for the limited purposes of Section 6.10 hereto.


By: _____
Name: Michael Haft, individually

SOLELY WITH RESPECT TO SECTION 9.19:

CAFFE NERO AMERICAS, INC.


By:_____
Name: Michael Ford-Deegan
Title: President

## **Exhibit B**

**Redline of Revised Asset Purchase Agreement to Stalking Horse Purchase Agreement**

*EXECUTION VERSION*

---

**ASSET PURCHASE AGREEMENT**

**by and between**

**COMPASS COFFEE, LLC,**

**as Seller,**

**and**

**CAFFE NERO NORTH AMERICA, INC.,**

**as Buyer,**

**and solely for purposes of Section 9.19,**

**CAFFE NERO AMERICAS, INC.,**

**as Buyer Guarantor**

**January 23, 2026**

---

## Table of Contents

**Page(s)**

ARTICLE I DEFINITIONS ............................................................................................. 2

ARTICLE II PURCHASE AND SALE ........................................................................... 11

    Section 2.1.    Purchase and Sale of Acquired Assets ............................ 11
    Section 2.2.    Excluded Assets ............................................................ 14
    Section 2.3.    Assumption of Assumed Liabilities .............................. 15
    Section 2.4.    Excluded Liabilities ...................................................... 15
    Section 2.5.    Purchase Price ............................................................... 17
    Section 2.6.    Assumption and Assignment of Contracts ................... 18
    Section 2.7.    Closing ......................................................................... 19
    Section 2.8.    Deliveries at Closing .................................................... 19
    Section 2.9.    Allocation ..................................................................... 20

ARTICLE III SELLER'S REPRESENTATIONS AND WARRANTIES. .................... 20

    Section 3.1.    Organization of Seller; Good Standing. ....................... 21
    Section 3.2.    Authorization of Transaction ....................................... 21
    Section 3.3.    Noncontravention ......................................................... 21
    Section 3.4.    Title to Acquired Assets ............................................... 21
    Section 3.5.    Contracts ....................................................................... 22
    Section 3.6.    Real Property ................................................................ 22
    Section 3.7.    Intellectual Property ..................................................... 22
    Section 3.8.    Information Technology ................................................ 22
    Section 3.9.    Permits .......................................................................... 23
    Section 3.10.    Employee Benefit Plans. ............................................. 23
    Section 3.11.    Labor Relations ........................................................... 23
    Section 3.12.    Environmental Matters ................................................ 23
    Section 3.13.    Insurance ..................................................................... 23
    Section 3.14.    Related Party Transactions .......................................... 23
    Section 3.15.    No Brokers or Finders ................................................. 24
    Section 3.16.    Litigation; Proceeding ................................................. 24
    Section 3.17.    Compliance with Laws ................................................ 24
    Section 3.18.    Taxes. .......................................................................... 24
    Section 3.19.    Discontinuance of Seller Operations ........................... 25

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ..................... 25

    Section 4.1.    Organization of Buyer .................................................. 25
    Section 4.2.    Authorization of Transaction. ...................................... 25
    Section 4.3.    Adequate Assurances Regarding Executory Contracts ... 26
    Section 4.4.    Good Faith Purchaser ................................................... 26
    Section 4.5.    Brokers' Fees ................................................................ 26
    Section 4.6.    Financial Capacity ....................................................... 26
    Section 4.7.    Condition of Assets ...................................................... 26

ARTICLE V PRE-CLOSING COVENANTS ................................................................ 26

    Section 5.1.    Certain Efforts; Cooperation. .......................................... 27
    Section 5.2.    Notices and Consents. ..................................................... 27
    Section 5.3.    Bankruptcy Actions. ....................................................... 27
    Section 5.4.    Preservation of Acquired Assets ..................................... 28
    Section 5.5.    Notice of Developments And Disclosure Schedule Supplements. .... 29
    Section 5.6.    Access ............................................................................. 30
    Section 5.7.    Press Releases and Public Announcements ..................... 30
    Section 5.8.    Bulk Transfer Laws ........................................................ 30

ARTICLE VI OTHER COVENANTS. ....................................................................... 30

    Section 6.1.    Cooperation .................................................................... 30
    Section 6.2.    Removal of Assets from Leased Premises ...................... 30
    Section 6.3.    Further Assurances ......................................................... 30
    Section 6.4.    Availability of Business Records .................................... 31
    Section 6.5.    Employee Matters. ......................................................... 31
    Section 6.6.    Taxes. ............................................................................. 31
    Section 6.7.    Casualty ......................................................................... 32
    Section 6.8.    Collection on Acquired Assets ....................................... 32
    Section 6.9.    No Successor Liability .................................................... 33

ARTICLE VII CONDITIONS TO CLOSING .............................................................. 34

    Section 7.1.    Conditions to Buyer's Obligations ................................. 34
    Section 7.2.    Conditions to Seller's Obligations ................................. 35
    Section 7.3.    Investigation .................................................................. 36
    Section 7.4.    No Frustration of Closing Conditions ............................ 36

ARTICLE VIII TERMINATION .............................................................................. 36

    Section 8.1.    Termination of Agreement ............................................. 36
    Section 8.2.    Procedure Upon Termination ......................................... 37
    Section 8.3.    Effect of Termination. ................................................... 37

ARTICLE IX MISCELLANEOUS ............................................................................ 38

    Section 9.1.    Expenses ........................................................................ 38
    Section 9.2.    Entire Agreement ........................................................... 38
    Section 9.3.    Incorporation of Schedules, Exhibits and Disclosure Schedule ... 38
    Section 9.4.    Amendments and Waivers .............................................. 39
    Section 9.5.    Succession and Assignment ........................................... 39
    Section 9.6.    Notices .......................................................................... 39
    Section 9.7.    Governing Law; Jurisdiction ......................................... 40
    Section 9.8.    Equipment Storage Through Closing .............................. 40
    Section 9.9.    Consent to Service of Process ........................................ 40
    Section 9.10.    WAIVER OF JURY TRIAL .......................................... 40
    Section 9.11.    Severability .................................................................... 40
    Section 9.12.    No Third Party Beneficiaries ......................................... 41
    Section 9.13.    No Survival of Representations, Warranties and Agreements ... 41

Section 9.14.    Construction................................................................................41
Section 9.15.    Mutual Drafting............................................................................41
Section 9.16.    Disclosure Schedule.....................................................................41
Section 9.17.    Headings; Table of Contents.........................................................41
Section 9.18.    Counterparts; Facsimile and Email Signatures...............................42
Section 9.19.    Buyer Guarantor...........................................................................42
Section 9.20.    Solicitation of Competitive Bids...................................................42

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of January 23, 2026 (the "Execution Date"), by and between Compass Coffee, LLC, a Delaware limited liability company ("Seller"), Caffe Nero North America, Inc., a Delaware corporation (together with its permitted successors, designees and assigns, "Buyer"), and, solely for purposes of Section 9.19, Caffe Nero Americas, Inc., a Delaware corporation (the "Buyer Guarantor"). Seller, Buyer, and Buyer Guarantor are referred to collectively herein as the "Parties." The Key Member is a party to this Agreement for the limited purposes set forth herein. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Seller is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended (the "Bankruptcy Code"), in a voluntary administered bankruptcy case under Chapter 11 of the Bankruptcy Code captioned *In re: Compass Coffee, LLC* bearing Case No. *26-00005 (ELG)* (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy Court");

WHEREAS, Seller has been engaged in the coffee retail and wholesale businesses, through both physical locations and online, including but not limited to the operation of cafes, a roastery and the online E-Commerce Platform (the "Business");

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Seller, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as of the Closing;[1]

WHEREAS, the Parties intend that the Acquired Assets include, but are not limited to, substantially all of Seller's inventory, equipment, intellectual property, and certain other real property Leases and Contracts;

WHEREAS, as a material inducement to Buyer to enter into this Agreement, the Key Member has agreed to provide certain representations warranties and covenants to Buyer as set forth in Section 6.10 hereto;

WHEREAS, Buyer Guarantor has agreed to absolutely, unconditionally, and irrevocably guarantee, as a surety, the full and timely performance and payment of all obligations of Buyer under this Agreement and any other document or instrument contemplated hereby (collectively, the "Transaction Documents"); and

WHEREAS, Seller shall seek Bankruptcy Court approval to implement the transactions contemplated hereby, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

---

[1] The transaction set forth in this Agreement is solely for a purchase of assets and the assumption of certain leases and executory contracts and is not for the purchase of equity interests or as a going concern entity.

# ARTICLE I
# DEFINITIONS

"<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Seller, and (b) any security interest, claim, remedy or other right related to any of the foregoing; *provided that* Accounts Receivable only includes accounts receivable and rights to payment for any product orders that have been delivered and fulfilled as of the Closing.

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Administrative Claim</u>" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"<u>Affiliate</u>" means, with respect to any Person, such Person's parent and Subsidiary entities, and any other Person directly or indirectly controlling, controlled by, or under common control with, said Person. For purposes of this definition, control of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions pursuant to which Seller (a) accepts a Qualified Bid, as defined in the Sale Procedures, other than that of Buyer, as the highest or best offer, or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets in a transaction or series of transactions to a party or parties other than Buyer.

"<u>Assigned Causes of Action</u>" means: any Claims of Seller arising out of or related the Acquired Assets including, but not limited to, Claims related to Contracts, Leases and other agreements related to the Acquired Assets; and any claim of Seller against Buyer other as specifically set for this Agreement, but shall specifically exclude any Claims and causes of action against the officers, directors, shareholders, members, managers, Affiliates and Insiders of Seller other than for a breach of this Agreement or as specifically set forth in this Agreement.

"<u>Assigned Contract</u>" has the meaning set forth in <u>Section 2.6(a)(ii)</u>.

"<u>Assumed Leases</u>" means all Leases set forth on <u>Schedule 2.1(d)</u>, but excluding all Leases to the extent solely related to any Excluded Asset.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumed Permits</u>" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"<u>Avoidance Actions</u>" mean, collectively and individually, preference actions, fraudulent conveyance actions and any other claims or causes of action, including but not limited to under sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553, and other applicable provisions of the Bankruptcy Code and other similar state law claims and causes of action.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Incentives" means the Break-Up Fee.

"Bidding Procedures" means the bidding and sale procedures approved by the Bankruptcy Court and attached to the Bidding Procedures Order.

"Bidding Procedures Motion" shall mean the Debtor's Motion For (A) Entry Of An Order (I) Approving Bidding Procedures and related relief Doc. 76.

"Bidding Procedures Order" shall mean the Order entered by the Bankruptcy Court approving of the Bidding Procedures Motion.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Break-Up Fee" means ~~four percent (4%) of the cash portion of the Purchase Price set forth in Section 2.5(a)(i) below~~ $87,000.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday and any day that is a legal holiday or a day on which banks located in New York, New York shall be authorized or required by Law or other government action to close.

"Buyer" has the meaning set forth in the preamble.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Closing Date Cure Amount" has the meaning set forth in Section 2.5(c)(i).

"Confidentiality Agreement" means any applicable agreement governing confidentiality of Seller's information which has been executed by and between Buyer (or its Affiliates) and Seller.

"Contemplated Transactions" means the sale by Seller to Buyer, and the purchase by Buyer from Seller, of the Acquired Assets, including the assumption, assignment and sale by Seller to Buyer, and the acceptance by Buyer, of the Assigned Contracts and Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Related Agreements.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding, and any amendments,

modifications or supplements thereto that is an executory contract pursuant to Section 365 of the Bankruptcy Code.

"Cure Amounts" means all amounts, costs and expenses (including real estate taxes) required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Current Employees" means all employees of Seller employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Decree" means any legally binding judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" means the sum of $290,000.00.

"Disclosure Schedule" has the meaning set forth in Article III.

"E-Commerce Platform" means the series of Software and hardware applications (and related services) integrated into and used in the operation of, and through which Seller or any of its respective Subsidiaries sells Inventory to consumers who place orders for such Inventory through websites (including www.compasscoffee.com (and similar permutations thereof) and any other websites used by Seller or any of its respective Subsidiaries and related internet or "app" based sales, marketing, advertising, and social media channels, including the Assigned Contracts and any Intellectual Property Licenses included in the Acquired Assets pursuant to which such Software and hardware applications (and related services) are owned or licensed by Seller or any of its respective Subsidiaries.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by Seller or for which Seller may have liability as being an ERISA Affiliate, or in which Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"Environmental Claim" means any action, order from a Governmental Entity, Lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification, and injunctive relief) arising out of, based on, or resulting from: (a) the presence, release of, or exposure to an Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means all federal, state, and local statutes, regulations, orders, rules, permits, licenses and ordinances (including common laws) concerning employee health and safety, pollution, and protection of human health or the environment, including, without limitation, the Clean Air Act; the Clean Water Act; the Resource Conservation Recovery Act; the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to Know Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Endangered Species Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the National Environmental Policy Act; and the Occupational Safety and Health Act, and the Hazardous Materials Transportation Act, and

all similar state statutes and local ordinances, and all regulations promulgated under any of those statutes, and all administrative and judicial actions respecting such legislation, all as amended from time to time.

"Environmental Liabilities and Costs" means any Liabilities determined as a result of an order from a Governmental Entity and pursuant to an Environmental Law, in each case: (a) arising from or relating to any claim pursuant to an Environmental Law for death or personal injury, property damage, damage to the environment, or a release of Hazardous Material (whether based on negligent acts or omissions, statutory liability without fault or otherwise), in connection with the Business or the Acquired Assets or the activities or operations conducted on the Acquired Assets; (b) arising from or related to any remediation occurring pursuant to applicable Environmental Law; or (c) incurred by reason of the failure of the Business or Seller or the activities or operations conducted on the Acquired Assets pursuant to Environmental Law, including (i) any fines and penalties assessed, levied or asserted against the Business or Seller, or (ii) any Liabilities or other losses related to the installation of or repairs to equipment or facilities used by the Business or Seller.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equity Securities" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests or partnership interests.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with Seller within the meaning of Section 414(b) or (c) of the IRC (and Sections 414(m) and (o) of the IRC for purposes of provisions relating to Section 412 of the IRC).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means the Claims described in Section 2.2(l), Section 2.2(m) and Section 2.2(n), but expressly excluding the Assigned Causes of Action.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Taxes" means any and all: (i) Taxes of Seller or its Affiliates; (ii) Taxes imposed on or arising in connection with the Business, the Acquired Assets, the employees of Seller or its Affiliates, and any withholding Taxes, in each case for any Pre-Closing Tax Period or allocable or apportioned to the portion of a Straddle Period ending on the Closing Date as provided herein; (iii) Taxes arising from a breach of covenant of, agreement, representation or warranty of Seller in this Agreement; (iv) all deferred payroll Taxes and credits associated with wages paid or incurred of employees of Seller and Affiliates for any Pre-Closing Tax Period; (v) Taxes of another Person as a result of Treasury Regulation Section 1.1502-6 (or any similar state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise; (vi) Taxes described in Section 6.5(d), and Seller's share of Transfer Taxes determined in accordance with Section 6.5(a); and (vii) all Taxes arising from any bulk sale provisions, or failure of Seller to obtain, comply with, and deliver to Buyer any tax clearance or certificate of no tax due or similar document.

"Final Order" means an Order, judgment or other Decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, enjoined, set aside, annulled, suspended or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Former Employees" means all individuals who have been employed by Seller who are not Current Employees.

"GAAP" means United States generally accepted accounting principles.

"Gift Cards" means (a) prepaid balance cards (including single use set amount cards, if any) or prepaid wallet accounts or applications issued by Seller or by any entity that Seller contracted with that can be used or redeemed to purchase products of the Business, including but not limited to any card program Seller contracted with any entity, including but not limited to In-Kind or Ansa, and (b) cards to customers of the Business entitling such customers to discounts on purchases of products of the Business.

"Governmental Entity" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi- governmental power or authority.

"Hazardous Material" means: (i) those substances included within the statutory and/or regulatory definitions of "hazardous substance," "hazardous waste," "extremely hazardous substance," "regulated substance," "contaminant," "hazardous materials" or "toxic substances," under any Environmental Law; (ii) those substances listed in 49 C.F.R. 172.101 and in 40 C.F.R. Part 302; (iii) any material, waste or substance which is designated as a "hazardous substance" pursuant to 33 U.S.C. § 1321 or listed pursuant to 33 U.S.C. § 1317; (iv) any material, waste or substance designated, classified or regulated as a "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "pollution" under any Environmental Laws; and (v) such other substances, materials, or wastes that are or become classified or regulated under Environmental Laws including, but not limited to, petroleum (including crude oil, gasoline, and diesel oil), asbestos, asbestos containing material, toxic mold, radon, urea formaldehyde, polychlorinated biphenyls, and per- and polyfluoroalkyl substances (PFAS).

"Indebtedness" of any Person means, without duplication, (a) the principal of, interest on, and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Information Technology" means any computer hardware, Software, microprocessors, networks, handheld devices, electronic devices, hardware, middleware, servers, workstations, routers, hubs,

switches, data communications lines, outsourced information technology arrangements and resources and all other information technology and communications assets and equipment used by the Business, and all associated documentation.

"Insider" shall have the meaning set forth in the Bankruptcy Code.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing, (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property, and (j) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Intellectual Property Assignment Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Intellectual Property Licenses" means (i) any grant in writing to a third Person of any right to use any Intellectual Property owned by Seller and (ii) any grant in writing to Seller of a right to use a third Person's Intellectual Property rights, and in the case of each of the foregoing clauses (i) and (ii), the right to use any Intellectual Property shall include any co-existence agreements, covenants not to sue and any agreements of a similar nature relating to Intellectual Property.

"Inventory" means all of Seller's now owned and hereafter acquired raw materials, commodities and work-in-process therefor, and all of Seller's tangible property used in the operation of the Business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Key Member" means Michael Haft.

"Knowledge," with respect to Seller, means the actual or constructive knowledge of the Key Member.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation, order or Decree of any Governmental Entity.

"<u>Leased Real Property</u>" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Seller which is used in the Business or related to the Acquired Assets.

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which Seller holds any Leased Real Property.

"<u>Liabilities</u>" means any Indebtedness, liabilities, demands, deferred revenue, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto.

"<u>Lien</u>" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien (including but not limited to any mechanics liens, attorneys liens and construction liens), encumbrance, interest, reclamation demand or claim, charge, security interest (including but not limited to any purchase money security interest), put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, reclamation claim, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type, and the meaning ascribed to the term "lien" in the Bankruptcy Code.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Losses</u>" means losses, damages, Liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"<u>Material Adverse Effect</u>" means any state of facts, change, event, effect, development, condition, circumstance or occurrence (individually or when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the condition (financial or otherwise) or results of operations of the Acquired Assets (taken as a whole) or the Business or prospects of the Business; <u>provided</u>, <u>however</u>, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, which do not disproportionately affect Seller relative to other industry participants; (ii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; and (iii) resulting from any act of God, any pandemic or other force majeure event (including natural disasters).

8

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and that is subject to Title IV of ERISA, to which Seller or ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"<u>Ordinary Course of Business</u>" means the conduct by Seller in the Business consistent with past custom and practice.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Patents</u>" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"<u>Pension Plan</u>" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Seller or ERISA Affiliate or to which Seller or ERISA Affiliate contributes or has an obligation to contribute, or has made contributions at any time during the preceding six plan years.

"<u>Permit</u>" means any franchise, approval, permit, license, order, registration, certificate, variance, concession, authorization, grant, easement, consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"<u>Permitted Liens</u>" means: (a) Liens for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (b) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business; and (c) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Petition Date</u>" means January 6, 2026.

"<u>Pre-Closing Tax Period</u>" means a taxable period of Seller or an Acquired Asset that begins before and ends on or before the Closing Date.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Records</u>" means the books, records **(including electronically stored files)**, information, ledgers, files, invoices, documents, work papers, correspondence **(including emails)**, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other

medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Rejected Contract" has the meaning set forth in Section 2.6(a)(ii).

"Related Agreements" means the Bill of Sale, the Intellectual Property Assignment Agreement and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Acquired Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" has the meaning set forth in Section 5.3(a).

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Case approving this Agreement pursuant to 11 U.S.C. 363 and conveying all Acquired Assets free and clear of all liens, claims and encumbrances to Buyer along with an assumption and assignment of the Assigned Contracts.

"Sale Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Sales Order, as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"Seller" has the meaning set forth in the preamble.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Stalking Horse Purchaser" has the meaning set forth in the Bidding Procedures.

"Straddle Period" means a taxable period that commences on or before the Closing Date and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this

10

purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means (a) any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, escheat, unclaimed property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed; and (b) any Liability for the payment of any amount of a type described in clause (a) arising as a result of Treasury Regulation Section 1.1502-6 (or similar provision of state, local, or foreign Law), or as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto; and (c) any Liability of another Person for the payment of any amount of a type described in clause (a) or clause (b) as a result of being a transferee, successor, by Contract, or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" shall mean any or all of the following (A) works of authorship including computer programs (whether source code or executable code, and whether embodied in software, firmware or otherwise), compilers, middleware, development tools, firmware, operating systems and specifications, platforms, interfaces, APIs, test specifications and scripts, architecture, documentation, designs, files and records, (B) inventions (whether or not patentable or reduced to practice), discoveries, and improvements, (C) proprietary and confidential information, trade secrets and know how, (D) database rights, databases, data compilations and collections, and technical data, whether or not machine readable, (E) internet domain names, applications and reservations therefor, and uniform resource locators and the corresponding internet websites (including any content and other materials accessible and/or displayed thereon), (F) tools, methods and processes, (G) all versions, updates, releases, patches, corrections, enhancements and modifications thereto and all documentation, developer notes, instructions, comments and annotations relating to any of the foregoing and (H) any and all embodiments of the foregoing in any form and embodied in any media.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Treasury Regulation" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

11

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.1.**     **Purchase and Sale of Acquired Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's direct or indirect, right, title and interest in, to and under all of Seller's tangible and intangible assets, properties and rights as of the Closing Date of whatever kind and nature and wherever situated or located, free and clear of all Liens (other than Permitted Liens), for the consideration specified in <u>Section 2.5</u>, in each case, expressly excluding all Excluded Assets (as defined below). All of such assets, properties and rights (other than the Excluded Assets) of Seller are collectively referred to in this Agreement as the "<u>Acquired Assets</u>." For the avoidance of doubt, the Acquired Assets shall include all of Seller's assets located at the Leased Real property, whether such Leases will be assumed or rejected by Buyer herein. Without limitation of the foregoing, the Acquired Assets shall include all of Seller's right, title and interest in, to and under the following assets as of the Closing Date:

(a)     all items of equipment ("<u>Equipment</u>"), machinery, supplies, furniture and furnishings owned by Seller as of the Closing, including, but not limited to, those items set forth on Schedule 2.1(a), to the extent owned by Seller as of the Closing (it being understood that Schedule 2.1(a) has been prepared in good faith based on Seller's books and records, is not based on a current physical inventory count, does not purport to be complete or accurate in all respects, and may be over-inclusive or under-inclusive with respect to such items) ***provided, that* all Equipment marked in red on Schedule 2.1(a) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets**;

(b)     all Inventory of Seller as of the Closing, and all rights of Seller to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)     all security deposits for rent, electricity, telephone, utilities for Assumed Leases, or otherwise related to the Acquired Assets and other prepaid charges and expenses of Seller relating to the Acquired Assets, including but not limited to all such deposits set forth on Schedule 2.1(c);

(d)     all Assigned Contracts (including but not limited to any Assumed Leases) set forth on Schedule 2.1(d)[2];

(e)     to the extent that such Lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a Lease (and any agreement related thereto) for a Leased Real Property, in each case together with all interests in and to all leasehold improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(f)     [Reserved];

(g)     all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by Seller or any Subsidiary thereof and all owned Software and Technology;

---

[2] Schedule 2.1(d) sets forth a listing of all leases and executory contracts which Buyer may assume at the Closing. Pursuant to the Bidding Procedures Order and as described in the Bidding Procedures Motion, the Buyer has the right to supplement or delete any lease or executory contract set forth on Schedule 2.1(d) up to two (2) Business Days prior to the Closing.

(h)    all customer data and information derived from any purchases at physical locations of the Business, through the E-Commerce Platform or through any other platform or branded loyalty promotion programs, provided such information is owned by Seller and solely to the extent permitted by the Bankruptcy Code and applicable Law, and subject to Buyer's commitment to use such customer and data consistent with Seller's contractual obligations and respective privacy policies or notices in effect at the time of collection of such information;

(i)    servers, offsite and backup storage, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of Seller in whatever media retained or stored, including computer programs and disks, in each case used in, held for use in, or relating to the Acquired Assets or the Assumed Liabilities, including files in the possession of or under the control of Seller;

(j)    all Intellectual Property owned by Seller and all of Seller's rights to use other Intellectual Property, including but not limited to the Intellectual Property set forth on Schedule 2.1(j); *__provided that__*__, all Intellectual Property under the header "Sell at Auction" on Schedule 2.1(j) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets;__

(k)    all Information Technology systems;

(l)    all Records related to the Acquired Assets and Assumed Liabilities, other than Records related to income Taxes of Seller, copies of which, however, shall be provided to Buyer upon request;

(m)    all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Seller and all rights under any Confidentiality Agreements to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(n)    all royalty payments and licensing receivables generated in connection with the Intellectual Property Licenses attributable to the period from and after the Closing;

(o)    any Intellectual Property Licenses granted by Seller or its respective Subsidiaries to third parties;

(p)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits, as set forth on Schedule 2.1(p);

(q)    the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets or (ii) any Assumed Liabilities;

(r)    except for the Excluded Claims, all causes of action, lawsuits, settlements, awards, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related to the Acquired Assets, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law, including, without limitation, all Assigned Causes of Action;

13

(s)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by, or provided to, Seller or to the extent related to the Acquired Assets;

(t)      all prepaid assets;

(u)      all accounts receivable and rights to payment for any product orders that have not been delivered and fulfilled as of the Closing;

(v)      all of Seller's rights of publicity and all similar rights, including all commercial merchandising rights;

(w)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts, profiles, pages, feeds, registrations and other online presences owned or purported to be owned by Seller (and usernames and passwords associated with the foregoing); and

(x)      all internet domain names owned by Seller, including but not limited to those set forth on Schedule 2.1(x)***; provided that, all internet domain names under the header "Sell at Auction" on Schedule 2.1(x) shall be expressly excluded from the Acquired Assets and shall be deemed Excluded Assets***.

Notwithstanding anything herein to the contrary, Buyer may, from time to time remove any Acquired Asset from this Section 2.1 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.2.      Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer; Buyer hereby disclaims all liability or responsibility with respect to any of the Excluded Assets; and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of the following items and assets:

(a)      all Accounts Receivable as of the Closing;

(b)      Seller's certificate of formation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of Seller as a limited liability company;

(c)      all Equity Securities of Seller and any of its Subsidiaries;

(d)      all executory contracts and unexpired leases that are not Assigned Contracts;

(e)      all Rejected Contracts;

(f)      any personnel and medical Records pertaining to any Current Employees or Former Employees, (2) other Records that Seller is required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Case that are protected by the attorney-client privilege;

      (g)     all Permits other than the Assumed Permits;

      (h)     all directors' and officers' liability insurance policies;

      (i)     the rights of Seller under this Agreement and all cash and non-cash consideration payable or deliverable to Seller under this Agreement;

      (j)     all cash and cash equivalents of Seller;

      (k)     any credit card numbers or related customer payment source, social security numbers or other personal identifiers;

      (l)     any Seller employee benefit plan, including but not limited to any equity incentive and other long-term incentive plans and grants thereunder and, if applicable, any funding arrangements related thereto;

      (m)     all Tax records related to income Taxes of Seller, subject to Buyer's rights under Section 2.1(k) and Section 6.5(b);

      (n)     any unused retainers paid by Seller to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same other than deposits for the Assigned Contracts or Acquired Assets;

      (o)     any Avoidance Action of Seller;

      (p)     any Claims and causes of action of Seller against any of its directors, shareholders, officers, members, managers, Insiders, or Affiliates other than as set forth in this Agreement; ~~and~~

      **(q)     all Equipment, Intellectual Property, and internet domain names expressly designated as Excluded Assets as provided in Section 2.1 above; and**

      **(r)**     ~~(q)~~ any Claims of Seller solely to the extent arising in respect of any of the Excluded Assets listed in (a)-(~~p~~q) listed above, and excluding the Assigned Causes of Action or any Acquired Assets.

**Section 2.3.**    **Assumption of Assumed Liabilities**. Other than all Liabilities in respect of the Acquired Assets arising from the period commencing on or after the Closing (the "Assumed Liabilities"), Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereafter created (including such Liabilities relate to or arise from any breach of contract, tort or violation of Law occurring prior to the Closing).

**Section 2.4.**    **Excluded Liabilities.** Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). For the avoidance of doubt and without limiting the generality of the foregoing, all of the following shall be Excluded Liabilities:

(a)      all Cure Amounts;

(b)      the Lien Payoff Amount;

(c)      the DIP Payoff Amount;

(d)      all Liabilities related to the Business as of the Closing (other than the Assumed Liabilities);

(e)      Excluded Taxes;

(f)      all Liabilities of Seller relating to the negotiation, execution and consummation of the Contemplated Transactions, including legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

(g)      all Liabilities of Seller relating to or arising from any breaches or defaults under the Assigned Contracts that are required to be cured pursuant to Sections 363 and 365(b) of the Bankruptcy Code so that the Assigned Contracts may be assigned to Buyer;

(h)      all Liabilities of Seller relating to or arising from any collective bargaining agreement, Multiemployer Plan or Pension Plan, if any;

(i)      any Liability arising out of any employee benefits or employee benefit plan (as defined in ERISA) maintained at any time by Seller or any Seller Affiliate, or to which any of the foregoing has ever made any contributions, if any;

(j)      all Liabilities related to the WARN Act, to the extent applicable, with respect to Seller's termination of employment of Sellers' or any of their respective Affiliates' employees on or prior to Closing;

(k)      any claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, right of set-off, rights of subrogation and all other rights of any kind, in each to the extent arising from the Excluded Assets or the Excluded Liabilities;

(l)      all Liabilities of Seller or any of its predecessors to their respective equity holders, partners, founders or members respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise and any Liability of Seller in any non-assigned contract;

(m)      all Liabilities of Seller relating to escheat or unclaimed property obligations arising from the ownership or operation of the Business or the Acquired Assets prior to Closing, including any such Liabilities;

(n)      all Liabilities of Seller or any of its Affiliates associated with any and all Indebtedness, including guarantees of third party obligations and reimbursement obligations to guarantors of Seller's obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred with Seller's affiliates;

(o)    all Liabilities arising out of or relating to any business or property currently or formerly owned or operated by Seller, any Affiliate or predecessor thereof, whether or not presently owned and operated by Seller (other than the Assumed Liabilities);

(p)    all Liabilities relating to any construction project(s) including for any reclamation, construction, mechanics or other Liens (except for Permitted Liens);

(q)    all Liabilities relating to any employee, independent contractor or agent of Seller;

(r)    all Liabilities relating to: (i) any payments or entitlements to any current or former employees, officers, directors, members, partners or consultants of the Business, including wages, other remuneration, holiday or vacation pay, bonus, change of control, retention, key employee incentive plan payments, key employee retention plan, ownership rights, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions, insurance premiums and taxes; (ii) ERISA Affiliate Liability; (iii) any Liability of any Current Employee or other Former Employee or independent contractor of Seller; (iv) any obligation, Liability or expense relating to any collective bargaining agreement or union agreement, including without limitation any withdrawal liability with respect to any Multiemployer Plan (whether or not yet asserted), if any; (v) any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of Sellers accrued or deferred as permitted under Section 2303 of the Coronavirus Aid, Relief and Economic Security Act of 2020 that otherwise would have been required to be deposited and paid in connection with amounts paid to such Person at any time on or prior to the Closing; (vi) any Liability with respect to Seller's defined benefit Pension Plans or retiree medical or retiree life insurance plans or arrangements, if any; and (vii) any obligation, Liability or expense relating to or arising out of the employment practices of Seller or any of its Affiliates in connection with or related to the Business occurring prior to the Closing, including any violations of Seller or its Affiliates of any labor or employment agreement in connection with or related to the Business;

(s)    other than the payments to be made at the Closing pursuant to this Agreement, any Liability relating to any loan or obligation owed or related to the SBA, Paycheck Protection Program, Economic Impact Dister Loan, Restaurant Revitalization Fund or other loan, grant or other funding received from any local, state or federal agency or authority by Seller;

(t)    all accounts payable of Seller or any of its predecessors, Affiliates or assigns;

(u)    all Liabilities for any rent or costs related to any Acquired Assets that arose after the Petition Date through the Closing, including but not limited to any rent or other affiliated costs related to any Assumed Leases set forth on Schedule 2.1(d) that are designated to be assumed and assigned to Buyer;

(v)    all Liabilities of Seller or any of its Affiliates or predecessors arising out of any contract, permit or claim that is not transferred to Buyer hereunder;

(w)    all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing by a Seller;

(x)    all Liabilities of Seller under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities);

(y)      all Liabilities of Seller incurred in connection with, or related to, the administration of the Chapter 11 Case, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Chapter 11 Case;

(z)      all Liabilities relating to or arising out of honoring any Gift Cards issued by Seller before the Closing and presented to Buyer or its Affiliates for redemption after Closing, which shall be disclosed in full by Seller to Buyer on Schedule 2.4(z), other than any Liabilities related to any Assigned Contract;

(aa)      all Liabilities of Seller with regard to any branded loyalty promotional programs, contracts or accounts which do not become Assigned Contracts;

(bb)      all Liabilities of Seller to any supplier, vendor, former or current employee, founder, member or customer of Seller;

(cc)      all Liabilities to or relating to any property, store, owner, contractor, subcontractor supplier, vendor or other party related to any construction, sub-contracting or other work performed or administered by the Seller;

(dd)      any Environmental Liabilities and Costs or any Liability arising from or related to any Environmental Claim which relates to operations conducted under prior ownership, or the period prior to the Closing;

(ee)      any Liability for the Stored Equipment as defined in Section 9.8 herein; and

(ff)      without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Seller or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by Buyer pursuant to the provisions of Section 2.3.

**Section 2.5.      Purchase Price**.

(a)      Consideration. In consideration of the sale of the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets shall be composed of the following: (i) a cash payment of $~~2,900,000.00~~4,550,000.00 (the "Cash Purchase Price"), subject to Section 2.5(c) below; ~~and~~ (ii) **the negotiated waiver by landlord of the payment of any rent for the post-petition period of January 6, 2026, through February 28, 2026 for the property located at 1401 Okie St NE Washington, DC 20002; and (iii)** the assumption by Buyer of the Assumed Liabilities (together, the "Purchase Price"). For the avoidance of doubt, the **Cash** Purchase Price shall never exceed a cash payment of $~~2,900,000.00~~4,550,000.00; provided, however, that Buyer may (i) be subject to additional and separate pro-rated rental costs and expenses as set forth in Section 2.6(a)(iii) and/or (ii) increase the Purchase Price through the Bidding Procedures approved by the Bankruptcy Court.

(b)      Purchase Price Deposit. Within three (3) Business Days after the execution of this Agreement, Buyer shall transfer cash in an amount equal to the Deposit to Seller, in the form of a wire transfer, certified check, or cash, pursuant to instructions to be provided by Seller, and which will be deposited into a segregated Seller-owned bank account designated as a "debtor-in-possession" account to

be held by Seller, in escrow, and not utilized for any other purpose, in accordance with the Bidding Procedures, and reserved for distribution as follows:

(i)        In connection with the Closing, the Deposit shall be paid to Seller; or

(ii)        If this Agreement is terminated pursuant to Section 8.1 (except by Seller pursuant to (A) Section 8.1(b) (due to Buyer's failure to perform or comply with the terms of under this Agreement), (B) Section 8.1(d), or (C) Section 8.1(h)), the Deposit shall be returned to Buyer within three (3) Business Days of such termination.

(c)        **Cash** Purchase Price Payment.

(i)        At the Closing, Buyer shall use that portion of the **Cash** Purchase Price sufficient to pay off:

(a)        first, (X) all Cure Amounts, by wire transfer of immediately available funds to the applicable counterparties to the Assigned Contracts that Buyer has designated as Assigned Contracts as of the Closing (such total Cure Amounts, the "Closing Date Cure Amount"), and (Y) any and all liens secured by the Acquired Assets, as set forth on Schedule 2.5(c)(i)(a), but explicitly *not* to include any obligations under any court approved Debtor-in-Possession financing issued as part of the Chapter 11 Case (collectively, the "Lien Payoff Amount"); and

(b)        second, to the extent the **Cash** Purchase Price has not been fully exhausted by the obligations in Section 2.5(c)(i)(a) above, any and all liens secured by any court approved Debtor-in-Possession financing issued as part of the Chapter 11 Case (the "DIP Payoff Amount").

(ii)        At the Closing but only after all of the obligations in Section 2.5(c) have been satisfied to Buyer's satisfaction and to the extent any portion of the **Cash** Purchase Price remains payable, Buyer shall deliver cash in an amount equal to the **Cash** Purchase Price *less* the Deposit *less* the Closing Date Cure Amount *less* the Lien Payoff Amount *less* the DIP Payoff Amount by wire transfer of immediately available funds to Seller (the "Net Closing Date Cash Amount").

**Section 2.6.        Assumption and Assignment of Contracts.**

(a)        Assignment and Assumption at Closing.

(i)        Schedule 2.6(a)(i) sets forth a list of all Contracts that Buyer has selected which may become Assigned Contracts if so designated by Buyer, together with estimated Cure Amounts for each such Contract. Buyer may delete any Contract set forth on Schedule 2.6(a)(i) up to two (2) Business Days prior to the Closing.

(ii)        At Closing, (x) Seller shall, pursuant to the Sale Order, the Bill of Sale and any other transfer and assignment documents requested by Buyer, assume (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assign to Buyer (the consideration for which is included in the Purchase Price) each of the Assigned Contracts so designated by Buyer as of the Closing, and (y) Buyer shall pay the Closing Date Cure Amount in connection with such assumption and assignment out of the Purchase Price, and such Assigned Contracts shall be "Assigned Contracts" for all purposes under this Agreement.

(iii)        Seller shall be solely responsible for and pay all rent and costs of the Assigned Contracts (including but not limited to any Assumed Leases) through the Closing Date,

*provided that*, to the extent applicable, Buyer will reimburse Seller for the prorated portion of the March 2026 monthly-rent payments of the Assumed Leases.

    (b)    <u>Assigned Contracts</u>.

    (i)    At the Closing, Seller shall promptly cause all of its Contracts which have not been assumed and assigned to Buyer and which have not previously been rejected, to be rejected pursuant to Section 365 of the Bankruptcy Code at or as soon after Closing as practicable.

    (ii)    Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assigned Contracts to Buyer at Closing without the need for obtaining consents to such assignments unless required under the terms of such Assigned Contracts, in which case Seller shall use commercially reasonable efforts to obtain such required consents in writing. In the event Seller is unable to assign any such Assigned Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from any Governmental Entities and third parties necessary to assume and assign such Assigned Contracts to Buyer. Notwithstanding anything to the contrary in this Agreement, nothing herein shall require the Seller to pay more than the Cure Amount in exchange for such consents.

    (iii)    All Assigned Contracts must be assigned to Buyer no later than March 6, 2026, unless extended or waived in writing by Buyer and Seller.

    **Section 2.7.**    <u>Closing</u>. The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place remotely by electronic exchange of counterpart signature pages commencing on the date (the "<u>Closing Date</u>") that is the first Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Seller and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto. The Closing shall be deemed to have occurred at 11:59 p.m. (prevailing Eastern time) on the Business Day prior to the Closing Date. Unless waived in writing by Buyer and Seller, the Closing must take place on or prior to March 6, 2026.

    **Section 2.8.**    <u>Deliveries at Closing</u>.

    (a)    At the Closing, Seller shall deliver or cause to be delivered to Buyer the following documents and other items, duly executed by Seller, as applicable:

    (i)    a Bill of Sale, Assignment and Assumption Agreement substantially in the form of <u>Exhibit A</u> attached hereto (the "<u>Bill of Sale</u>");

    (ii)    an Intellectual Property Assignment Agreement substantially in the form of <u>Exhibit B</u> attached hereto for each registered Patent, Trademark, registered copyright, license, and domain name, respectively, transferred or assigned hereby and for each pending application therefor (the "<u>Intellectual Property Assignment Agreement</u>"); *provided that*, to the extent certain Trademarks of Seller cannot be assumed and assigned under Law, Seller shall then retire and surrender any such Trademarks related to the Business to the satisfaction of Buyer;

    (iii)    a duly executed non-foreign affidavit from Seller, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury

20

Regulations issued pursuant to Section 1445 of the IRC stating that Seller is not a "foreign person" as defined in Section 1445 of the IRC;

(iv)     the officer's certificate required by <u>Section 7.1(m)</u>;

(v)      a copy of the Sale Order entered on the docket of the Chapter 11 Case;

(vi)     evidence reasonably satisfactory to Buyer that all consents, approvals or novations, as applicable, listed on <u>Schedule 2.8(a)(vi)</u>, have been received, including that executed counterparts of any such consents, approvals or novations have been delivered to Buyer; and

(vii)    any other customary business documents requested by Buyer to enable the Closing.

(b)      At the Closing, Buyer shall deliver to Seller, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)      the Bill of Sale;

(ii)     **evidence satisfactory to Seller of the waiver by landlord of the payment of any rent for the post-petition period of January 6, 2026, through February 28, 2026 for the property located at 1401 Okie St NE Washington, DC 20002;**

(iii)    ~~(ii)~~ the Net Closing Date Cash Amount by wire transfer of immediately available funds to one or more bank accounts designated by Seller in writing to Buyer; and

(iv)     ~~(iii)~~ the officer's certificate required by <u>Section 7.2(e)</u>.

**Section 2.9.     <u>Allocation.</u>** The Parties agree and intend that the transactions contemplated herein are intended to constitute a taxable asset acquisition for federal and state income Tax purposes and not as any "reorganization" within the meaning of Section 368 of the IRC. Within thirty (30) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all Assumed Liabilities, capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) and the methodology set forth on <u>Schedule 2.9</u>, substantially in the form set forth therein (the "<u>Allocation</u>"). Seller shall have thirty (30) days following receipt of Buyer's proposed Allocation to review and comment on such proposed Allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Seller with Buyer's final Allocation. Buyer and Seller shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation and this <u>Section 2.9</u>. Neither Buyer nor Seller shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with this <u>Section 2.9</u> unless required to do so by a "determination" within the meaning of Section 1313 of the IRC to the contrary.

**ARTICLE III**
**SELLER'S REPRESENTATIONS AND WARRANTIES.**

Seller represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"):

**Section 3.1.     <u>Organization of Seller; Good Standing.</u>**

(a)      Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Seller has all requisite limited liability power or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted. Compass Coffee Corporation, an Indiana corporation, is not an Affiliate of Seller.

(b)      Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.2.    **Authorization of Transaction.** Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)      Seller has all requisite limited liability power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by Seller and no other corporate action on the part of Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)      This Agreement has been duly and validly executed and delivered by Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Seller is a party will have been duly and validly executed and delivered by Seller. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Seller, enforceable against Seller in accordance with such Related Agreement's terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3.    **Noncontravention.** Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Assignments and Assumptions Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents of Seller, or (ii) violate any Law to which Seller is, or its assets or properties are, subject, in the case of clause (ii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4.    **Title to Acquired Assets.** Seller, as of the Closing, shall have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (other than Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6, Seller will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, to the fullest extent

permissible under section 363(b) of the Bankruptcy Code and applicable non-bankruptcy law, free and clear of all Liens (other than Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

Section 3.5.    **Contracts.**    To the knowledge of Seller, no Contract (i) deviates in any material respect from the samples provided to Buyer, (ii) includes a "most favored customer" or similar restriction or (iii) includes a liquidated damages provision. Seller has delivered or made available to Buyer any and all material amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement in connection with such exemplary contracts. Seller has identified to Buyer the Cure Amounts (listing separately both pre-petition and post-petition amounts) with respect to such Contracts. Seller has provided timely and proper written notice of the Sale Motion, which includes the procedures for the assumption and assignment of Contracts, to all parties to Assigned Contracts and all other parties in interest and all individuals and entities that Buyer requested be served with the Sale Motion and proposed Sale Order.

Section 3.6.    **Real Property.** Seller does not own any real property. Seller has provided to Buyer true and complete copies of all default notices and any other correspondence of a material nature to or from any party to any lease, ground lease, sublease or license relating to the Leased Real Property.

Section 3.7.    **Intellectual Property.**

(a)    Except as set forth on <u>Section 3.7(a)(i) of the Disclosure Schedule</u>, (i) with respect to any Intellectual Property owned by Seller (as opposed to any Intellectual Property Licenses of which such Seller is a licensee), to the Knowledge of Seller, Seller has all right, title and interest to all such Intellectual Property, (ii) to the Knowledge of Seller, no Person other than Seller has the right to use the Intellectual Property owned by Seller and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in the Business that is owned by a party other than Seller. <u>Section 3.7(a)(ii) of the Disclosure Schedule</u> sets forth a complete list, as of the Execution Date, of all registered and applied for Intellectual Property owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

(b)    <u>Section 3.7(b) of the Disclosure Schedule</u> sets forth all Intellectual Property Licenses denoting if Seller is the licensor or licensee.

Section 3.8.    **Information Technology.** Except as set forth on <u>Section 3.8 of the Disclosure Schedule</u>: (a) no notice of any material defect has been sent or received by Seller in respect of any Permits or lease under which Seller receives Information Technology; (b) all of the Information Technology owned by Seller is held by Seller as sole, legal and beneficial owner and is held free of all Liens or any other similar third party rights or interests, other than Permitted Liens; (c) the records, systems, controls and/or data used by Seller are recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by third parties with whom Seller has contracted for such services (including holding through electronic, mechanical or photographic process whether computerized or not); and (d) to the Knowledge of Seller, Seller has taken commercially reasonable precautions to protect the integrity and security (both logical and physical), as applicable, of the Information Technology and Technology from any unauthorized use, access, interruption or modification by any other Person. To the Knowledge of Seller, the Information Technology, including the Technology, shall (i) operate and run in a commercially reasonable business manner, and (ii) conform in all material respects to the Business or customer specifications thereof. None of the Information Technology has materially malfunctioned or

failed in any manner that materially and adversely impacted customer-facing capabilities within the past three (3) years.

**Section 3.9.    Permits.** Section 3.9(i) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits issued to Seller for the operation of the Business. Section 3.9(ii) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits applied for by Seller or the issuance of which to Seller is pending. Seller represents and warrants that such approvals are in full force and effect and have not been limited, revoked or modified in any manner. Section 3.9(iii) of the Disclosure Schedule sets forth a complete list, as of the Execution Date, of all material Permits required for the operation of the Business and the Acquired Assets which have not been issued to Seller or applied for by Seller or the issuance of which to Seller is not pending.

**Section 3.10.    Employee Benefit Plans.** Except as set forth on Section 3.10 of the Disclosure Schedule, Seller is not a participant in any  Employee Benefit Plans.

**Section 3.11.    Labor Relations.** Except as set forth on Section 3.11 of the Disclosure Schedule, (a) Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization, and (b) Seller has not received written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any state labor board, and, to the Knowledge of Seller, no such petition has been threatened, and, to the Knowledge of Seller, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing. Seller is not subject to any material unfair labor practice charge.

**Section 3.12.    Environmental Matters.** Except as set forth on Section 3.12 of the Disclosure Schedule, to the Knowledge of Seller, the Acquired Assets are in material compliance with all applicable Environmental Laws. Except as set forth on Section 3.12 of the Disclosure Schedule, since January 1, 2022 Seller has conducted the Business and its operations in accordance with all Environmental Laws applicable to Seller and the Business. Since January 1, 2021, Seller has not received written notice of any violation, investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to the Knowledge of Seller, are any of the same being threatened in writing against Seller. Seller holds, and to the Knowledge of Seller, is in compliance in all material respects with, all Permits required under applicable Environmental Laws (each of which is listed in Section 3.12 of the Disclosure Schedule) to operate at the Acquired Assets and to carry on its respective businesses as now conducted and, to the Knowledge of Seller, there are no material capital expenditures required to maintain or achieve such compliance in all material respects. Seller has not received any written notice of, or entered into, any obligation, Order, settlement, judgment, injunction, indemnity, or Decree involving outstanding requirements relating to or arising under Environmental Laws, nor are Seller a party to any settlement agreement pertaining to matters arising under Environmental Laws. Seller has provided to Buyer any and all material environmental reports, surveys, studies, audits and other similar documents in Seller possession with respect to the Business and the Acquired Assets.

**Section 3.13.    Insurance.** Seller maintains the insurance policies set forth on Section 3.13 of the Disclosure Schedule, which sets forth all insurance policies covering the Acquired Assets. Such policies are in full force and effect. Seller has paid all premiums on such policies due and payable prior to the date hereof. To the Knowledge of Seller, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

**Section 3.14.    Related Party Transactions.** Except as set forth on Section 3.14 of the Disclosure Schedule, no current or former equity holder, officer, director, employee, member, manager,

24

managing member or Affiliate of Seller, or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns or has any interest in, has any ownership or right, title or other interest in any of the Acquired Assets, tangible (real or personal) or intangible property or assets of or used by, is a party to any Contract with, or performs any services for, or on behalf of, or provides any group purchasing benefits to or with respect to, Seller.

Section 3.15.   **No Brokers or Finders.** No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of Seller in connection with the negotiation, execution or performance of this Agreement or the Contemplated Transactions is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which Buyer could become liable or obligated to pay.

Section 3.16.   **Litigation; Proceeding.** Except as set forth in Section 3.16 of the Disclosure Schedule, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Knowledge of Seller, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Entity, nor are there any investigations relating to Seller or the Business, pending or, to Knowledge of Seller, threatened by or before any arbitrator or any Governmental Entity. None of the Acquired Assets is subject to any judgment, injunction, Order, consent, or Decree of any Governmental Entity or any arbitration award or settlement agreement with any Person.

Section 3.17.   **Compliance with Laws.** Except as set forth on Section 3.17(i) of the Disclosure Schedule, since January 1, 2021, to the Knowledge of Seller, Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits (exclusive of Tax law compliance to the extent disclosed in Section 3.17(i) of the Disclosure Schedule) in all material respects, and (ii) holds all Permits necessary for the lawful conduct of the Business by Seller. Except as set forth on Section 3.17(ii) of the Disclosure Schedule, Seller has not received any written notice or other written communication from any Governmental Entity or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (y) notifying Seller of the non-renewal, revocation or withdrawal of any Permit. Seller is in material compliance with the terms of the Permits.

Section 3.18.   **Taxes.**

(a)      Except as set forth on Section 3.18(a) of the Disclosure Schedule, all Tax Returns with respect to the Business or the Acquired Assets required to be filed for any Tax period ending on or before the Closing Date have been timely filed. Such Tax Returns are true, complete, and correct in all material respects. All Taxes due and owing by Seller or with respect to the Acquired Assets or the Business (whether or not shown on any Tax Return) have been timely paid;

(b)      Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, member, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law;

(c)      No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller or relating to the Acquired Assets or the Business;

(d)     Except as set forth on <u>Section 3.18(d) of the Disclosure Schedule</u>, all deficiencies asserted, or assessments made, against Seller or relating to the Acquired Assets or the Business as a result of any examinations by any Taxing authority have been fully paid;

(e)     Seller is not a party to any Litigation by any Taxing authority. There is no pending or, to the Knowledge of Seller, threatened Litigation by any Taxing authority;

(f)     Except as set forth on <u>Section 3.18(f) of the Disclosure Schedule</u>, no claim has been made by any Taxing authority in a jurisdiction in which Seller do not file Tax Returns that a Seller is or may be subject to taxation by that jurisdiction;

(g)     Seller is not a party to any Tax allocation or sharing agreement applicable to the Business or the Acquired Assets other than such agreements entered into by Seller in the Ordinary Course of Business, the primary purpose of which does not relate to Taxes;

(h)     Seller has not been a member of an affiliated, combined, consolidated or unitary Tax group filing a consolidated, unitary or combined Tax Return. Seller has no Liability for Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign Law), as transferee or successor, by Contract or otherwise;

(i)     Seller is not subject to any private ruling of the Internal Revenue Service or comparable ruling of other Taxing authorities with respect to the Acquired Assets or the Business;

(j)     To the Knowledge of Seller, Seller does not have any Liability for Taxes pursuant to any Assigned Contract;

(k)     The Acquired Assets do not include any stock or other equity interests in any Person, including for these purposes any interest in a "disregarded entity" described in Treasury Regulation Section 301.7701-3;

(l)     None of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the IRC;

(m)     Except as set forth on <u>Section 3.18(m) of the Disclosure Schedule</u>, there are no Liens for any Tax on the Acquired Assets, except for Taxes not yet due and payable nor, to the Knowledge of Seller, is any Taxing authority in the process of imposing any Liens for Taxes on any of the Acquired Assets (other than for current Taxes not yet due and payable);

(n)     Seller is not a foreign person as defined in Section 897 of the IRC; and

(o)     None of the Acquired Assets is a "United States real property interest" within the meaning of Section 897 of the IRC.

**Section 3.19.   <u>Discontinuance of Seller Operations</u>**. The Seller will sell, liquidate or abandon all of its assets in the Bankruptcy proceeding and permanently discontinue its business operations (subject to the Fiduciary Out (as defined below)).

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as follows:

Section 4.1. **Organization of Buyer.** Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its assets and to carry on the Business as now being conducted.

Section 4.2. **Authorization of Transaction.**

(a)    Buyer has full corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other corporate action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Seller, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Seller, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3. **Adequate Assurances Regarding Executory Contracts.** As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and, subject to section 365(c), 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

Section 4.4. **Good Faith Purchaser.** Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

Section 4.5. **Brokers' Fees.** Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Seller could become liable or obligated to pay**.**

Section 4.6. **Financial Capacity.** Buyer (a) has, and at all time through the Closing will have, the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

Section 4.7. **Condition of Assets.** Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Seller (including its directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other Representatives) makes no express or implied

27

representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition, value or otherwise of any of the Acquired Assets. Except for the representations and warranties contained in <u>Article III</u> (as qualified, amended, supplemented and modified by the Disclosure Schedule), Buyer will accept the Acquired Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

**ARTICLE V**
**PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1.   Certain Efforts; Cooperation.**

(a)   Each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in <u>Article VII</u>), except as otherwise provided in <u>Section 5.2</u>. Without limiting the generality of the foregoing, each of the Parties shall use commercially reasonable efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> to not be satisfied.

(b)   On and after the date hereof, Seller and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Seller and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Seller's right, title and interest to the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order).  For the avoidance of doubt, prior to the Closing, at no material cost to Seller, Seller shall use commercially reasonable efforts to support Buyer's efforts to facilitate the transition of the Acquired Assets to the Buyer. Such support shall include, but is not limited to, Seller providing information and data reasonably requested by Buyer and participating in teleconference calls with third party providers that may be required to transition the Acquired Assets.

**Section 5.2.   Notices and Consents.**

(a)   To the extent required by the Bankruptcy Code, Bankruptcy Rules (Federal and Local) or the Bankruptcy Court, Seller shall give any notices to third parties, including notices of Buyer's Sale Motion and assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code consistent with this Agreement.

(b)   Seller and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information

required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

### Section 5.3. **Bankruptcy Actions.**

(a)     Upon the execution of this Agreement, Seller shall select Buyer as the Stalking Horse Purchaser in accordance with, and subject to the requirements of, the Bidding Procedures and Bidding Procedures Order.

(b)     The final Sale Order shall be provided to Buyer prior to filing in the Bankruptcy Court and shall include reasonable provisions requested by Buyer prior to the filing. Consent of Buyer to the proposed Sale Order is required prior to filing.

(c)     Seller shall provide timely and proper written notice of the Sale Motion, "Stalking Horse Selection Notice" and any cure notice upon all known lien holders, creditors, landlords, suppliers, vendors, applicable governmental and regulatory agencies, the U.S. Small Business Administration, state, local and federal taxing authorities and all interested parties required to be served under the Bankruptcy Code and the Federal and Local Bankruptcy Rules. In addition, Seller shall serve the Sale Motion, "Stalking Horse Selection Notice," Sale Order and any cure notice on any other individual or party as may be requested by Buyer.

(d)     Seller shall provide timely and proper written notice to all parties to Assigned Contracts and all other parties in interest and will take all other actions necessary to cause all Assigned Contracts to be assumed by Seller (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assigned to Buyer, provided that the only Contracts to be actually assumed and assigned to Buyer at or after Closing will be the Assigned Contracts pursuant to this Agreement.

(e)     If the Break-Up Fee becomes payable, then Seller shall make the Break-Up Fee payment at the closing of the Alternate Transaction.

(f)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights otherwise arising from this Agreement, Seller shall use commercially reasonable efforts to prosecute such appeal, petition or motion and seek to obtain an expedited resolution of any such appeal, petition or motion.

### Section 5.4. **Preservation of Acquired Assets**. Except as may have been authorized or approved by the Bankruptcy Court, as set forth on <u>Schedule 5.4</u> attached hereto or as agreed to in writing by Buyer (which agreement shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing:

(a)     Seller shall: (i) operate the Business in all material respects substantially the same manner as conducted as of the date of this Agreement and only in the Ordinary Course of Business; and (ii) preserve in all material respects the Acquired Assets;

(b)     Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than the sale of Inventory in the Ordinary Course of Business; provided, however,

that Seller may dispose of obsolete, worn-out or immaterial assets in the Ordinary Course of Business with Buyer's consent;

(c)      Seller shall not, directly or indirectly, knowingly permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or Encumbrance (other than Permitted Liens);

(d)      Seller shall not, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in or constitute a material breach of any representation or warranty (as if then made) or covenant made by Seller in this Agreement;

(e)      Seller shall notify Buyer promptly in writing of the occurrence of any Material Adverse Effect;

(f)      Seller shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(g)      Seller shall not purchase any other assets, including Inventory, other than in the Ordinary Course of Business unless the price of any single transaction or series of transactions shall exceed 130% of such transaction(s)' historical cost, in which case Buyer's written consent is required;

(h)      Seller shall not, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Acquired Asset;

(i)      Seller shall not, directly or indirectly, reject, terminate, amend or modify in any manner any Contract for Leased Real Property that has been identified to be assumed and assigned to Seller;

(j)      Seller shall use commercially reasonable efforts to assist Buyer in obtaining all consents or approvals prior to the Closing that are required, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Buyer any Assigned Contract or Permit;

(k)      Seller shall use commercially reasonable efforts to assist Buyer in obtaining all Permits required to own or operate the Acquired Assets under applicable Laws, including making filings with the Governmental Entity;

(l)      Seller shall maintain in full force and effect each Permit held by Seller as of the date of this Agreement or otherwise obtained by Seller prior to the Closing, Seller shall comply with, in all material respects, the terms of each such Permit and Seller shall not permit any such Permit to terminate, expire or lapse; provided, however, that any failure to maintain a Permit that is promptly cured or that does not have a Material Adverse Effect shall not constitute a breach of this Section;

(m)     Seller shall maintain in full force and effect without modification any insurance policy with respect to Acquired Assets in all material respects, Seller shall comply with, in all material respects, the terms of such insurance policy and Seller shall not permit any such policy to terminate, expire or lapse; and

(n)      Commencing at 5:00 pm Eastern Time on January 30, 2026, Seller shall not issue any Gift Cards, allow any value to be loaded or re-loaded onto any Gift Cards, or replace lost or

stolen Gift Cards, and shall terminate the continuation of any branded liability programs, unless otherwise agreed in writing by Buyer and Seller.

**Section 5.5.    Notice of Developments And Disclosure Schedule Supplements.**

(a)    From the date hereof until the Closing Date, Seller shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Seller, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Seller and Buyer) of any material failure of Seller or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

(b)    From time to time prior to the Closing Date, Seller, on the one hand, with respect to the Disclosure Schedule and representations and warranties relating to Seller, shall notify Buyer of, and Buyer on the other hand, with respect to representations and warranties relating to Buyer, shall notify Seller of, and shall supplement or amend the Disclosure Schedule, if applicable, with respect to, any matter that arises after the date hereof and that, (i) if existing or occurring at or prior to such delivery of the Disclosure Schedule, would have been required to be set forth or described in the Disclosure Schedule to this Agreement or (ii) makes it necessary to correct any information in the Disclosure Schedule or in any representation or warranty of Seller or Buyer, as applicable, that has been rendered inaccurate thereby. Each such notification and supplement, to the extent known, shall be made by Seller to the Disclosure Schedule prepared by Seller no later than two (2) Business Days after discovery thereof by Seller or Buyer, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties hereto, then promptly after discovery thereof by Seller or Buyer, as applicable, and in any event prior to the Closing. Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Buyer under Section 7.1(a) and Section 8.1(b)(i) as if the Schedules were not supplemented or amended pursuant to this Section 5.5(b) and (ii) no such supplement or amendment to the Disclosure Schedule shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

**Section 5.6.    Access.** Upon reasonable advance written request by Buyer prior to Closing, Seller shall permit Buyer and its Representatives, at Buyer's sole cost and expense, to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Seller, to all facilities, offices, premises, and documents related to the Acquired Assets.

**Section 5.7.    Press Releases and Public Announcements.** Promptly following the Closing, the Buyer may issue a press release concerning this Agreement and the Contemplated Transactions. The Seller shall not issue any press release or make any statements relating to this Agreement, except that the Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court and that Seller may make statements in furtherance of the Bidding Procedures Motion, the sale process, any auction held in accordance with the Bidding Procedures and the Bidding Procedures Order, and any hearing in connection with, and to obtain, the Sale Order.

**Section 5.8.    Bulk Transfer Laws.** The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

31

**ARTICLE VI**
**OTHER COVENANTS.**

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1.**    **Cooperation.** Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Seller to Buyer.

**Section 6.2.**    **Removal of Assets from Leased Premises**. Seller shall ensure that Buyer has access to all and the ability to remove all Acquired Assets at any location wherever located. Except to the extent expressly required by the Sale Order, Seller shall have no obligation to remove or relocate any Excluded Assets.

**Section 6.3.**    **Further Assurances.** In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Seller's retention of the Excluded Assets and Excluded Liabilities.

**Section 6.4.**    **Availability of Business Records.** For a period of ~~twelve~~**two** (~~12~~**2**) ~~months~~**years** after the Closing **Date, or such longer period as the parties may agree or may be required by any order from a court with jurisdiction**, Buyer shall promptly provide to Seller and its Representatives (after reasonable notice and during normal business hours and without charge to Seller) access to all Records included in the Acquired Assets for periods prior to the Closing to the extent such access is necessary in order for Seller to**: (a)** comply with applicable Law or any contract to which it is a party, **(b)** for liquidation, winding up ~~or,~~ Tax reporting ~~and~~**, or other financial reporting, and (c) the investigation or defense of claims, litigation, or disputes arising from periods prior to the Closing, and** so long as such access is subject to an obligation of confidentiality~~, and~~. **Buyer** shall preserve such Records until the latest of (i) ~~twelve~~**two** (~~12~~**2**) ~~months~~**years** after the Closing Date, (ii) the required retention period for all government contact information, records or documents (solely for such information which such requirement applies), ~~or~~(iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Case**, or (iv) the final disposition of any pending litigation with respect to any disputes arising from periods prior to the Closing**. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing during the ~~twelve~~**two** (~~12~~**2**) ~~month~~**year** period described herein, Buyer shall notify Seller **and any statutory committee of unsecured creditors (or any successor or continuation of Seller or such committee, including any liquidation trustee, plan administrator, or chapter 7 trustee)** thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Seller to retain such Records~~,~~ at Seller's cost and expense. **For the avoidance of doubt, and notwithstanding anything to the contrary herein, during the two (2) year period described herein, Buyer shall maintain and grant Seller continuous access to the email addresses and associated Google accounts, including calendar, drive, and related Google suite services, for the email accounts michael@compasscoffe.com and harrison@compasscoffee.com;** *provided, that,* **upon request, Seller shall reimburse Buyer for the cost to maintain such email addresses and associated Google accounts.  Further, notwithstanding anything to the contrary herein, any access of Seller to Records maintained by Oracle America,**

**Inc. ("Oracle") via its NetSuite platform, or otherwise, shall be limited to access through Buyer's account with Oracle, if any, and Oracle shall have no obligation to provide Seller direct access to any Records after the Closing.**

Section 6.5.    **Employee Matters.**

(a)    Buyer is only purchasing assets in the Contemplated Transactions. While Buyer intends to review and consider for potential employment some or all of the Current Employees, Buyer shall have no obligation to retain or offer (or cause a designee of Buyer to offer) employment to any Current Employees after the Closing Date. Buyer shall have no liability to any of Seller's employees and Seller shall be solely responsible for terminating its employees prior to the Closing and any costs associated therewith.

(b)    Nothing contained herein shall be construed as requiring, and neither Seller nor any of its Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Seller's Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any of Seller's employees or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

Section 6.6.    **Taxes.**

(a)    To the extent not exempt under any section of the Bankruptcy Code, any and all stamp, documentary, registration, transfer or similar Tax (each, a "Transfer Tax") imposed under any applicable Law on the transfer of the Acquired Assets contemplated by this Agreement shall be borne by Seller; *provided that* Buyer shall reasonably cooperate with Seller to timely prepare and timely file any Tax Returns required to be filed with respect such Transfer Taxes, and shall provide such other assistance including exemption or resale certificates as allowable to reduce any such Transfer Taxes, unless otherwise required by Law; *provided further that* if Buyer is required by Law to pay any such Transfer Taxes, Seller shall promptly reimburse Buyer for the amount of such Transfer Taxes actually paid by Buyer (including the cost associated with preparing and filing any such Tax Returns).

(b)    Seller and Buyer shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any Tax proceeding relating to: (a) the Acquired Assets; or (b) the Contemplated Transactions. Such cooperation shall include the retention and (upon the other party's written request) the provision of records and information which are reasonably relevant to any Tax audit, Litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Parties agree that all books and records with respect to Tax matters pertinent to the Acquired Assets relating to any taxable period beginning before the Closing Date shall be retained by Seller and that each of Seller and Buyer shall have reasonable access to same upon request so long as Seller has not previously dissolved. In the event Seller intends on destroying any such books and records, Seller shall provide Buyer with written notice of same and Buyer shall have thirty (30) days thereafter to remove the books and records that are the subject of destruction from the premises. This Section 6.6(b) is intended to, and shall, supplement and not limit the generality of the provisions contained in Section 6.4.

(c)    Notwithstanding anything to the contrary in this Agreement, Seller shall not file any Tax Return or amended Tax Return relating to any property, ad valorem, or similar Tax with respect

33

to the Acquired Assets or the Business ("<u>Asset Taxes</u>") (or otherwise change such Tax Returns) or make or change an election relating to Asset Taxes, in each case, with respect to a Pre-Closing Tax Period, without a written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), unless required to do so by applicable Law.

(d)     For the avoidance of doubt, Seller shall remain responsible for, and Buyer shall have no liability for, all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets or the Business or attributable to Tax periods (or portions thereof) commencing on or after the Petition Date and ending on or before the Closing Date. Seller shall remain responsible for all sales Taxes, use Taxes, payroll Taxes, real property taxes (including such amounts included in the Cure Amounts), personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or are attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date.

**Section 6.7.**     <u>Casualty</u>. If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Buyer shall have the option to: (a) acquire such Acquired Assets on an "AS IS" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the applicable Casualty; or (b) in the event that the applicable Casualty would have a Material Adverse Effect, Buyer may terminate this Agreement and the transactions contemplated hereby.

**Section 6.8.**     <u>Collection on Acquired Assets</u>.  If, after the Closing Date, Seller receives any cash, checks, payments or other property with respect to any Acquired Assets (including misdirected customer payments under the Assigned Contracts), Seller shall promptly (and within three (3) Business Days) remit or deliver such cash, checks, payments or other property to Buyer and use commercially reasonable efforts to take such actions to vest title to such cash, checks, payments or other property in Buyer. After the Closing Date, Seller hereby designates Buyer and its officers as the true and lawful attorney in-fact of Seller, with full power of substitution, solely for the limited purpose to execute and endorse for the benefit of Buyer all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Acquired Assets. Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agrees to execute and deliver to Buyer from time to time any documents or other instruments requested by Buyer to evidence such power of attorney; provided further that nothing herein shall require Seller to take any action that would be inconsistent with applicable law or any order of the Bankruptcy Court. If, following the Closing, any right, property or asset forming part of the Acquired Assets is found not have been transferred to Buyer, Seller shall, upon written notice from Buyer, use commercially reasonable efforts to transfer such rights, property or asset forming part of the Acquired Assets as soon as practicable to Buyer.

**Section 6.9.**     <u>No Successor Liability</u>. Buyer is only purchasing the Acquired Assets, including by taking an assignment of, and assuming liabilities under, certain Leases and executory contracts as specifically set forth herein in connection with the Contemplated Transactions. The parties hereto intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under COBRA and the applicable regulations thereunder) to Seller, including with respect to any collective bargaining agreement and any Employee Benefit Plans; (b) have *de facto* or otherwise, merged with or into Seller; (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller; or (d) be liable for any acts or omissions of Seller in the conduct of the Business, other than with respect to the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement, the parties hereto intend that Buyer shall not be liable for any Liens against Seller or any of its Affiliates, and that Buyer shall have no

successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising on or prior to the Closing Date. The parties hereto agree that a provision substantially in the form of, and with comparable effect (to the extent permitted by law), to this Section 6.9 shall be reflected in the Sale Order.

Section 6.10.      **Non-Competition; Non-Solicitation.**

(a)      For a period of two (2) years commencing on the Closing Date (the "Restricted Period"), Seller and the Key Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly: (i) engage in or assist others in engaging in the Business within the Mid-Atlantic region of the United States (the "Territory"); (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, (A) the Key Member may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person; and (B) neither Seller nor the Key Member shall be deemed to violate this Section 6.10 solely by reason of the ownership, directly or indirectly, by any of their respective Affiliates, of equity interests or other securities in any Person that engages in the Business in the Territory during the Restricted Period, to the extent such interests are owned as of the Execution Date.

(b)      During the Restricted Period, Seller and the Key Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any Person who is offered employment by Buyer at or after the Closing or is or was employed in the Business during the Restricted Period, or encourage any such Person to leave such employment or hire any such Person who has left such employment; *provided*, *however*, that this restriction shall not apply to (i) general solicitations which are not directed specifically to any such Persons, (ii) any Former Employee who is terminated by Buyer without cause after the Closing Date, or (iii) to any Former Employee after the expiration of the one (1)-year period commencing on the date of the termination of such Person's employment relationship with Buyer.

(c)      Seller and the Key Member acknowledge that a breach or threatened breach of this Section 6.11 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by Seller or the Key Member of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond or prove likelihood of success).

(d)      Seller and the Key Member acknowledge that the restrictions contained in this Section 6.10 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the Contemplated Transactions. In the event that any covenant contained in this Section 6.10 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other

35

limitations permitted by applicable Law. The covenants contained in this <u>Section 6.10</u> and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.1.** **Conditions to Buyer's Obligations**. Subject to <u>Section 7.3</u>, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or express written waiver by Buyer of each of the following conditions:

(a)     each of the representations or warranties set forth in <u>Article III</u> that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) when made and shall be true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in <u>Article III</u> that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date); provided, however, that any failure of any such representation or warranty to be so true and correct shall not constitute a failure of this condition unless such failure, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(b)     Seller shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and at the Closing, Seller shall have caused the documents and instruments required by <u>Section 2.8(a)</u> (Deliveries at Closing) to be delivered to Buyer (or tendered subject only to Closing);

(c)     all of the Assigned Contracts shall have been cured and assumed and assigned to Buyer;

(d)     the full satisfaction of the DIP Payoff Amount (either payable from the Purchase Price or by Seller);

(e)     the full satisfaction of any Administrative Claims;

(f)     Seller shall have paid and satisfied all fees, obligations, costs and rent related to all of the Acquired Assets, including but not limited to all obligations under the Assumed Leases set forth on <u>Schedule 2.1(d)</u>, which accrued after the Petition Date through the Closing;

(g)     all of the Acquired Assets located at any location other than at the Assumed Lease location sites shall have been delivered to Buyer at a location reasonably acceptable to Buyer;

(h)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(i)      the Sale Order, in a manner acceptable to Buyer, shall have become a Final Order (unless this condition has been waived in writing by Buyer);

(j)      the **Cash** Purchase Price shall not exceed $~~2,900,000.00~~**4,550,000.00**, unless otherwise agreed to by Buyer;

(k)      all Intellectual Property of Seller shall have been assigned and delivered, pursuant to the Intellectual Property Assignment Agreement, and/or retired and surrendered to Buyer in a form and format reasonably satisfactory to Buyer;

(l)      Seller shall certify, represent and warrant in writing that all Lien holders, creditors, landlords, required Governmental Entities, parties to any ongoing Litigation involving Seller (both plaintiffs and defendants), counterparties to the Assigned Contracts, relevant Taxing authorities and any other parties-in-interest, including any individual or entity that Buyer requests be served, has been notified and served under the Chapter 11 Case; and

(m)      Seller shall have delivered a certificate from an authorized officer of Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) has been satisfied.

Section 7.2.      **Conditions to Seller's Obligations**. Subject to Section 7.3, Seller's obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver by Seller of the following conditions:

(a)      each of the representations or warranties set forth in Article III that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) when made and shall be true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in Article III that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date); provided, however, that any failure of any such representation or warranty to be so true and correct shall not constitute a failure of this condition unless such failure, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Seller (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order shall have become a Final Order (unless waived by Buyer);

(e)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

Section 7.3.    **Investigation**. Buyer shall not be entitled to rely on the failure of any representation or warranty to be true and correct as of the Closing as a basis to refuse to consummate the Closing or to claim the failure of any closing condition to the extent such failure was disclosed to Buyer or otherwise known to Buyer prior to the Closing.

Section 7.4.    **No Frustration of Closing Conditions.** Neither Buyer nor Seller may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.  In the event all of the Acquired Assets are not present at the Closing then, only with the consent of the Buyer, the Parties may seek approval to modify the Purchase Price.

## ARTICLE VIII
## TERMINATION

Section 8.1.    **Termination of Agreement.** This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(b)    by Buyer or Seller if the Closing has not occurred by March 6, 2026;

(c)    by Buyer by giving written notice to Seller at any time prior to Closing (i) in the event Seller has breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in Section 7.1(a)), contained in this Agreement in each case in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of five (5) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(d)    by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in Section 7.2(a)), contained in this Agreement in each case in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of five (5) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Seller;

(e)    by Buyer, if, prior to the Closing, (x) Seller seeks to have the Bankruptcy Court enter an order dismissing, or converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason, or (y) the Chapter 11 Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

(f)      automatically and without any action or notice by Seller to Buyer, or Buyer to Seller, immediately upon the issuance of a final and non-appealable order, Decree, or ruling by a Governmental Entity to permanently restrain, enjoins or otherwise prohibits the Closing;

(g)      by Buyer if Buyer reasonably determines that Seller has frustrated the satisfaction of any of the conditions to Closing in Section 7.1;

(h)      by Seller if Seller reasonably determines that Buyer has frustrated the satisfaction of any of the conditions to Closing in Section 7.2;

(i)      by Buyer or Seller, in either case, upon the approval by the Bankruptcy Court of an Alternate Transaction;

(j)      by Seller, notwithstanding anything to the contrary in this Agreement, if Seller reasonably determines in good faith, after consultation with counsel, that continuing to pursue or consummate the Contemplated Transactions would be inconsistent with applicable Law or Seller's fiduciary duties thereunder; provided, however, that Seller shall promptly provide Buyer with written notice of any such determination (collectively, the "Fiduciary Out");

(k)      by Buyer if, commencing at 5:00 pm Eastern Time on January 30, 2026 until the Closing Date, Seller issues any Gift Cards, allows any value to be loaded or re-loaded onto any Gift Cards (including but not limited to those issued under the Ansa Platform Services Agreement) or replaces any lost or stolen Gift Cards, unless otherwise agreed to in writing by Buyer and Seller;  or

(l)      by Buyer if the **Cash** Purchase Price exceeds $~~2,900,000.00~~**4,550,000.00**.

**Section 8.2.     Procedure Upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Seller, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Seller.

**Section 8.3.     Effect of Termination.**

(a)      If any Party terminates this Agreement pursuant to Section 8.1, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I (Definitions), Article IX (Miscellaneous), and this Article VIII (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party with respect to the Contemplated Transactions, as applicable, except as otherwise expressly set forth in this Agreement including as set forth in Section 2.5(b) with respect to the Deposit. In the event Buyer terminates this Agreement pursuant to Section 8.1, Seller shall return the Deposit within three (3) Business Days of the termination. Notwithstanding anything to the contrary in this Agreement, in the event of a termination of this Agreement, Seller's exclusive remedies shall be to seek compensatory damages and/or, if Seller terminates this Agreement pursuant to (i) Section 8.1(b) (due to Buyer's failure to perform or comply with the terms of under this Agreement), (ii) Section 8.1(d), or (iii) Section 8.1(i), to seek an order permitting Seller to retain the Deposit. The parties acknowledge and agree that in no event shall Seller or Buyer be entitled to punitive or liquidated damages.

(b)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)      Any Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 8.3(c) shall relieve Buyer or Seller of their respective obligations under a Confidentiality Agreement.

(d)      The Break-Up Fee shall be payable to Buyer (consistent with Section 5.3(e)) from the sale proceeds received in connection with an Alternate Transaction if this Agreement is terminated for any reason, other than by Seller in the circumstances set forth in Section 8.1(b), (d) or (h).

Any obligation to pay the Break-Up Fee hereunder shall be absolute and unconditional; and such payment shall constitute an administrative expense of Seller's estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. Seller and Buyer agree that the Bidding Incentives were a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(e)      Except as set forth above in this Section 8.3, all fees and expenses incurred in connection with this Agreement and the other documents contemplated thereby shall be paid by the party incurring such expenses, whether or not the Sale is consummated.

(f)      This Section 8.3 and the rights and obligations created hereunder, shall survive termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1.**      **Expenses**. Except as otherwise provided in this Agreement, Seller and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.2.**      **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements.

**Section 9.3.**      **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4.**      **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by either Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein. Except where a specific period for

action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.5.** **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither of the Parties may assign either this Agreement nor any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Seller; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

**Section 9.6.** **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller, then to: | Compass Coffee, LLC<br>1535 7th Street NW<br>Washington, D.C. 20001<br>Attention: Michael Haft & Robert Haft<br>Email: michael@compasscoffee.com |
| with a copy to: | Hunton Andrews Kurth LLP<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219<br>Attention: Tyler P. Brown<br>Email: tpbrown@hunton.com |
| If to Buyer, then to: | Caffe Nero North America, Inc.<br>320 Congress Street, 4th Floor<br>Boston, MA 02210<br>Attention: Michael Ford-Deegan, President<br>Email: michaeld@caffenero.com |
| with a copy to: | McCarter & English, LLP<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, NJ 07102<br>Attention: Jeffrey T. Testa<br>Theodore M. Grannatt<br>Email: jtesta@mccarter.com<br>tgrannatt@mccarter.com |

Either Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.6.

41

**Section 9.7.    Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; *provided that* if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the state and federal courts located in the State of Delaware shall have exclusive jurisdiction over such Litigation.

**Section 9.8.    Equipment Storage Through Closing**. Seller intends to close certain cafés at locations other than those locations subject to the Assumed Leases,  between the date hereof and the Closing, and the Parties acknowledge and agree that any Equipment to be sold by Seller to Buyer under this Agreement may be moved or relocated by Seller to the property located at 1401 Okie St NE Washington, DC 20002, commonly referred to the Roastery, or to such other location as the Parties may agree (the "Stored Equipment"). Seller shall retain title to all such Stored Equipment until Closing and shall have continuous twenty-four (24) hour access to any Stored Equipment wherever stored. Buyer shall have no Liability related to or arising from the Stored Equipment until the Closing.

**Section 9.9.    Consent to Service of Process.** Both Parties hereby consent to process being served by either Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.6.

**Section 9.10.    WAIVER OF JURY TRIAL.** BOTH PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11.    Severability.** The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12.    No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13.    No Survival of Representations, Warranties and Agreements.** None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, and (ii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

42

**Section 9.14.** **Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.15.** **Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.16.** **Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the applicable disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is readily apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly referenced.

**Section 9.17.** **Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18.** **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.19.** **Buyer Guarantor**.

(a)     Buyer Guarantor hereby absolutely, unconditionally and irrevocably guarantees, as surety, the full and timely performance and payment of all of Buyer's obligations under this

Agreement and the other Transaction Documents (the "Buyer Guarantee"). The Buyer Guarantee is valid, in full force and effect, and constitutes the valid and binding obligation of Buyer Guarantor, enforceable in accordance with its terms. Buyer Guarantee is an irrevocable guarantee of payment (and not just of collection) and shall continue in effect notwithstanding any extension or modification of the terms of this Agreement (except to the extent such extension or modification affects Buyer's 's obligations hereunder) or any assumption without the consent of Buyer of any such guaranteed obligation by any other Party. The obligations of Buyer Guarantor hereunder shall not be affected by or contingent upon (i) the liquidation or dissolution of, or the merger or consolidation of Buyer with or into any Person or any sale or transfer by Buyer of all or any part of its property or assets, (ii) the bankruptcy, receivership, insolvency, reorganization or similar actions involving or affecting Buyer, (iii) any modification, alteration, amendment or addition of or to this Agreement (except to the extent such modification, alteration, amendment or addition affects Buyer's obligations hereunder and then only to such extent) or (iv) any disability or any other defense of Buyer or any other Person (with or without notice) which might otherwise constitute a legal or equitable discharge of a surety or a guarantor or otherwise. In connection with the foregoing, Buyer Guarantor waives all defenses and discharges it may have or otherwise be entitled to as a guarantor or surety and further waives presentment for payment or performance, notice of nonpayment or nonperformance, demand, diligence or protest. Seller entered into this Agreement in reliance upon this Section 9.19. Buyer Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated hereby and that the waivers and agreements by Buyer Guarantor set forth in this Section 9.19 are knowingly made in connection with such benefits.

(b)      Upon default by Buyer with respect to, or failure by Buyer to perform any of, its obligations under this Agreement or any other document or instrument contemplated hereby, as the case may be, Buyer Guarantor shall be liable for the obligations of Buyer arising under this Agreement and the other Transaction Documents, as applicable.

(c)      Buyer Guarantor hereby represents and warrants as follows: (i) Buyer Guarantor is a Delaware corporation and has all power and authority to execute, deliver and perform its obligations created by this Section 9.19; (ii) the execution, delivery and performance of this Agreement by Buyer Guarantor has been duly and validly authorized and approved by all necessary corporate action; (iii) this Agreement has been duly and validly executed and delivered by Buyer Guarantor and constitutes a valid and legally binding obligation of Buyer Guarantor, enforceable against Buyer Guarantor in accordance with its terms; (iv) all consents, approvals, authorizations of, or filings with, any Governmental Entity necessary for the due execution, delivery and performance of this Agreement by Buyer Guarantor have been obtained or made; (v) the execution, delivery and performance by Buyer Guarantor of this Agreement does not and will not violate its organizational and charter documents, any applicable law or any material contractual restriction binding on Buyer Guarantor or its assets; and (vi) Buyer Guarantor has, and, for so long as this Section 9.19 shall remain in effect in accordance with its terms, Buyer Guarantor shall have, funds sufficient to satisfy all of its obligations hereunder.

Section 9.20.   **Solicitation of Competitive Bids**. Upon selection of Buyer as the Stalking Horse Purchaser pursuant to Section 5.3(a) of this Agreement, Seller is authorized to solicit competing bids in accordance with the Bidding Procedures and Bidding Procedures Order, subject to Buyer's right to terminate pursuant to Section 8.1(i) of this Agreement.  Buyer acknowledges that the transactions contemplated herein are subject to potential higher and better offers in connection with the Bidding Procedures.

**[SIGNATURE PAGES FOLLOW]**

**SIGNATURE PAGE TO**
**ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

<u>SELLER</u>:

COMPASS COFFEE, LLC

By _____
Name:  Michael Haft
Title:  CEO / President

<u>BUYER</u>:

CAFFE NERO NORTH AMERICA, INC.


By _____
          Name: Michael Ford-Deegan
          Title: President

Acknowledged and accepted by the Key Member for the
limited purposes of Section 6.10 hereto.


By: _____
Name: Michael Haft, individually

<u>SOLELY WITH RESPECT TO SECTION 9.19</u>:

CAFFE NERO AMERICAS, INC.


By:_____
Name: Michael Ford-Deegan
Title: President