**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>**Compass Coffee, LLC,**<br><br>　　　　Debtor. | Chapter 11<br><br>Case No. 26-00005 (ELG) |

### DECLARATION OF MICHAEL HAFT IN SUPPORT OF ASSET SALE

I, Michael Haft, hereby declare under penalty of perjury:

1.　　I am the Chief Executive Officer of Compass Coffee, LLC ("**Compass**" or the "**Debtor**") and have served in that capacity since the company's founding in 2014. I am authorized to submit this declaration (this "**Declaration**") on behalf of Compass in support of the *Debtor's Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (V) Approving Form of Notice Thereof; (B) Entry of an Order After the Sale Hearing (I) Authorizing the Debtor to Sell its Assets; and (II) Authorizing the Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 76] (the "**Sale Motion**").[1]

2.　　Except as otherwise indicated, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by Compass's outside professional advisors, or my lay opinion based upon my experience, knowledge, and information concerning the Debtor's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[1]　Capitalized terms not defined herein have the meanings set forth in the Sale Motion.

3. On January 6, 2026 (the "**Petition Date**"), the Debtor commenced with this bankruptcy court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

4. Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this Case is set forth in the *Declaration of Michael Haft in Support of Debtor's Chapter 11 Petition and First Day Motions* [Docket No. 16] (the "**First Day Declaration**"), which is incorporated herein by reference.

## Prepetition Marketing Efforts

5. Beginning in May 2021, in the face of the financial headwinds more fully described in the First Day Declaration, I personally began to solicit interest from industry contacts in the possible sale of Compass or its assets, or another financial transaction, that would be beneficial to Compass and its creditors and equity holders. Having served as an executive in the coffee industry since I co-founded Compass in 2014, I leveraged my extensive network and determined that there was sufficient market interest to warrant continued exploration of a strategic transaction. Over the course of the last 4 ½ years of marketing efforts, I have engaged in discussions with numerous parties who were willing to discuss a potential purchase of, or a financial transaction with, Compass prior to the Petition Date.

6. With the advice of legal counsel, and in my reasoned business judgment, I determined in the fall of 2025 that pursuing an asset sale through section 363 of the Bankruptcy Code was the most efficient and equitable way to maximize the value of Compass' assets for the benefit of its creditors.

## Section 363 Sale Process

7. On January 14, 2026, the Debtor filed the Sale Motion, seeking, among other things, approval of the Bidding Procedures and entry of the Sale Order. The Court entered the Bidding Procedures Order [Docket No. 90] on January 24, 2026.

8. The timeframe proposed to the Court in the Sale Motion for conducting a sale process in Chapter 11 was driven in large part by the Debtor's concerns about its ability to maintain Compass as a going concern while also providing prospective purchasers adequate time to investigate the purchase opportunity, meet with Compass personnel, visit the Compass cafes and roastery, and formulate a bid. The timeframe for that process proved prescient when Compass and the entire metropolitan DC experienced massive weather interruptions in January and February, resulting in significant reductions in same-store customer sales from historical sales for the same period a year ago. Those devastating revenue drops continue to compel Compass to push for the earliest possible sale closing date to avoid the need to close the cafes that comprise a large part of the assets Compass intends to sell.

9. Following the Petition Date, I continued to solicit interest in Compass' assets both before and after approval of the Sale Motion. Prospective purchasers were provided access to a virtual data room that I organized prior to the Petition Date. That data room contains pertinent financial, legal, and other documents necessary for a potential purchaser to perform sufficient due diligence, and I have updated the data room with information relating to the company and the proposed sale Compass intended to pursue.

10. Since the Petition Date, I have also answered numerous questions from prospects and hosted potential purchasers for on-site visits. In fact, substantially all of my working hours since the bankruptcy filing have been dedicated to keeping the cafes open and providing

necessary due diligence information and organizing and otherwise hosting site visits at the Debtor's cafes and roastery.

11. At least 92 people from 56 different groups gained access to the Compass virtual data room and actively reviewed financial information of Compass to consider whether to propose to enter into a transaction with Compass. These people were from a variety of large strategic coffee industry players, medium size coffee enterprises, private equity firms, venture capital firms, family offices, and hedge funds. I spoke with many more people about a potential transaction who did not request data room access. Both before and after the Petition Date, numerous prospects visited with me and my management team in DC, including to visit various of the cafes and/or the roastery equipment and leased space.

12. Based on my extensive marketing efforts to date, I determined in my reasoned business judgment that it was in Compass' best interest to designate Caffe Nero North America, Inc. ("*Caffe Nero*") as the Stalking Horse Purchaser under the Bidding Procedures Order. Following Caffe Nero's designation, I continued to engage with other potential bidders who expressed a desire to purchase some or all of the same café locations and assets sought to be acquired by Caffe Nero.

13. Prior to or on the Bid Deadline, the Debtor received four Bids for the purchase of its assets in addition to the Caffe Nero purchase offer. At least two of those bids were qualified under the bidding procedures after the Debtor gathered financial information concerning the bidders and conferred with the consultation parties about the bids. As a result, the Debtor conducted an Auction at the offices of its counsel, Hunton Andrews Kurth LLP, in Washington D.C. The Auction commenced on February 17, 2026. After 21 rounds of bidding that day, the Debtor adjourned the Auction to February 18, 2026. The Debtor reconvened the

Auction on February 18, 2026, and, after one additional round of bidding, the Debtor again adjourned the Auction to February 19, 2026. The Debtor reconvened the Auction on February 19, 2026, and, having received no further Bids, closed the Auction on February 19, 2026.

14. At the close of the Auction, following 22 rounds of bidding, and in consultation with the consultation parties, the Debtor designated Caffe Nero as the Successful Bidder, having raised its bid to a value of $4,764,988 to the estate, and Next Gen Coffee Enterprises, LLC as the Back-Up Bidder, having bid a value of $4,663,000 to the estate.

15. Prior to agreeing to become the Stalking Horse Purchaser, Caffe Nero had negotiated and secured a conditional agreement to a new lease with the Debtor's landlord, AP DC Tomato's LLC, at its leased roastery space located at 1401 Okie St. N.E., Washington D.C., 20002. During the course of the Auction, AP DC Tomato's LLC agreed to waive all administrative claims for postpetition rent and related charges against the Debtor for the period of January 6, 2026 through February 28, 2026, provided that Caffe Nero was the Successful Bidder and consummated the purchase. In valuing Caffe Nero's Bid at the Auction, the Debtor, in consultation with the consultation parties, ascribed $214,988 of value to that administrative claim waiver to the Caffe Nero Bid because such waiver, if Caffe Nero prevailed at the auction, constitutes dollar for dollar value to the Debtor's estate.

16. The Auction and designation of Caffe Nero as the Successful Bidder for the Purchased Assets required conforming revisions to the previously negotiated Stalking Horse Purchase Agreement (the "*APA*") executed with Caffe Nero. The updated APA, with a redline against the original APA was filed on February 24, 2026 [Docket No. 215].

17. The sale process was neither rushed nor disorganized. Indeed, it was very successful in driving the price up to the amount the Successful Bidder, Caffe Nero, is willing to pay for the Purchased Assets.

18. Given the extensive marketing and sale efforts I conducted for over 4 1/2 years, I do not believe that additional marketing of the Purchased Assets, additional time soliciting bids, or otherwise extending the sale process would be worthwhile or would result in a higher or otherwise better offer than the offer from Caffe Nero represented by the APA. In fact, additional time marketing the Purchased Assets could cause Caffe Nero to reconsider its interest in pursuing the APA and likely would result in degradation of the value of the assets to be purchased.

19. The negotiation of the APA between the Debtor and Caffe Nero was extensive and conducted at arms'-length. The Debtor and Caffe Nero each have had counsel to represent their respective interests in the negotiation of the APA, as well as to represent them throughout the Sale process.

20. Neither I nor any other insiders are gaining any advantage or insulating themselves from any risks at the expense of the estate's creditors through this sale. I have executed my duties to the estate to the best of my abilities in seeking to obtain as much recovery for creditors as I reasonably could through the Court-approved sale process. I have not received any offer of employment or any other incentive to support the sale to Caffe Nero.

21. Neither I nor any other insiders of Compass have any ownership, contractual, or other interests in Caffe Nero. It is an unrelated third-party. I observed nothing that would suggest that Caffe Nero was acting in collusion with any other party to suppress the sale price, was acting fraudulently, or was acting in bad faith.

22. Accordingly, based on my experience and direct involvement in the Debtor's marketing and sale processes, I believe that the proposed APA represents the highest and otherwise best offer available to the Debtor with respect to the Purchased Assets.

23. Harrison Suarez, through counsel, has objected to the sale. Immediately upon receipt of the request of counsel to Mr. Suarez, on or about January 26, 2026, I provided access to him to the Compass virtual data room. Despite my having provided such access, Mr. Suarez did not submit a bid to purchase any of the assets. Mr. Suarez, furthermore, does not own any interest in the assets Compass is selling. Mr. Suarez has a minority equity interest in Compass and may have a small unsecured claim. Compass is selling assets it owns, and Mr. Suarez's consent to the sale is not required under the Compass operating agreements.

24. The sale to Caffe Nero is, by contract, scheduled to close by March 6, 2026, at the latest. It is my belief that any delay in that closing would be extremely harmful to the estate and its creditors because, absent receipt of the sale proceeds or another source of funds, Compass will not be able to continue to pay expenses as they arise in the ordinary course, including the continuing costs of this Chapter 11 proceeding. With the closing of the sale, on the other hand, Compass should have the financial wherewithal to propose an appropriate wind-down process, whether through a Chapter 11 plan or otherwise, pay all administrative claimants in full, and make a distribution to unsecured creditors.

[*Remainder of Page Intentionally Left Blank*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 25, 2026
Washington, D.C.

                                             /s/ *Michael Haft*
                                             Chief Executive Officer
                                             Compass Coffee, LLC